1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2

STATE OF WASHINGTON, et al.,    )  Case No. 1:23-cv-03026-TOR
3                    Plaintiffs,  )
                                 )  March 28, 2023
4   vs.                          )  Spokane, Washington
                                 )
5                                )  Preliminary Injunction
   U.S. FOOD AND DRUG            )  Motion Hearing
6   ADMINISTRATION, et al.,       )
                     Defendants. )  Pages 1 - 28
7

                   BEFORE THE HONORABLE THOMAS O. RICE
8                   UNITED STATES DISTRICT COURT JUDGE

9   APPEARANCES:

10  For the Plaintiff State of    KRISTIN BENESKI
    Washington:                   COLLEEN M. MELODY
11                                NOAH G. PURCELL
                                  State of Washington Attorney
12                                General's Office
                                  800 Fifth Ave., Ste. 2000
13                                Seattle, Washington 98104

14  For the Defendants:           NOAH T. KATZEN
                                  MOLLY SMITH
15                                U.S. Attorney General's Office
                                  450 Fifth St. NW
16                                Washington D.C. 20530

17                                ARAVIND SREENATH
                                  FDA Office of Chief Counsel
18

19

20  Official Court Reporter:      Allison R. Anderson, RMR, CRR, CCR
                                  United States District Courthouse
21                                P.O. Box 700
                                  Spokane, Washington 99210
22                                (509) 458-3465

23

24

25  Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.

1          (Court convened on March 28, 2023, at 8:28 a.m.)

2          THE COURTROOM DEPUTY:  The matter now before the Court

3   is the *State of Washington, et al., versus the U.S. Food and*

4   *Drug Administration, et al.*, Case No. 1:23-cv-3026-TOR.  This is

5   the time set for a preliminary injunction motion hearing.

6          Counsel, please state your appearances for the Court and

7   record, beginning with the plaintiff.

8          MS. BENESKI:  Kristin Beneski for the plaintiffs.

9          THE COURT:  Good morning.

10          MS. MELODY:  Colleen Melody for the plaintiff states,

11   Your Honor.

12          THE COURT:  Good morning.

13          MR. PURCELL:  And Noah Purcell for the plaintiffs.

14          THE COURT:  Good morning.

15          MR. KATZEN:  Noah Katzen for the defendants, Your

16   Honor.  I have with me at counsel table Aravind Sreenath of

17   FDA's Office of the Chief Counsel and Molly Smith of the U.S.

18   Attorney's Office.

19          THE COURT:  And good morning to all of you.

20          I've read all the materials in the file.  I'll hear from

21   the plaintiff first.  Who will be speaking?

22          MS. BENESKI:  I will, Your Honor.

23          THE COURT:  Come to the podium and use the microphone,

24   please.

25          MS. BENESKI:  Can you hear me all right?

1          THE COURT:  Yes.

2          MS. BENESKI:  Thank you.  Kristin Beneski for the

3    state of Washington, on behalf of the 18 plaintiff states; and

4    Attorney General Ferguson and Attorney General Rosenblum are

5    with us in the courtroom today.

6          I understand from Ms. Fortenberry's email that I have

7    15 minutes, and I'd like to return after that for any rebuttal

8    time that may be permitted.

9          The 18 plaintiff states in this case represent 87 million

10   Americans with protected rights to reproductive freedom.  A

11   preliminary injunction is needed to preserve and protect that

12   freedom.

13         This case is about Mifepristone, which is an FDA-approved

14   drug that is part of the gold standard of care for abortion

15   within the first ten weeks of pregnancy and for treating

16   miscarriages early in pregnancy.  This drug has been on the U.S.

17   market since the year 2000.  It has been used by over 5 million

18   people in this country alone, and it has proven to be extremely

19   safe and effective, safer even than Tylenol.

20         Access to Mifepristone has never been more crucial or more

21   threatened.  Restricted access to abortion care is a full-blown

22   crisis, including in the plaintiff states, as health care

23   refugees turn to our states for care that has been outlawed

24   elsewhere.  This includes life-saving and essential abortion and

25   miscarriage care.

1    THE COURT:  I'm going to interrupt you.  The briefing

2   indicates that the January 2023 is the decision that you're

3   challenging; is that correct?

4        MS. BENESKI:  That's correct.

5        THE COURT:  What existed?  What were the restrictions

6   to this drug prior to January 2023?

7        MS. BENESKI:  It was many of the same restrictions,

8   including the provider certification requirement and the patient

9   agreement form prior to --

10        THE COURT:  So those existed.

11        MS. BENESKI:  Those existed.  And then prior to 2023,

12   there was no pharmacy certification requirement.  Instead, the

13   drug had to be dispensed by the provider.

14        THE COURT:  So the pharmacy couldn't dispense it at

15   all.

16        MS. BENESKI:  Correct, Your Honor.  But the reason

17   we're challenging these restrictions now is that in the wake of

18   the *Dobbs* decision, as I mentioned, access to reproductive

19   health care has become a full-blown crisis; and the impact of

20   the REMS, the unlawful and arbitrary REMS restrictions, the

21   impact of those is much more significant now than it ever has

22   been when prior REMS restrictions were imposed.

23        THE COURT:  Okay.  I'm reading from your brief, and

24   you indicate that there's three changes, and the first change

25   was the patient agreement form, but that's always existed; is

1  that correct?

2          MS. BENESKI:  That's correct.

3          THE COURT:  So that wasn't a change in 2023.

4          MS. BENESKI:  Well, we're challenging the REMS that

5  were imposed in January 2023.  We're challenging the FDA's

6  decision to reimpose restrictions on Mifepristone.  The FDA

7  could have decided to lift those, and it should have given the

8  crisis that we're facing; but instead, the FDA chose to reimpose

9  those restrictions, and that's what we're challenging.

10          THE COURT:  So you're seeking a mandatory injunction.

11  You're not going back to the status quo.  You're asking me to

12  mandatorily enjoin the FDA from reimposing the patient agreement

13  form.

14          MS. BENESKI:  No, Your Honor.  We're asking for a

15  prohibitory injunction against the FDA's enforcement or

16  application of the REMS restrictions, and this is the same form

17  of relief that was issued in the *ACOG versus FDA* case in the

18  District of Maryland, which enjoined the REMS restrictions

19  during the COVID-19 pandemic.  It's not a mandatory injunction.

20          THE COURT:  Okay.  The second issue that you raised in

21  your brief was that this drug can only be prescribed by a health

22  care provider who is specially certified.  Didn't that exist

23  prior to January 2023?

24          MS. BENESKI:  It did, Your Honor, but, again, the

25  impact of the REMS restrictions is far more significant now that

1  we're facing a crisis of care.  People from other states that

2  have outlawed abortion or restricted it heavily are coming to

3  our states, to the plaintiff states, for care that they can't

4  get in their home state, and the REMS restrictions limit the

5  number of providers who can prescribe this medication, which

6  overburdens our health care systems.  This is something that the

7  FDA itself has acknowledged elsewhere that when access to

8  Mifepristone is restricted, it overburdens state health care

9  systems, and it's a huge problem following the *Dobbs* decision.

10        THE COURT:  And how long has that been in effect, the

11  health care provider must be specially certified?

12        MS. BENESKI:  I believe it's been in effect the entire

13  time that Mifepristone has been approved, but it has always been

14  arbitrary and capricious.  It has always been unlawful.  It's

15  just that the impact of that is far more significant today than

16  it ever has been when the REMS were previously imposed.

17        THE COURT:  All right.  And then the third item in

18  your brief was that the FDA now allows pharmacies to distribute

19  the drugs if they're specially certified; yet prior to January

20  of 2023, pharmacies were never allowed.  So what's -- how's that

21  arbitrary and capricious?

22        MS. BENESKI:  It's arbitrary and capricious, Your

23  Honor, because Mifepristone ought to be available to the same

24  extent as any other prescription drug.  It's far, far safer than

25  many drugs that do not have any REMS restrictions at all.  The

1  pharmacy certification requirement is completely unique to

2  Mifepristone.  No other drug has this requirement; so it's

3  arbitrary and capricious to restrict this drug to a much greater

4  degree than drugs that are far less safe.

5          THE COURT:  Okay.

6          MS. BENESKI:  Thank you, Your Honor.  I will go ahead

7  and address the *Winter* factors, which are likelihood of success

8  on the merits, irreparable harm and the public interest and

9  equities.

10      Starting with likelihood of success, as the FDA is well-

11  aware, the evidence of Mifepristone's safety and efficacy has

12  only gotten more compelling as millions of people in the United

13  States have used this medication over the last 23 years; and by

14  statute, the restrictions the FDA has imposed on Mifepristone

15  can only be applied to inherently dangerous drugs, opioids being

16  one example.  Opioids are highly addictive and deadly.  They're

17  responsible for an epidemic that has killed more than a million

18  people in this country; and yet the REMS restrictions for

19  opioids, it's not mandatory, and it requires nothing more than

20  optional training for prescribers.

21      By contrast, Mifepristone has a better safety record than

22  Tylenol, aspirin, insulin, penicillin, Adderall, Viagra, and

23  just about every other commonly-used medicine.  Mifepristone is

24  extremely safe by any measure, and yet its REMS restrictions are

25  mandatory and unduly burdensome.  The FDA asks this Court for

1  near total deference to its decision, but the FDA cannot

2  disregard the limitations Congress placed on its authority nor

3  can it justify singling out an exceptionally safe drug for

4  uniquely burdensome restrictions.

5      This is illustrated, I think, most clearly by the fact that

6  the FDA does not impose any restrictions on Mifepristone when

7  it's used for a purpose other than abortion and miscarriage

8  care.  For abortion and miscarriage care, you take one

9  200-milligram pill one time.  That is subject to onerous REMS

10 restrictions.  If you take Mifepristone for Cushing's disease,

11 it's a 300-milligram pill up to four times a day every single

12 day over the long-term, and there are no REMS restrictions on

13 that usage.  This is the definition of arbitrary and capricious,

14 and it also violates the statutory requirement that REMS --

15 excuse me, that ETASU, the type of REMS at issue here, can only

16 be imposed on inherently dangerous drugs.

17     The REMS is causing irreparable harm in our states every

18 single day because it prevents patients from accessing

19 Mifepristone for no good reason.  This is much more harmful, as

20 I mentioned, now than it was the last time the FDA imposed a

21 REMS because now there is an access crisis across this country.

22 Because of the REMS restrictions, there are only a limited

23 number of specially-certified providers who can write a

24 prescription for Mifepristone, and that's not because other

25 providers aren't qualified.  Primary care providers, OB/GYNs,

1  and others have the basic skills needed to safely prescribe

2  medication abortion, but the REMS prohibits otherwise qualified

3  providers from prescribing an extremely safe drug.

4          THE COURT:  I need to interrupt you.  I need

5  clarification here.  Ever since this drug's been on the market,

6  though, it's been required to have specially-certified

7  providers; isn't that correct?

8          MS. BENESKI:  That's correct, Your Honor.

9          THE COURT:  All right.

10          MS. BENESKI:  And again, the reason that we're

11  challenging it now is because a situation that might have been

12  tolerable at a time in this country when everyone had a

13  constitutional right to access abortion care within the ten-week

14  window, for which Mifepristone is available, that world no

15  longer exists.  Now we have extremely restricted access to care

16  that is overburdening our health care systems, and so the REMS

17  restrictions that limit the universe of prescribers that can

18  prescribe this drug causes and exacerbates this access crisis.

19      The harms that are caused by the REMS are detailed

20  extensively in our briefing, and I won't spend too much time

21  going over them here.  All of these harms are well substantiated

22  by the undisputed record evidence that we've submitted, but I

23  would like to spend just a few minutes talking about the impacts

24  of the REMS on real people who rely on access to Mifepristone.

25      The people who are most hurt by the REMS restrictions are

1 those who live in rural medically-underserved areas, including

2 right here in eastern Washington.  The FDA was required by

3 statute to consider these impacts on rural and underserved

4 patients, but it did not do so.  In fact, it explicitly said in

5 its 2021 review that it would not consider these impacts.

6     The REMS hurt people who have the least available time and

7 resources to navigate complex and unusual pathways to care or to

8 travel to get care.  The REMS hurt people who already suffer the

9 worst disparities in health care outcomes at a time when

10 maternal mortality is rising in this country.  The REMS hurt

11 people who are the most vulnerable, such as people living with

12 domestic abuse, as amici in this case explain.  In this country,

13 a black woman is three to four times more likely than a white

14 woman to die a pregnancy-related death.

15     In states that protect the right to choose to end a

16 pregnancy, medication abortion offers the promise of broader

17 access to care that reduces disparities.  If the REMS

18 restrictions are lifted, which they should be, Mifepristone

19 could be prescribed by any qualified provider and dispensed by

20 any qualified pharmacy just like any other prescription

21 medication subject to all the same safeguards.  But the FDA's

22 decision to single out Mifepristone for disfavorable treatment

23 right now when we're -- they're experiencing the worst crisis in

24 access that has occurred in generations, this blocks people from

25 accessing this essential medication and causes widespread

1   irreparable harm.

2       Lastly, the public interest, which merges with the equities

3   here, overwhelmingly favors preserving and expanding access to a

4   safe, effective, and essential medication that's been available

5   for a generation and that people rely on as the gold standard of

6   care.

7       Turning to the plaintiff states' request for relief, the

8   Ninth Circuit has held that courts have broad discretion to

9   fashion equitable relief that addresses the specific needs of

10  the parties before them and the specific facts and circumstances

11  of the case; and here, our request for relief has two layers.

12      First, we seek an order prohibiting the FDA from taking

13  Mifepristone off the market or otherwise harming access to the

14  drug in our states.  This is a pure preservation of the

15  longstanding status quo, and it's crucial in part because the

16  FDA is a party to a case in Texas that seeks to undue its

17  longstanding approval of this extremely safe and effective drug.

18  The plaintiff states are not parties to that case, and the FDA

19  agrees, as I mentioned, that the states will suffer enormous

20  irreparable harm if the nationwide relief sought in the Texas

21  case were to be granted.

22      The REMS restrictions are bad enough, but losing access to

23  Mifepristone would be a catastrophe.  That is why we need a

24  court order protecting access in our states.  Our claims in this

25  case depend upon the FDA's correct determination over

1  twenty years ago that Mifepristone is safe and effective, and

2  our claims rely on the drug's continued availability.

3       The FDA opposes this relief but fails to offer any

4  assurances that the status quo will be preserved.  To the

5  contrary, the FDA's opposition to this relief and the dire

6  threat posed by the Texas lawsuit and other threats to access to

7  Mifepristone show why a court order is needed to protect access

8  in our states.

9       And for the second layer of relief, we seek an order

10 enjoining the FDA from applying or enforcing the REMS.  This is

11 necessary to prevent all the irreparable harms I've just

12 discussed and that are extensively detailed in our brief.  Even

13 though it's not a pure preservation of the status quo, courts

14 have awarded similar injunctive relief to prevent irreparable

15 harm during a crisis.  For example, as I mentioned, prior

16 Mifepristone REMS included an in-person dispensing requirement

17 that was enjoined during the COVID-19 pandemic, and those

18 restrictions were ultimately lifted.

19      The FDA did not create the current crisis in access to

20 abortion care, but the FDA is responsible for exacerbating that

21 crisis by deciding at this moment to impose the unlawful REMS

22 restrictions without considering the harm they would cause in a

23 post-*Dobbs* world.  These useless and harmful restrictions should

24 be enjoined while this case proceeds to the merits.

25      In conclusion, Your Honor, the REMS exacerbate the crisis

1  that is impacting reproductive rights every day, including in

2  states where those rights are protected, and these restrictions

3  must be enjoined to prevent further irreparable harm.

4     Additionally, an injunction is needed to keep Mifepristone

5  on the market in our 18 states and to prevent the massive

6  irreparable harm that would be caused by a radical departure

7  from the status quo.  If the Court has no further questions,

8  I'll reserve my remaining time.

9           THE COURT:  I have no further questions at this time.

10          MS. BENESKI:  Thank you.

11          MR. KATZEN:  Good morning again, Your Honor.

12          THE COURT:  Good morning.

13          MR. KATZEN:  Plaintiffs say that they seek an order

14  that would preserve the status quo, but the reality here is far

15  different.  They seek a preliminary injunction that would --

16  that would set aside FDA's existing determination that

17  Mifepristone is safe with particular restrictions and replace it

18  with plaintiffs' own determination that Mifepristone is safe

19  without any restrictions.  Not only is that not the status quo,

20  it has never been the status quo in the entire 22 years that the

21  drug has been on the market.

22     Moreover, plaintiffs request this extraordinary relief

23  despite never having properly presented their evidence and

24  arguments to the agency and despite the fact that the agency

25  action they challenge, the January 2023 REMS modification,

1  actually reduced restrictions on Mifepristone and made them less

2  burdensome than they've been the entire time the drug has been

3  on the market.  The Court should deny the motion for a

4  preliminary injunction because plaintiffs have met none of the

5  factors; and even if they had met all of the factors, the relief

6  that they seek is plainly beyond any permissible scope.

7       I'll begin first with irreparable harm, which is -- the

8  plaintiffs' failure to show irreparable harm, which is in and of

9  itself a basis for denying the motion for preliminary injunction

10  and is also relevant because they assert irreparable harm as a

11  basis for being excused from the exhaustion requirement.  The

12  easiest way to see why plaintiffs have failed to show

13  irreparable harm is to ask how are they worse off as a result of

14  the January 2023 REMS modification than they were before the

15  January 2023 REMS modification?  The answer is they're not.

16       Let's look at what the January 2023 modification did.  It

17  did three things.  First, it retained two requirements, the

18  prescriber certification requirement and the patient agreement

19  form, that have been in continuous effect since the drug was

20  approved in 2000.  Plaintiffs cannot credibly claim irreparable

21  harm from having to comply with two restrictions that they've

22  been complying with for over twenty years and did not during

23  that whole time seek relief from the agency through a citizen

24  petition or filing an action in this court.

25       The second thing that the 2023 REMS modification did is it

1  eliminated the in-person dispensing requirement.  Plaintiffs do

2  not claim irreparable harm from that.  In fact, they favor that.

3      And the third thing that the 2023 REMS modification did is

4  that it permitted something that had previously been prohibited,

5  namely dispensing the drug by pharmacy.  Now, to be sure, FDA

6  didn't go as far as plaintiffs would like.  The pharmacies have

7  to be certified to dispense Mifepristone.  But nonetheless, FDA

8  didn't burden any activity that states were permitted to engage

9  in prior to January 2023.  Prior to January 2023, no pharmacy

10 could dispense Mifepristone under the REMS; and after

11 January 2023, certified pharmacies can dispense Mifepristone

12 under the REMS.  That doesn't make plaintiffs worse.

13     THE COURT:  Let me stop you there.  What other drug

14 requires pharmacy certification?

15     MR. KATZEN:  I'm not -- pharmacy certification, I

16 believe, is one of the possible -- one of the statutorily

17 possible elements to assure safe use.  I don't have another

18 example off the top of my head of such a drug, but there are

19 other drugs, including -- that have elements to assure safe use,

20 including drugs where the -- where one drug product has a REMS

21 and another drug product doesn't have a REMS, even though they

22 have the same active ingredient, but I don't know of another --

23 there may be another drug.  I'm just not aware of one, Your

24 Honor.

25     THE COURT:  Well, I'm trying to understand how

1  pharmacy certification provides any safety to the patient if the

2  patient's already signed a patient agreement form and the

3  certified health care provider is certified to prescribe the

4  drug.  So what role does the pharmacy certification play?  It

5  doesn't seem --

6        MR. KATZEN:  It helps ensure that the provider

7  certification -- the integrity of the provider certification

8  requirement is maintained.  Prior to January 2023, the drug

9  could only be dispensed in person by the provider, who was

10  certified.  Now it can be dispensed by pharmacies; and to make

11  sure -- and to help make sure that the integrity of that

12  requirement is maintained, the pharmacies themselves have to be

13  certified.

14        THE COURT:  So the pharmacy's --

15        MR. KATZEN:  This was --

16        THE COURT:  -- overlooking the health care provider's

17  certification?

18        MR. KATZEN:  The pharmacy has to receive the

19  certification from the provider and verify that the provider is

20  certified.  This was essentially the trade-off that FDA decided

21  was necessary in order for it to conclude that there was

22  sufficient evidence of safety to remove the in-person dispensing

23  requirement, which, of course, was more burdensome than the

24  pharmacy certification requirement because it prohibited

25  pharmacies from dispensing the drug altogether.

1        THE COURT:  All right.

2        MR. KATZEN:  So plaintiffs do not suffer any

3   irreparable harm as a result of the January 2023 action.

4        Let me just turn to exhaustion.  Plaintiffs don't claim

5   that they filed a citizen petition, but they offer a number of

6   reasons why it shouldn't matter, one of which is that they

7   suffer irreparable harm.  Well, for the reasons I just

8   explained, they don't suffer irreparable harm from the

9   January 2023 action.  But even if they did suffer some

10  irreparable harm from the January 2023 action, that still would

11  not explain why they failed to exhaust administrative remedies

12  before January 2023.  Again, two of the requirements they

13  challenge have been in effect for 20 -- for 22 years.

14       The third requirement, the pharmacy certification

15  requirement, was first announced by FDA back in December,

16  December 16th, 2021, which means that any time after

17  December 16th, 2021, plaintiffs could've filed a citizen

18  petition with FDA challenging all three requirements and asking

19  FDA to refrain from approving a supplemental drug application

20  proposing modifications to the REMS with those three

21  requirements.  They have offered no excuse for their failure to

22  do so.  Even assuming they could have done so until *Dobbs*, *Dobbs*

23  was in June of 2022, with plenty of time to file a citizen

24  petition, especially since they did not know at the time that

25  the FDA was going to approve supplemental applications modifying

1  the REMS in January 2023.

2      The next excuse that plaintiffs offer for not exhausting

3  their administrative remedies is they claim those remedies were

4  effectively exhausted by the 2022 ACOG citizen petition.  The

5  ACOG citizen petition, however, was very different, Your Honor.

6  It contained two requests to FDA besides its request for

7  enforcement discretion.

8      The first request was that FDA direct the application

9  holder from Mifeprex to submit a supplemental new drug

10  application proposing miscarriage management as a new approved

11  indication for Mifepristone.  Miscarriage management is not an

12  approved indication for Mifepristone.  The second request -- and

13  this is the key -- was to -- was that FDA modify the REMS so as

14  not to unduly burden that new use, meaning miscarriage

15  management.

16      So it makes perfect sense that when FDA denied the first

17  request, because it is up to the application holder to decide

18  what uses to seek approval for, it denied the second request

19  relating to REMS modification as premature, not on the merits

20  but as premature because miscarriage management was not and is

21  not an approved indication for Mifepristone.  So that response

22  says nothing whatsoever about how FDA would've responded to a

23  citizen petition that raised the issue that plaintiff raised in

24  this case -- that raised -- that asked FDA to modify or

25  eliminate the REMS to -- in light of, for instance, the burdens

1  of *Dobbs* or the recent evidence from 2022 or the expert

2  declarations attached to plaintiffs' motion to modify or

3  eliminate the REMS so as not to burden the existing approved use

4  of abortion.

5      And even if FDA had substantively addressed ACOG's citizen

6  petition request for modification of the REMS, that still

7  wouldn't bear on the question here because when FDA considers

8  scientific evidence, including evidence relating to the burdens

9  of the REMS or the safety of Mifepristone or anything else, it

10  views that evidence in the context of the specific question

11  that's being asked; and since ACOG's citizen petition was asking

12  a very different question, asking FDA to do very different

13  things than what plaintiffs are asking here, any answer that FDA

14  would've -- could conceivably have given, even if the ask by

15  ACOG were not premature, would have no bearing on the issue in

16  this case.

17      And the third and final excuse plaintiffs give for not

18  exhausting their administrative remedy is they say that their

19  claim just involves the same issues that were presented to the

20  agency before 2022.  Well, I think that's belied by the entire

21  emphasis that plaintiffs put on the burdens that have arisen,

22  they say, in the wake of the *Dobbs* decision, which was decided

23  in 2022.  It's also belied by the fact that they cite studies

24  from 2022, including the Canadian study, that forms their

25  primary evidence that Mifepristone's safety profile isn't at all

1  attributable to the fact that it has been operating with a REMS

2  since its approval.

3       Moreover, it includes the declarations that contain expert

4  opinions that plaintiffs cite as evidence going to the merits of

5  this dispute appended to their motion for a preliminary

6  injunction, which were obviously not before the agency before

7  2022.  And this is important because FDA's exhaustion

8  requirement, part of it, at 21 CFR 10.45(f), says that one thing

9  a plaintiff has to do before relying on information and views

10  that were not before the agency at the time of its initial

11  decision is if they want to rely on such information or reviews,

12  they have to put it before the agency in a new citizen petition,

13  and it is indisputable that plaintiffs failed to do so here.  So

14  failure to exhaust administrative remedies, apart from their

15  failure to show irreparable harm, is another reason to deny

16  plaintiffs' motion for a preliminary injunction.

17       I'll move next to standing, and I'm going to make one point

18  about standing here going to the redressability point.  Then I'm

19  going to tie it into plaintiffs' broader request for relief, and

20  then I'll get to the merits.  As I said, plaintiffs have a broad

21  request for relief that goes well beyond enjoining the action

22  that they say was unlawful, the final agency action they're

23  challenging, namely the January 2032 REMS modification.  They're

24  also asking for an injunction that would preclude future

25  decisionmaking by FDA on the REMS or anything else, whatever it

1  could be, that would in their view make the drug less available

2  than it currently is.

3      They're not entitled to that relief under basic principles

4  of injunctive relief and under the APA.  Their relief would have

5  to run against the final agency action.  They've challenged the

6  final agency action that they say is unlawful; so the question

7  for redressability on standing is would an order that runs

8  solely against the agency action that they are challenging here

9  redress their injuries?  They have offered no theory as to how

10  it would.  They have not alleged that it would.

11      And in fact, in their reply brief on Page 16, they say that

12  the minimum relief that they would need in order to have their

13  injuries redressed would be an order that goes beyond the final

14  agency action here and precludes future agency decisionmaking

15  with regard to the REMS.  Since they can't get that relief and

16  the only relief that they could get if they met all four

17  preliminary injunction factors is not relief they say would

18  redress their injuries, they fail to show redressability for any

19  of their injuries, and that is an additional basis for they lack

20  standing and that their motion for preliminary injunction should

21  be denied.

22      Now I'll turn briefly to the merits.  I'm not sure how much

23  time I have.  I'll just start with kind of a broad point about

24  what it is that the agency was doing in 2021 when it undertook

25  its REMS review, which culminated in the January 2023 action

1   that plaintiffs challenge.  Contrary to what plaintiffs have

2   suggested, FDA was not deciding whether on a tabula rasa to

3   impose a REMS with elements to assure safe use.  FDA originally

4   imposed the elements to assure safe use in this case under its

5   subpart (h) regulation before the REMS statute was enacted.

6        When Congress enacted the REMS statute in 2007, it ratified

7   FDA's decision to impose elements to assure safe use by

8   providing that drugs with existing subpart (h) restrictions like

9   Mifepristone would be deemed to have in effect a REMS with

10  elements to assure safe use.  So the question for FDA by 2021

11  was whether, in the language of the REMS statute's modification

12  provision at 355-1(g)(4), to add or modify or remove any of the

13  existing elements to assure safe use that were part of the

14  existing REMS, and FDA came ultimately to a mixed decision on

15  that point.  It decided two of the requirements should be

16  retained, it decided a third should be omitted, and it decided a

17  fourth should be added.

18       The question is whether -- and FDA undertook its analysis

19  by asking whether since its last REMS modification in 2016 there

20  was any evidence that justified taking such a step.  That is the

21  window through which FDA's decision in 2023 to approve a REMS

22  modification in its decision in December of 2016 that the REMS

23  must be modified, as it eventually was, should be judged, and we

24  submit that FDA's decision on that point was reasonable and not

25  arbitrary and capricious.

1    THE COURT:  I have one question.  Your briefing

2   indicates that you've expanded the use of this drug by allowing

3   pharmacies now to distribute it, but that doesn't take away the

4   health care provider's ability to provide it directly to the

5   patient, does it?

6    MR. KATZEN:  No.  A provider can still dispense the

7   drug in person.  The states and pharmacies still have every

8   option that they had prior to January 2023 to dispense first;

9   they just have a new additional option now.

10    THE COURT:  All right.

11    MR. KATZEN:  Thank you, Your Honor.

12    THE COURT:  All right.  I'll hear a couple minutes of

13   rebuttal.

14    MS. BENESKI:  Thank you, Your Honor.  I'd like to

15   touch briefly on the exhaustion issue.  These same issues that

16   we're raising in this case have been raised at least a dozen

17   times since 2015.  If you look at the Hughes declaration,

18   Exhibit M, there's a chronology of all the times these same

19   issues have been raised, and it's not just the ACOG petition

20   from last fall.  The FDA conducted what it described as a full

21   review of the Mifepristone REMS in 2021; and as part of that,

22   the FDA received multiple letters from leading health care

23   organizations and professional organizations in this country,

24   including the American Medical Association, representing the

25   nation's obstetricians, gynecologists, family physicians and

1   others.

2       There's a broad consensus in the medical field that the

3   Mifepristone REMS are unsupported by scientific evidence and

4   should be lifted, and the FDA was aware of all of this.  Those

5   letters that the FDA received as part of the 2021 full review

6   cite the same evidence that we cite in our briefing, including

7   the Canadian study that the FDA chose to disregard; so these

8   issues are both exhausted and futile.

9       To touch on the point about why the harm is so much more

10  salient now than it has been and why we didn't challenge the

11  REMS previously, we had every reason to believe that the FDA was

12  taking this crisis, this post-*Dobbs* crisis, seriously.

13  Secretary Becerra, after the *Dobbs* decision, released a

14  statement saying that, "Working to increase access to this

15  drug," Mifepristone, "is a national imperative and in the public

16  interest."  As part of those same comments, Secretary Becerra

17  recognized that Mifepristone is part of the gold standard of

18  care for miscarriage.  He also said, "If there's something we

19  can do to protect access, we will find it and we will do it."

20  So it wasn't until January 2023 that we realized that the FDA

21  was in fact not going to take Secretary Becerra's comments

22  seriously and reimpose -- reimpose the unlawful and arbitrary

23  REMS restrictions.

24      The Court asked several questions during my initial

25  comments about why we're harmed now if the REMS have been in

1  place for such a long time, and I want to emphasize again the

2  prior REMS restrictions were issued under much different

3  circumstances in which there was a universal constitutional

4  right to abortion at the federal level.  The FDA completely

5  ignores the changed circumstances in which it reissued these

6  REMS restrictions.  The REMS have always been arbitrary and

7  discriminatory, but now they are exacerbating the crisis that

8  has emerged in the last year, a crisis recognized by Secretary

9  Becerra himself.

10      Before the *Dobbs* decision, no one could be prosecuted for

11  providing or facilitating an abortion or miscarriage care that

12  might be characterized as an abortion.  That is an irreparable

13  harm by itself to our state providers who have to sign these

14  forms and who have to get certified and identify themselves as

15  abortion providers and put themselves in danger by getting

16  certified.  These harms are brand new in the wake of the *Dobbs*

17  decision.

18      One thing I did not hear during Counsel's presentation was

19  any discussion of the real public interests at stake here.  I

20  heard about the FDA's institutional concerns and its desire for

21  deference, but Counsel did not even acknowledge the interests of

22  real people who need access to this essential medication.  For

23  them, this issue is not an abstraction.  It is their lives and

24  their health, and the REMS restrictions are impacting their

25  lives and their health every single day.

1    Again, it's not as though defendants are unaware of this.

2  Secretary Becerra's comments, which are at Hughes Exhibit G to

3  our reply and they're also cited in our complaint, they make

4  very clear that Secretary Becerra believes that this is a crisis

5  and that expanding access to Mifepristone is a national

6  imperative.  So it's inexplicable that the FDA would not take

7  this into account when imposing senseless restrictions on a

8  medication women need that is safer than Tylenol, aspirin,

9  penicillin, and just about every other commonly-used drug, and

10 it's inexplicable that the FDA is fighting so hard to remain

11 free to pull this extremely safe medication off the market at a

12 time when people need it more than ever.

13   Access to Mifepristone, the baseline of access that exists

14 today, is a necessary predicate to the ultimate relief that

15 we're requesting, and this Court has the power to enjoin the FDA

16 from changing that status quo in order to prevent irreparable

17 harm; in other words, to prevent the egg from being scrambled --

18 that's the terminology that courts addressing similar issues use

19 -- to preserve the plaintiffs' ability to obtain ultimate

20 relief.

21   These issues that we're addressing today can seem abstract

22 from the inside of a courtroom, but the declarations we've

23 submitted and the briefs filed by amici are powerful messages

24 from people who care for patients every day and see the harmful

25 impacts of the FDA's actions every day.  The REMS restrictions

1  are exacerbating the crisis of scarce access to essential

2  reproductive health care and the climate of fear and uncertainty

3  surrounding it.  The states ask that the Court grant their

4  motion for a preliminary injunction.

5          THE COURT:  All right.  Thank you, Counsel.  I'll take

6  this matter under advisement and issue a written decision as

7  promptly as I can.  That concludes today's hearing.

8          THE COURTROOM DEPUTY:  All rise.

9       (Court adjourned on March 28, 2023, at 9:10 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, ALLISON R. ANDERSON, do hereby certify:

4        That I am an Official Court Reporter for the United States

5   District Court for the Eastern District of Washington in

6   Spokane, Washington;

7        That the foregoing proceedings were taken on the date and

8   place as shown on the first page hereto; and

9        That the foregoing proceedings are a full, true, and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12       I do further certify that I am not a relative of, employee

13  of, or counsel for any of said parties, or otherwise interested

14  in the event of said proceedings;

15       DATED this 4th day of April, 2023.

16

17  _____
    ALLISON R. ANDERSON, RMR, CRR
18  Washington CCR No. 2006
    Official Court Reporter
19  Spokane, Washington

20

21

22

23

24

25