# Exhibit C

# TWO SIDES
## OF THE SAME COIN:
### Integrating Economic and Reproductive Justice

© Reproductive Health Technologies Project August 2015

## ACKNOWLEDGMENTS

The Reproductive Health Technologies Project (RHTP) would like to thank Myra Batchelder for her substantial contributions to this report; Deepika Srivastava for her research assistance; Chris Olah for copy editing; SKDKnickerbocker for design; the following reviewers for their invaluable input: Christine Dehlendorf, Lawrence B. Finer, Andrea Flynn, Diana Greene Foster, Heather Gould, Andrea Miller, and Shira Saperstein; and the RHTP funders who make our work possible.



The Reproductive Health Technologies Project
1634 Eye Street NW, Suite 650
Washington, DC 20006

www.rhtp.org

# EXECUTIVE SUMMARY

Access to comprehensive reproductive health care, including abortion, is essential to women's economic security. Yet many progressive politicians and advocates often ignore this important connection. This report delineates the many links between these topics—including that family planning increases women's economic opportunity, lack of supports for pregnant and parenting women interferes with their economic stability, and there is an unfulfilled potential for reproductive health care to help create economic security—and the need to integrate both issues into any proactive policy agenda to achieve equality for women.

The report also draws on critical new data from a longitudinal study conducted by Advancing New Standards in Reproductive Health (ANSIRH) at University of California, San Francisco. That study, known as the Turnaway Study, tracks what happens to women who seek but are "turned away" from the abortion care they need. We then analyze the study's key findings—including the impact on the subjects' economic status, health, and relationships—as well as other data to develop a rich picture of the interplay between women's access to reproductive health care and their economic security.

Highlights related to abortion access and economic security include:

## 1 Most women who seek abortion are already struggling financially.

Over two-thirds of women (69 percent) obtaining abortions have incomes below 200 percent of (*i.e.*, twice) the federal poverty level (FPL), according to the Guttmacher Institute. The Turnaway Study found even more striking results: Among the women in the study who reported their household income, **two-thirds were poor,** meaning they lived below 100 percent FPL.

## 2 The most commonly cited reasons for seeking an abortion are financial concerns.

The most common theme that arose in the Turnaway Study was women not feeling financially prepared to have a baby (40 percent), meaning that they had general financial concerns, were unemployed or underemployed, were uninsured or could not get welfare, or did not want government assistance. In other words, **they could not afford to have a child.**

**3** **Women denied an abortion are more likely to be in poverty two years later.**

At the time they presented at a clinic, the women turned away from the abortion care they sought were on similar socio-economic footing with the women who obtained abortions.  However, two years later, according to preliminary analysis, women denied an abortion had **three times greater odds of ending up below the federal poverty line,** adjusting for any previous differences between the two groups.

**4** **Many women cannot afford the cost of an abortion.**

The median price of an abortion in the Turnaway Study ranged from $450 for a first trimester abortion to $1750 for an abortion at 20 weeks or beyond. Total out-of-pocket costs for abortion paid by women and their family and friends ranged from $0 to $3,700. For more than half the women who had an abortion, out-of-pocket costs for the procedure and travel were equivalent to **more than one-third of their monthly personal income.**

**5** **Insurance bans create additional financial hardships.**

Restrictions on insurance coverage of abortion—both public (*i.e.,* Medicaid) and private— make it difficult for women to afford the cost of the procedure. When public or private insurance was not avail-able, **median costs** to women obtain-ing abortions in the Turnaway Study **amounted to $575.**

**6** **Women often make great sacrifices to obtain the money needed for an abortion.**

Many women **divert funds from necessi-ties** like food, electricity, or rent in order to pay for the unexpected costs of an abortion.

**7** **Economic barriers delay abortion care.**

More than half the women (54 percent) who had an abortion in the Turnaway Study said that **raising money** for their abortion **delayed them in obtaining care,** which raises the cost and complex-ity of the procedure. Being nonwhite and having a pregnancy at a later gestational age were associated with higher odds of cost being a reason for delay in obtain-ing an abortion.  Not having Medicaid or private insurance coverage also was associated with citing cost as a reason for delay.

**8** **Later abortion poses a higher financial burden.**

**As a pregnancy progresses, the cost of an abortion rises,** which leads to a phenomenon sometimes called "chasing the money." And the social and economic barriers that surround early abortion care are further compounded when seeking later abortion care. Women needing such care often must travel longer distances and face increased travel costs.

**9** **Financial barriers can be a complete obstacle to abortion care for some women.**

Approximately **one in four poor women** who would have an abortion if Medicaid funding were available instead **carry their pregnancy to term** because they cannot secure the needed funds. More than one in five turnaways said they con-sidered having an abortion elsewhere but never obtained one. Among this group, **85.4 percent reported proce-dure and travel costs** as the reason they were not able to obtain an abortion somewhere else.

The implications of these findings for the eco-nomic well-being of women and their children are not insignificant given that approximately one in three women in the U.S. will have an abortion in her lifetime and nearly two in three women are already mothers when they have an abortion.

The inescapable conclusion is that those developing strategies to keep women out of poverty cannot overlook access to abortion care, along with other reproductive health services such as contraception, prenatal care, and screening and treatment for reproductive cancers, HIV, and sexually transmitted infections.

At the same time, these findings should come as no surprise. It has been well-established that a woman's capacity to manage her fertility and determine whether and when to have children is intimately tied to her ability to pursue her life goals and take care of herself and her family. Because a woman's reproductive years directly overlap with her time in school and the workforce, she must be able to prevent unintended pregnancy in order to complete her education, maintain employment, and achieve economic security.

For instance:

- The annual cost of raising a child can range from $9000 to more than $25,000.
- Families living below the poverty line spend **30 percent of their monthly income** on child care.
- In a survey of individuals filing for bankruptcy conducted by then-Professor Elizabeth Warren and colleagues, 7 percent of respondents identified the birth of a child as a reason for their bankruptcy.
- Women saved approximately **$483 million on birth control pills** in 2013 due to the Affordable Care Act's (ACA) guarantee of no-cost coverage of contraception.
- The birth control pill is estimated to be responsible **for nearly one-third (31 percent) of the narrowing of the gender wage gap** witnessed in the 1990s.
- Studies have shown that when women can plan their families, their children have better outcomes with regard to education and wages.

According to the *Shriver Report: A Woman's Nation Pushes Back from the Brink*, 42 million women—and the 28 million children who depend on them—are "living one single incident—a doc-tor's bill, a late paycheck, or a broken-down car—away from economic ruin." **The Turnaway Study demonstrates that a birth resulting from an unintended pregnancy is another such incident that can upend the financial security of a woman and her family.**

Moreover, voters recognize that any women's economic empowerment agenda is incomplete without policies that further access to comprehensive reproductive health care. Surveys conducted by the National Institute for Reproductive Health (NIRH) in New York, Pennsylvania, and Virginia found that "voters intuitively recognize links between control over one's reproductive decision-making—including access to abortion—and financial stability and equal opportunities."

Put simply, the anti-poverty agenda—affordable housing, health insurance, education, supplemental nutrition, a living wage, paid sick and family leave, child care and reliable public transportation—is incomplete without affordable, comprehensive reproductive health care, including contraception to prevent unintended pregnancies and abortion care to end such pregnancies when that is what a woman has determined is the best course under her circumstances. After all, the woman struggling to pay for contraception or abortion services is also the woman trying to find a job, pay her bills, and feed her children.

The policy solutions are quite clear: ensure access to contraception, remove barriers to abortion care, and provide economic supports for women who choose to carry their pregnancies to term.

Policies targeting poor women have led to a tattered and torn safety net. But progressives can work to repair it by advocating for economic and reproductive justice together, by standing up to the constant attacks on abortion and contraception, and by developing proactive measures that promote a vision of poor women's self-determination alongside their self-sufficiency. The economic and reproductive rights of all women will never be secure until we do.

> Put simply, the anti-poverty agenda... is incomplete without affordable, comprehensive reproductive health care.

# INTRODUCTION

There is likely no decision that has a greater economic impact on a woman's life than having—or not having—a child. Sadly, this obvious fact is often ignored, even by progressive politicians and advocates. They may know that access to comprehensive reproductive health care, including birth control and abortion, is essential to women's economic security, but too often they overlook this connection when it matters most.

For instance, in July 2013, House Leader Nancy Pelosi and other House Democratic women introduced "When Women Succeed, America Succeeds: An Economic Agenda for Women and Families," which addressed equal pay, work-family balance, and child care but included no mention of reproductive health care.[1]

Likewise, in the spring of 2014, the White House, the Department of Labor, and the progressive think tank the Center for American Progress launched a series of local forums around the country to discuss working families, culminating in a national Summit on Working Families in Washington, D.C. that June.[2] The conversation focused on a wide range of topics such as workplace flexibility, accommodations for pregnant workers, affordable child care, paid sick and family leave, the gender pay gap, and expanding women's participation in non-traditional occupations such as Science, Technology, Engineering, and Math (STEM). Again, however, reproductive health care was noticeably absent from the agenda.[3]

All of the above economic issues are critical to realizing reproductive justice[4]—as people cannot carry pregnancies to term and raise their children with dignity without economic security and workplace fairness. But it is striking that our country's progressive leaders would attempt to have a national dialogue about family economic well-being without some acknowledgment of the role that access to comprehensive reproductive health care plays in ensuring economic security, especially for low-income women who cannot afford to pay for such services out of pocket.

That said, it is somewhat easy to understand the inclination to avoid discussion of reproductive rights in the context of a proactive economic agenda. The controversial nature of any political debate about reproductive health care and the central role abortion continues to play in our nation's so-called culture wars are clear driving forces in this trend. Moreover, past policy efforts to link birth control with economic security have been met with derision by political conservatives and the press—such as when a family planning provision was inserted in the 2009 stimulus package and President Obama quickly urged Congressional Democrats to remove it at the first hint of blowback,[5] or in the 2012 election cycle when debate over contraception was dismissed as a distraction from "real issues" like jobs and the economy.[6]

But succumbing to such social pressures and leaving access to abortion and contraception out of economic policy conversations creates a huge missed opportunity to educate the public about the important relationship between these issues. It also represents a substantial political miscalculation, given polling that shows large majorities of voters already intuitively understand these topics are linked and support comprehensive policy solutions.[7]

In this report, we first delineate some of the many interconnections between reproductive health and economic security. We then examine the impact of access to abortion specifically on women's economic status, health, and relationships. In particular, we draw on critical new—and still emerging—data from a longitudinal study conducted by Advancing New Standards in Reproductive Health (ANSIRH) at the University of California, San Francisco (UCSF). That study, known as the Turnaway Study, tracks what happens to women[8] who seek but are "turned away" from the abortion care they need.

Ultimately, we conclude that anyone who wishes to advance the economic security of women and their families will not be able to do so effectively without integrating access to reproductive health care into a proactive policy agenda to achieve economic equality for women.

> Anyone who wishes to advance the economic security of women and their families will not be able to do so effectively without integrating access to reproductive health care into a proactive policy agenda to achieve economic equality for women.

# THE BIG PICTURE:
# CONNECTIONS BETWEEN REPRODUCTIVE HEALTH AND ECONOMIC SECURITY

## Family planning increases women's economic opportunity

A woman's capacity to manage her fertility and determine whether and when to have children is intimately tied to her ability to pursue her aspirations and support herself and her family. Because women's reproductive years directly overlap with their time in school and the workforce, they must be able to plan their pregnancies in order to have the best opportunity to achieve their education, employment, and economic goals.

Biologically, a woman is most fertile between the ages of 20 and 35,[9] and the average American woman is nearly 26 when she has her first child.[10] It is a striking but often overlooked fact that, on average, women in the U.S. spend more than 30 years trying to prevent pregnancy and only five years pregnant, postpartum, or trying to become pregnant.[11]

Notably, these fertile years are typically the time when women are trying to complete their education, join the workforce, and build their careers.[12]

As economists Claudia Goldin and Lawrence Katz first established, access to oral contraceptives (i.e., "the pill") has been an essential component of women's ability to delay marriage and childbearing, obtain college and professional degrees, and secure better employment opportunities.[13] As a result of the marriage and childbearing delays spurred by the advent of modern contraception, the average age of U.S. women at the time of their first birth increased from 21.4 to 25.0 years in the period between 1970 and 2006.[14] Moreover, due to an increasing decoupling of marriage and childrearing, we are now

seeing the age of first marriage (26.5) exceed the age of first birth (25.8) for the first time.[15]

By creating predictability around pregnancy and childbearing—and thereby minimizing the economic and social opportunity costs of pursuing higher education—the pill empowered women to make long-term career investments.[16] Moreover, Goldin and Katz found that by making marriage delay more normative, the pill encouraged career investments even for women not using birth control.[17] Subsequent research also suggests that women's use of contraception may have indirectly led to modest increases in educational attainment among their male partners.[18]

> It is a striking but often overlooked fact that, on average, women in the U.S. spend more than 30 years trying to prevent pregnancy and only five years pregnant, postpartum, or trying to become pregnant.

As women began to join the workforce in greater numbers, their families increasingly began to rely on their earnings. To wit, economist Heather Boushey testified before Congress: "In recent decades, the families that were upwardly mobile were those who had a working wife."[19] One study by the Center for American Progress found that had women's employment patterns not changed over the past three decades, middle-class families would have substantially reduced incomes today.[20] Another study by the same organization determined that more than half of married mothers provide at least a quarter of their families' wages.[21] The report concludes simply: "Women's earnings contributions to their families are necessary in order to provide economic security."[22]

Women's large-scale entrance into the formal workforce not only benefitted themselves and their families, it also contributed to economic growth overall. According to the Roosevelt Institute, women's participation in the labor market in the 1970s and 1980s propelled nearly 20 percent of real GDP growth.[23] However, due to a commercial and policy climate that has failed to keep pace with changing family and labor patterns, these trends may be starting to reverse. While the workforce participation rate of women ages 15 and older in the U.S. increased by more than 20 percentage points in the second half of the 20th century, it has dropped by three points in the first 15 years of this century, even while that rate has been increasing in most other developed countries.[24] Some of this backsliding may have been accelerated by the Great Recession—women have gained only one in seven jobs added to the private sector during the economic recovery.[25] Still, at 47 percent, women remain nearly half of U.S. workers.[26]

Family planning also has numerous proven health benefits for women and their children, which in turn lead to health savings for families and for society overall. For instance, women who are able to space their pregnancies with at least six months in between a birth and a subsequent conception are more likely to avoid the adverse birth outcomes of preterm birth, low birth weight, or small size for gestational age.[27] Women with planned pregnancies are also more likely to initiate prenatal care earlier than those with unintended pregnancies, to receive more prenatal care throughout pregnancy, to have higher breastfeeding rates, and to breastfeed longer.[28]

The Guttmacher Institute has estimated that federally funded family planning services in 2010 prevented 2.2 million unintended pregnancies, which averted 287,500 closely spaced pregnancies and 164,190 preterm and low birth weight births, resulting in a savings of $15.7 billion.[29] This amount does not include savings from other health benefits noted above, such as improved uptake of breastfeeding.

The multiple benefits of contraception have led to near-universal usage: 98 percent of women who have had sex with a man have used at least one method of modern contraception in their lifetime.[30]

## Lack of supports for pregnant and parenting women interferes with their economic stability

While completing one's education often means delaying full-time employment, as the Guttmacher Institute notes, it also commonly results in better job opportunities, higher income, and increased social influence, which in turn all lead to greater economic stability.[31] Yet pregnant and parenting students often lack support on campus and face many barriers to completing their education. For instance, nearly two-thirds (61 percent) of women who have children after enrolling in community college fail to finish their education.[32]

In 2012, 4.8 million financially independent college students had dependent children of their own.[33] Parent students are more likely to be first-generation college students and low-income, the latter especially if they're single – 88 percent of single parent students live at or below 200 percent of the federal poverty level (FPL).[34]

Women represent 7 out of 10 student parents and nearly 80 percent of single student parents are female.[35] Women of color are more likely than



For the first time, age of first birth is before age of of first marriage

First Birth    25.8 YEARS
First Marriage    26.5 YEARS

Sarah Jane Glynn, "Breadwinning Mothers, Then and Now," Center for American Progress (Washington, DC: June 2015), https://cdn.americanprogress.org/wp-content/uploads/2014/06/Glynn-Breadwinners-report-FINAL.pdf

0    10    20    30    40    50
Age

other college students to be parents—among student parents, 47 percent are African American women, 39.4 percent are Native American women, and 31.6 percent are Latinas compared to 29.1 percent who are white women.[36] Parents of color in college are more likely to be low-income than their white counterparts: approximately 70 percent of black and Latino student parents live at or below 200 percent FPL versus nearly 50 percent of white student parents.[37]

Despite the clear assistance needed by student parents, few states count college attendance as an approved work activity under Temporary Assistance for Needy Families (TANF).[38] And while it is easier for student parents to obtain benefits under the Supplemental Nutrition Assistance Program (SNAP), Women, Infants and Children (WIC), and Free and Reduced Price Lunch benefits (for their children) than under TANF, among eligible student parents, only 40 percent, 7 percent, and 17 percent participate in these programs, respectively.[39]

Working parents also lack needed supports. Raising a family while working is hardly impossible; in fact, the vast majority of people manage to do so, whether by economic necessity or choice. Today, only 20 percent of families have a father in the workplace and a mother who is a full-time, unpaid caregiver.[40] Yet our workplace is far from catching up to the social and economic reality of our families—it is still designed for Don Draper when it should be structured for Roseanne. For instance:

- The United States is the only industrialized nation without required **paid maternity leave.**[41] While the Family and Medical Leave Act (FMLA) does require up to 12 weeks of leave for certain medical circumstances, including the birth or adoption of a child, that leave is not required to be paid. Moreover, due to thresholds related to number of employees, length of employment, and number of hours worked, the FMLA covers only 59 percent of the workforce.[42] Only 13 percent of employees have paid family leave and 95 percent of part-time and low-wage workers lack this benefit.[43]

- Similarly, federal law does not guarantee **paid sick leave.** This is especially problematic for pregnant women and mothers who need to make frequent

appointments to care for themselves or their children.[44] According to the National Partnership for Women and Families, 3.1 days' worth of lost wages can equal a family's entire health care budget for the month, and 3.5 days of wages is equivalent to its monthly grocery budget.[45]

- Only 56 percent of workers can adjust their hours or work location when needed and such **workplace flexibility** is concentrated among those with higher income and education levels. Seventy percent of low-income workers have no control over the times they are scheduled to begin and end work. Equally problematic, nearly 30 percent of workers have fluctuating start and stop times, which makes it hard to arrange for childcare, and 10 percent say their schedule changes so much it's completely unpredictable.[46]

- Women often need minor **pregnancy accommodations** to protect their health. Such adjustments could be a change in duties (less heavy lifting, more opportunities to sit), a change in schedule, time off for prenatal doctors' visits, or extra breaks. A 2013 survey revealed that while the majority of pregnant women had their requests for accommodation honored, approximately a quarter million had their requests denied each year.[47]

- Employers with more than 50 employees must provide **breaks for nursing mothers** to pump breastmilk, but the breaks do not have to be paid[48]—and because this law does not apply to women who work for small businesses, many are still left out of even those minimal protections.

- **Child care** remains outrageously expensive while quality remains wildly inconsistent. Families living below the poverty line spend 30 percent of their monthly income on child care.[49]

Mothers are breadwinners in nearly two-thirds of American homes and they are the primary or sole earner in 40 percent of U.S. families.[50] These primary breadwinners break out into two groups

> Having a child results in both an immediate and long-term decrease in women's pay, while there is no negative effect for men and possibly even a pay boost as a result of becoming a father.

of women with very different levels of economic security: 37 percent (15 percent of all mothers of minor children) are married women who earn more than their husbands and have a median family income of $80,000; 63 percent (25.3 percent of all mothers) are single heads of households with a median family income of $23,000.[51] And the median income of women in same-sex couples (with or without children) is less than men, regardless of whether those men are in same-sex or different-sex couples ($38,000 vs. $47,000 and $48,000, respectively).[52]

The economic instability of single mothers cannot be overemphasized—in the wake of the Great Recession, the poverty rate has been increasing, especially among single women with children.[53] Nearly 522,000 unmarried mothers worked full-time, year-round in 2013 and yet still lived in poverty.[54] That same year the poverty rate for all women-headed households with children was 39.6 percent, and it was nearly 50 percent in families headed by African American, Latina, and Native American women.[55] Among children in poverty, half live with a single mother.[56]

Women are disproportionately represented in low-wage jobs[57] and comprise nearly two-thirds of minimum wage workers.[58] Nearly one-third of low-wage workers are mothers, and of those, four in ten have household incomes under $25,000.[59] Moreover, gender-based occupational segregation means that women are funneled into "pink-collar" jobs that bring in less income than male-dominated professions, despite requiring comparable skills, education levels, and occupational risks.[60]

The gender wage gap is perhaps the clearest driver of women's economic insecurity. On average, working women earn only 78 cents per dollar paid to their male counterparts. When this number is broken down, we find that women of color are affected even more by the gender pay gap, with Black women earning 64 cents for every dollar earned by their non-Hispanic white male counterparts and Latina women earning only 56 cents.

Women with children also fare badly: working mothers earn 70 cents for every dollar working fathers make.[61] In fact, research shows that having a child results in both an immediate and long-term decrease in women's pay, while there is no negative effect for men and possibly even a pay boost as a result of becoming a father.[62]

However, this pay disparity is less significant when a woman is able to postpone childbearing. According to the Guttmacher Institute, "By delaying having a first child until her late 20s or 30s, a woman can mitigate the family [pay] gap and contribute to her family's strengthened economic stability."[63]

More than 7.3 million families are headed by single, working mothers, and these lower earnings can substantially affect their economic well-being.[64] Based on today's gender pay gap, a woman working full time, year round could lose $435,049 on average over a 40-year period.[65]

Older women continue to feel the effects of the wage gap and gender-influenced work patterns into their retirement, receiving only 56 cents per dollar received by their male counterparts in pensions and annuities and approximately $4,000 less per year in Social Security benefits.[66] Eliminating the gender pay gap would result in a 17 percent raise—more than $6,000 a year—for two-thirds of single mothers and would nearly halve their families' poverty rate, from 28.7 to 15 percent.[67]

Racism and other forms of discrimination only serve to amplify and exacerbate gender inequality. As noted in the *Shriver Report: A Woman's Nation Changes Everything,* "It is especially poor and low-income women, women of color, and immigrant women who are driven into the most hazardous and low-status jobs, who are given the least amount of flexibility in their schedules, and who are least likely to receive employer-provided benefits such as health care, sick leave, or family leave."[68] Consider, for example, the recent attention that has been brought to the plight of nail salon workers, many of whom experience wage exploitation, race discrimination, and exposure to a host of toxic chemicals that can affect their fertility and cause cancer.[69]

When confronted with evidence of a workplace environment that could have harmful effects on a pregnancy, instead of improving workplace safety employers sometimes respond with protectionist policies barring pregnant women—or even any woman with reproductive capacity[70]—from positions that are high exposure but often also high paying, even though male fertility is

**$435,049**

Lost earnings of a full time female worker over 40 years due to the gender pay gap

National Women's Law Center, "Employment: Fact Sheet: How the Wage Gap Hurts Women and Families," April 2015, http://www.nwlc.org/sites/default/files/5.11.15_how_the_wage_gap_hurts_women_and_families.pdf

equally if not more vulnerable to environmental exposures.[71]

Perhaps the strongest connection between economic security and reproduction is the cost of raising a child itself, which can range from $9,000 to more than $25,000 annually.[72] And, prior to the passage of the Affordable Care Act (ACA),[73] prenatal care and childbirth presented tremendous out-of-pocket costs for many families[74]—and still remain a large burden for many immigrants who were cut out of health reform.[75] Indeed, in a 2001 survey of individuals filing for bankruptcy conducted by then-Professor Elizabeth Warren and colleagues, 7 percent of respondents identified the birth of a child as a reason for their bankruptcy.[76]

It is little wonder, then, that childbearing tends to be cyclical, following the ups and downs of the economy.[77] For instance, with the current economic recovery underway, the Centers for Disease Control released data in June 2015 showing that 2014 marked the first year that the U.S. birthrate increased since the Great Recession began in 2007.[78] While the overall rate increased by 1.4 percent, the rate increased 3 percent among women in their 30s and the birth rate for third children increased by 2 percent[79]—signs that those with more economic stability felt in a better position to create or add to their families. Although the study did not examine the reasons for the increase, Laura Lindberg of the Guttmacher Institute observed: "I think as people feel their paycheck is more stable, it feels like a safe environment to have a child in."[80]

## The unfulfilled potential of reproductive health care to help create economic security

In the face of these educational, workplace, and economic challenges, access to reproductive health care is by no means a panacea, but it certainly makes a critical contribution to addressing the above problems. For instance, the birth control pill is estimated to be responsible for nearly one-third (31 percent) of the narrowing of the gender wage gap witnessed in the 1990s.[81] And studies have shown that when women can plan their families, their children have better outcomes with regard to education and wages.[82] Conversely, as the Guttmacher Institute has noted, "Parents' economic and emotional investment in each child are increasingly constrained as family size increases and are limited by close childspacing."[83]

Other studies have shown just how much of a pocketbook issue birth control coverage is. For instance, in the wake of the ACA's guarantee of no-cost coverage of contraception, women saved approximately $483 million on birth control pills in 2013.[84] However, these advancements have not accrued to everyone equally. As the Guttmacher Institute has observed:

> Being able to plan whether and when to have children, for example, has not benefited low-income women and women of color in terms of their education as greatly as it has benefitted their higher-income and white counterparts. Similarly, because lower-income and single mothers with lower levels of education may have less freedom in their choices of when and where to work than do other women, their job security does not benefit as much from contraceptive access.[85]

This unequal distribution of benefits is all the more reason to work to ensure that women of all incomes have meaningful—*i.e.*, affordable—access to contraception. Yet opponents of reproductive rights have been unceasing in their efforts to undermine contraceptive access, namely by seeking special exemptions from the ACA's contraceptive coverage benefit for religiously-affiliated corporations and by trying to defund essential health providers like Planned

Parenthood Federation of America and the Title X network, our nation's only federal program dedicated to the provision of family planning services, despite the fact that Title X only meets approximately 35 percent of the need at current funding levels.[86]

In addition, given that Medicaid is the largest insurer for low-income women—and therefore the largest source of funding for contraceptive services, representing 75 percent of all public spending on family planning[87]—the refusal of 19 states to accept ACA funding to expand Medicaid to a greater percentage of their low-income populations[88] has left many women in the lurch with regard to affordable contraception, not to mention other essential health care services. And, since many immigrants were left behind in health reform,[89] their access to inexpensive contraceptive services also remains more limited than it should be.

While many of the above intersections between economic and reproductive health are well-understood and routinely discussed by policymakers, there is another essential component that is notably absent from many of the debates: abortion. With this report, we seek to fill that gap. Below we detail the role that access to abortion care plays in helping women achieve economic security and the role economic security plays in ensuring women can access the abortion care they need.

# THE MISSING LINK:
# HOW ABORTION RELATES TO ECONOMIC SECURITY

Abortion remains a controversial issue in our society, but its connection to women's economic well-being is incontrovertible. Moreover, the role of abortion in women's lives cannot be overlooked given that approximately one in three women in the U.S. will have an abortion in her lifetime and nearly two in three women are already mothers when they have an abortion.[90]

A number of studies have examined aspects of this issue, the most recent being the Turnaway Study from ANSIRH at UCSF.[91] This prospective longitudinal study[92] aimed to "describe the mental health, physical health, and socioeconomic consequences of receiving an abortion compared to carrying an unwanted pregnancy to term."[93] From 2008 to 2010, ANSIRH collaborated with 30 abortion facilities in 21 states across the country. The researchers recruited approximately 1,000 women who either obtained the abortion they sought or were "turned away" because they were past the gestational limit of the clinic.[94] The women were then interviewed at six-month intervals over a five-year period, which will end in December 2015.[95] This study is the first of its kind to track what happens to women who are denied an abortion and to contrast their well-being with an appropriate comparison group—women who did receive an abortion.

Based on the initial findings of the Turnaway Study, as well as other studies that have examined the characteristics of women who seek abortions, several key themes about the economic realities of abortion are apparent.

## 1  Most women who seek abortion are already struggling financially

Women who seek abortions are often already economically insecure. According to the Guttmacher Institute, over two-thirds of women (69 percent) who obtain abortions have incomes below 200 percent FPL.[96] The Turnaway Study found even more striking results: Among the women in the study who reported their household income, two-thirds were poor, meaning they lived below 100 percent FPL.[97] And almost half (45 percent) of the women had received support from public safety net programs in the past month.[98] Moreover, because the study recruited women who actually made it to an abortion clinic, it does not capture those who wanted an abortion but faced such significant socioeconomic or other barriers that they were unable to reach a clinic in the first place.

This economic disparity among women who seek abortions is also seen across reproductive outcomes. Poor women have significantly higher rates of unintended pregnancy, which in turn leads to higher rates of both abortion and unintended birth (i.e., birth that results from unintended pregnancy). According to the Guttmacher Institute, the rate of unintended pregnancy among poor women (less than 100 percent FPL) in 2008 was more than five times the rate among women at the highest income level (at or above 200 percent FPL) (137 vs. 26 per 1000 unintended pregnancies).[99] Likewise, their

> Women who seek abortions are often already economically insecure.

abortion rate was upwards of five times higher (52 vs. 9 abortions per 1000 women)[100] and their unintended birth rate was almost six times as high (70 vs. 12 births per 1000 women).[101]

Furthermore, the divergence between the reproductive outcomes of women at the opposite ends of the economic scale has increased over time. While the rate of unintended pregnancies declined by 24 percent among higher-income women from 1994 to 2008, it increased by 56 percent among poor and low-income women.[102]

One of the clearest contributors to these rates is the lower levels of contraceptive use among low-income women. The Brookings Institution found that, among women not trying to conceive, those with incomes below the poverty level were twice as likely not to use contraception as those with incomes at or above 400 percent FPL.[103]

The barriers to contraception faced by low-income women are driven by a broad range of social determinants of health, including lack of access to health care providers, health insurance coverage, transportation, and legal identification, among others. For example, a lack of public and private health insurance among immigrant women has been shown to create a large barrier to preventive care such as birth control and screenings for sexually transmitted infections and cervical cancer.[104] Among poor women of reproductive age, 53 percent of non-citizen immigrant women have no health insurance—almost double that of U.S.-born women—and only 28 percent have Medicaid coverage, in contrast to 46 percent of their U.S.-born counterparts.[105]

Guttmacher Institute, "Fact Sheet: Unintended Pregnancy in the United States," February 2015, http://www.guttmacher.org/pubs/FB-Unintended-Pregnancy-US.html



Rate of unintended pregnancy for poor and low-income women vs. rate of unintended pregnancy for higher-income women

56% for poor and low-income women

24% for higher-income women

1994 1995 1996 1997 1998 1999 2000 2001 2002 2003 2004 2005 2006 2007 2008

# REPRODUCTIVE HEALTH DISPARITIES IN CONTEXT

Given the complicated relationship between income and race in this country—e.g., African American, Hispanic, and Native American women all have poverty rates that hover around 25 percent compared to a 10.3 percent poverty rate for white, non-Hispanic women[106]—many of these trends in health disparities are reflected across race as well as class and all of the aforementioned social determinants affect women of color disproportionately. In other words, due to structural racism[107] and economic inequality, women of color are more likely than white women to experience reproductive and sexual health disparities, as well as general health disparities such as heart disease and diabetes.[108]

For instance, due in part to sexual networks, African American women have substantially higher rates of sexually transmitted infections (STIs) such as chlamydia, gonorrhea, and the Human Papillomavirus (HPV) than their white counterparts, despite having similar numbers of sexual partners. They also represent 65 percent of new AIDS diagnoses; have higher unintended pregnancy rates; and are at much greater risk for maternal and infant mortality, premature births, and low birth weight infants.[109] Indeed, the maternal mortality rate for African American women is nearly four times that of white women—a trend that has held constant for 50 years.[110]

According to a 2007 shadow report to the United Nations by the Center for Reproductive Rights and others, "Nearly all minority groups contract STIs at much higher rates than the majority white population. Together, African American women and Latinas account for 80% of reported female HIV/AIDS diagnoses, even though they represent only 25% of the U.S. female population. And while women of color are much more likely to die of cervical cancer than are white women, with the exception of African American women, they are less likely to receive regular Pap smears, a crucial screening mechanism."[111]

Similar disparities appear with regard to unintended pregnancy and abortion. The unintended pregnancy rate for low-income Latinas is almost twice that of low-income white women.[112] And although the abortion rate has declined among all racial and ethnic subgroups, African American women are more likely than any other group to seek an abortion.[113] Moreover, because ever-mounting restrictions on abortion do not address these underlying disparities, they are likely to lead only to greater numbers of abortions later in pregnancy and unplanned births, thereby increasing health disparities even further.[114]

As summed up in a report by the Center for American Progress, "Differential access to treatment, lower levels of respect and competency from health care providers, lack of trust in the medical establishment, lack of accurate information, and a host of other socioeconomic factors lead to poorer outcomes along racial and ethnic lines for overall health indicators, specifically with regard to reproductive health."[115]

## 2 The most commonly cited reasons for seeking an abortion are financial concerns

Women typically cite multiple interrelated reasons for seeking an abortion, but the most common theme that arose in the Turnaway Study was not feeling financially prepared (40 percent), meaning that they had general financial concerns, were unemployed or underemployed, were uninsured or could not get welfare, or did not want government assistance.[116] Six percent of women in the study named a financial theme as their *only* reason for deciding to have an abortion.[117] Women also cited other factors that could be seen as economic, including: they did not think the timing was right for a number of reasons, including financial ones; having a child would affect their future educational or economic opportunities; they wanted a better life for the baby than they could provide; and they worried about adverse effects on their existing children.[118]

General financial concerns (i.e., "financial problems," "don't have the means," "it all boils down to money," and "can't afford to support a child") were the most common factor, cited by 38 percent of study participants.[119] For instance, one unemployed 42-year-old woman who had a monthly household income of a little over $1,000 explained, "[It was] all financial, me not having a job, living off death benefits, dealing with my 14 year old son. I didn't have money to buy a baby spoon."[120] A 28-year-old woman in the study echoed similar concerns. She received $1,750 a month in government assistance and was looking for work and living alone with her two children while her husband was away in the Air Force. She said, "[My husband and I] haven't had jobs in a while and I don't want to go back to living with other people. If we had another child it would be [an] undue burden on our financial situation." [121]

In terms of bad timing—cited by 36 percent of respondents—a 21-year-old recounted: "Mainly I didn't feel like I was ready yet—didn't feel financially, emotionally ready. Due date was at the same time as my externship at school. Entering the workforce with a newborn would be difficult—I just wasn't ready yet." And a 25-year-old who was looking for work and didn't have

enough money to meet basic living needs said: "So many things going on now—physically, emotionally, financially, pretty busy and can't handle anymore right now."[122]

Women in the Turnaway Study also raised concerns about their future opportunities. One in five women (20 percent) reported they chose abortion because they felt a baby would interfere with their future goals and opportunities, including their plans for school and career.[123] One 18-year-old respondent in high school stated simply, "I didn't think I'd be able to support a baby and go to college and have a job."[124]

Among the women who chose abortion because they felt having a baby would interfere with their future plans, over half (52 percent) were in college or getting an Associates or technical degree.[125] One 21-year-old college student who did not have children yet explained that she sought an abortion because she "still want[s] to be able to do things like have a good job, finish school, and be stable."[126]

Twelve percent worried that they could not provide a good enough life for the baby.[127] "I can't take care of a kid because I can barely take care of myself…"; "I've been unemployed[;] it's not a decision I can face morally without being able to raise it properly"; "My mom pays my rent for me and where I live I can't have kids. I can't get anyone to rent to me because I have had an eviction and haven't had a steady job."[128]

Finally, five percent said having a baby would negatively affect the children they already had.[129] As one woman put it: "I already have 5 kids; their quality of life would go down if I had another."[130] This concern makes sense when one considers that six in ten women who have an abortion are already raising children.[131] Indeed, 29 percent of Turnaway subjects cited the need to focus on other children as a reason for seeking an abortion.[132]

## 3 Women denied an abortion are more likely to be in poverty two years later

At the time they presented at a clinic, the women turned away from the abortion care they sought were on similar socioeconomic footing with the women who obtained abortions.[133] However,

> Two years later…women denied an abortion had three times greater odds of ending up below the federal poverty line.

two years later, according to preliminary analysis, women denied an abortion had three times greater odds of ending up below the federal poverty line, adjusting for any previous differences between the two groups.[134]

While the study is still ongoing, the trends are already clear: The women in the study who reported household incomes started out with similar levels of economic well-being. However, only one year later, the turnaways were more likely to be living in poverty (67 percent vs. 56 percent).[135] Similarly, at the outset, 45 percent of subjects seeking abortions after the first trimester had received public assistance; but one year later, the women denied an abortion were three-quarters as likely to be enrolled in public assistance programs (76 percent vs. 44 percent).[136] Consistent with these findings, the proportion of women who were working full time one year later was higher among women who received an abortion than among those who did not (58 percent vs. 48 percent)—a somewhat unsurprising result given the challenges mentioned above that the workplace presents to mothers of young children.[137]

Thus, the data would suggest that, for a woman who is already struggling to make ends meet, being able to end an unintended pregnancy is a critical component to her and her family's ability to get out of poverty, become economically self-sufficient, and maintain employment. While a low-income woman who wants to carry a pregnancy to term absolutely should have the supports needed to do so, it is undeniable that being cut off from abortion care only increases the economic distress of those already living in poverty.

As Diana Greene Foster, lead researcher for the Turnaway Study, stated in the *New York Times,* "Maybe women know what is in their own and their family's best interest… They may be making a choice that they believe is better for their physical and mental health and material well-being. And they may be making a decision that they believe is better for their kids — the kids they already have and/or the kids they would like to have when the time is right."[138]

## 4  Many women cannot afford the cost of an abortion

Given the economic insecurity among many women who seek abortions, it should not be surprising that the cost of an abortion is more than many can afford. The price of the procedure varies depending on the clinic, the state, and the gestational stage of the pregnancy.[139] The median price of an abortion in the Turnaway Study ranged from $450 for a first trimester abortion to $1,750 for an abortion at 20 weeks or beyond.[140]

Due to the constantly-increasing restrictions on abortion—such as the overregulation of clinics known as Targeted Restrictions on Abortion Providers, or TRAP, laws[141]—and the limited number of providers—89 percent of counties in the United States lacked an abortion clinic in 2011 and 38 percent of women live in those counties[142]—women sometimes have to travel long distances to obtain an abortion, resulting in high travel costs, as well as childcare, hotel stays if required to visit the clinic multiple days, and time off work.

According to national data collected by Think-Progress, out-of-pocket costs for an abortion (including the procedure itself plus ancillary costs such as travel and lodging) range from $375 in the first trimester to $6,531 at 22 weeks.[143] Think-Progress examined the potential fees paid by two archetypal Wisconsin women and found that "the process of obtaining an abortion could total up to $1,380 for a low-income single mother saddled with charges related to gas, a hotel stay, childcare, and taking time off work."[144]

In the Turnaway Study, total out-of-pocket costs for abortion paid by women and their family and friends ranged from $0 to $3,700.[145] For more than half the women (56 percent) who had an abortion in the Turnaway Study, out-of-pocket costs for the procedure and travel were equivalent to more than one-third of their monthly personal income—and such costs approached two-thirds among women obtaining later abortions.[146] Travel costs and time off work can be especially difficult to manage for low-income women, who, by definition, lack substantial earnings or assets and are less likely to get sick leave, paid or unpaid.[147]

> For a woman who is already struggling to make ends meet, being able to end an unintended pregnancy is a critical component to her and her family's ability to get out of poverty,

Again, women of color bear a disproportionate burden of such economic barriers: In 2007, according to research predating the Turnaway Study, the median wealth of white women was $45,400, whereas it was a mere $100 for African American women and $120 for Latinas.[148] Even more shocking, the net worth of single African American women in their prime working years (36-49) was only $5, compared to $42,600 for white single women of the same age.[149]

## 5  Insurance bans create additional financial hardships

Despite being a legal and constitutionally protected medical procedure, many laws restrict abortion coverage in public and private health insurance plans. As a result, many women must pay for an abortion out of pocket, which, given the costs detailed above, can be a major financial barrier to obtaining abortion care.

Such restrictions began in 1976 with the passage of the Hyde Amendment, which denies abortion coverage in Medicaid, the public health insurance program for low-income people.[150] This ban only permits exceptions for cases of rape, incest, and life endangerment and is renewed annually as part of the federal appropriations process.[151] Though the laws of seventeen states require coverage for all or most medically necessary abortions with *state* Medicaid funds, the majority of states do not provide this coverage.[152] Other federal health plans and programs that restrict abortion coverage include Indian Health Service, the Federal Employees Health Benefits Program, the military's TRICARE plan, and the Peace Corps, among others.[153]

Many states also limit abortion coverage in private insurance plans, especially after the Affordable Care Act opened the door for them to do so. Twenty-five states currently prohibit abortion coverage in plans offered through their health insurance marketplaces known as exchanges.[154] And ten states ban abortion coverage in all private insurance plans, whether sold within or outside of an exchange.[155]

To address the gaps caused by political decisions to withhold abortion coverage, a number of philanthropic efforts, led largely by volunteers, have been established across the country to help women pay for the abortion care they could not otherwise afford. The National Network of Abortion Funds, an umbrella organization of charitable abortion funds, along with the National Abortion Federation and many Planned Parenthood affiliates, work to help women secure the funds needed to obtain an abortion. These funds are particularly important for low-income women, women who are not eligible for health insurance due to their immigration status, and women seeking more expensive later abortions.

The Turnaway Study found that over two-thirds of the women who obtained an abortion received some form of what the study characterized as "financial assistance," whether from private insurance (7 percent), Medicaid (34 percent), or charitable organizations (29 percent).[156] However, even with those forms of support, most women still had some out-of-pocket costs.[157] And those costs could be substantial for some women, particularly those at later gestations.[158] When public or private insurance was not available, median costs amounted to $575.[159]



## 6 Women often make great sacrifices to obtain the money needed for an abortion

Economic insecurity coupled with a lack of abortion coverage means that many women must divert personal funds from necessities like food, electricity, or rent in order to pay for the unexpected costs of an abortion.[160] Though the Turnaway Study did not address this issue, several other studies have examined the measures women take to obtain the money they need for an abortion.

One study found that "many women delayed or did not pay bills to cover the cost of the procedure. Borrowing money and delaying paying bills were even used by a minority of women who were using their health insurance."[161] In another study, women said "they made significant sacrifices to come up with money to pay for their procedures, including donating plasma, lying to family members about why they needed money, taking out loans, and selling personal belongings."[162]

In addition, women often feel the ramifications of their sacrifices immediately after obtaining their procedure: "In the clinic setting, it was common for women to mention not having enough gas money to get back home, or expressing that they could not afford to buy the meal that clinic staff told them to eat before taking their first dose of prophylactic antibiotics following the procedure."[163]

## 7 Economic barriers delay abortion care

A lack of resources to pay for abortion care pushes many women later into pregnancy. More than half the women (54 percent) who had an abortion in the Turnaway Study said that raising money for their abortion delayed them in obtaining care,[164] which raises the cost and complexity of the procedure.[165] Being non-white and having a pregnancy at a later gestational age were associated with higher odds of cost being a reason for delay in obtaining an abortion.[166] Not having Medicaid or private insurance coverage also was associated with citing cost as a reason for delay.[167]

Indeed, a comparison of those who present for abortion earlier in pregnancy and those who present later underscores how the social determinants that drive health disparities overall similarly influence access to abortion care: "Sociodemographic characteristics of first trimester patients differed substantially from near-limit abortion patients. Near-limit abortion patients were less likely to be aged 25 to 34 years [*i.e.*, more likely to be younger], more likely to be multiracial or other race, less likely to have a college

> Economic insecurity coupled with a lack of abortion coverage means that many women must divert personal funds from necessities like food, electricity, or rent in order to pay for the unexpected costs of an abortion.

degree, less likely to be in the highest income category, and less likely to be employed."[168] These findings correlate with data from the Guttmacher Institute that show poor women (67 percent) are more likely than women above 200 percent of the poverty line (50 percent) to say they would have liked to have obtained an abortion sooner.[169]

Almost two-thirds of women in the Turnaway Study seeking abortions at 20 weeks or later said they were delayed because they were raising money for the procedure, travel, and other costs, compared to less than one-third of those seeking a first-trimester abortion.[170] Similarly, in a study by the Guttmacher Institute, among women who said they would have liked to have received their abortion sooner but needed extra time to make arrangements, one-quarter ascribed the additional time to finding ways to pay for the procedure.[171]

When insurance coverage is an option, any delays in securing that coverage also can lead to delays in obtaining the procedure. The Turnaway Study found that women seeking abortions at 20 weeks or later were twice as likely as women seeking first-trimester abortions to report delays due to difficulties securing public or private insurance coverage for the procedure (41 percent vs. 20 percent).[172] For instance, a 16-year-old woman in California, who had an abortion at 23 weeks, said what slowed her down was Medi-Cal, the California Medicaid program: "I got [the] runaround from the offices about getting on it."[173]

## 8 Later abortion poses a higher financial burden

As a pregnancy progresses, the cost of an abortion rises, which leads to a phenomenon sometimes called "chasing the money." One 28-year-old woman from Kentucky, who received an abortion at 21 weeks, described it well: "I couldn't afford it. They told me it was going to be $650, [but] by the time I was able to raise the $650, they had to do a different procedure, and so the price went up. The price jumped to $1,850...and they don't take insurance."[174]

One reason women sometimes seek abortions at later gestational ages is simply because they discovered their pregnancy later.[175] But as a result, they have less time to gather the fund-

ing needed and arrange travel plans. However, instead of being able to end their pregnancy as soon as they have made their decision, they find the social and economic barriers that surround early abortion care to be further compounded when seeking later abortion care. As Foster with the Turnaway Study observed: "Usually the only difference between making it and not is just realizing you are pregnant. ... If you're late, abortion gets much harder to find. All the logistic concerns snowball—money, travel, support."[176]

For instance, due to the limited number of providers who offer later abortion care, women needing such care often must travel longer distances and face increased travel costs. In the Turnaway Study, women who sought abortions at 20 weeks or beyond were more likely than first-trimester patients to have traveled more than three hours to get to the abortion facility (21 percent vs. 5 percent).[177]

When one factors in characteristics such as immigration status, the barriers increase even further. Some obstacles that immigrants typically face when trying to access abortion care include poverty, no insurance, a lack of culturally and linguistically competent care, fear of triggering immigration enforcement resulting in deportation, and bans on abortion care for those in immigration detention centers.[178] As the National Latina Institute for Reproductive Health has noted: "Later abortion bans disproportionately harm immigrant

> As a pregnancy progresses, the cost of an abortion rises, which leads to a phenomenon sometimes called "chasing the money."



Sarah Roberts, Heather Gould, Katrina Kimport, Tracy Weitz, and Diana Greene Foster, "Out-of-Pocket Costs and Insurance Coverage for Abortion in the United States," Women's Health Issues, March-April 2014, Vol. 24, Issue 2, pgs. e211–e218.

Median price of abortion in the Turnaway Study

$450 — First trimester
$750 — 14 to <20 weeks
$1,750 — 20 weeks or more

Latinas, as immigrant Latinas have fewer options for insurance coverage of abortion care and fewer financial resources to overcome the gaps in coverage. In addition, immigrant Latinas face many restrictions on travel, which can also delay access to care."[179]

## 9 Financial barriers can be a complete obstacle to abortion care for some women

For some women, the financial barriers are insurmountable. Approximately one in four poor women who would have an abortion if Medicaid funding were available instead carry their pregnancy to term because they cannot secure the needed funds.[180] In addition, researchers Christine Dehlendorf and Tracy Weitz conclude that coverage bans—as well as other barriers to access such as waiting periods, reduced number of abortion clinics, and limitations on providers who can offer abortions—exacerbate disparities in access to abortion care.[181]

The Turnaway authors note that, "Public financing and insurance coverage for abortion would have made procedures possible for many of the turnaways, and ability to pay while in the first trimester could have prevented some women from needing later abortions."[182] Indeed, more than one in five women turned away in this study said they considered having an abortion elsewhere but never obtained one. Among this group, 85.4 percent reported procedure and travel costs as the reason they were not able to obtain an abortion somewhere else.[183]

Sometimes women are squeezed at both ends—pushed beyond first-trimester care due to policies such as those restricting abortion coverage and then cut off from later abortion by bans on abortion at 20 weeks. In today's political climate, this is increasingly the case: from 2011 to 2013, states passed more restrictions on abortion care than they had done during the preceding decade, and last year alone over 250 bills to limit abortion access were introduced in close to 40 states.[184] As of July 2015, 11 states have bans in effect that specifically target access to later abortion.[185]

One paper, using data from both the Turnaway Study and the Guttmacher Institute's Abortion Provider census, discussed the impact that state bans on abortion at 20 weeks could have on women: "These bans present an undue burden because, as demonstrated in this study, many women do not realize they are pregnant until later in pregnancy and cannot travel to other states for abortion care."[186] The Turnaway Study also forecast that 20-week abortion bans would disproportionately affect young women and women with limited financial resources.[187]

> It is impossible to cut off access to abortion care without inflicting further suffering on low-income families.

# The Whole Woman:
## Abortion's Connection to Overall Health and Safety

Just as women's economic outlook worsens when they are unable to carry out their decision to get an abortion, so too does their physical and emotional health and safety. In particular, the Turnaway Study showed that women who are denied abortion care have poorer outcomes with regard to intimate partner violence. Moreover, women who seek abortion care because they are struggling with addiction do so with good reason. While most women denied abortion reduce recreational drug and alcohol use when they carry to term, those with substance abuse problems often do not reduce their usage.

There are a number of ways an abusive partner may engage in reproductive sabotage, such as hiding, tampering with, or disposing of birth control in order to impregnate his partner.[188] Once pregnant, an abusive relationship may lead a woman to seek an abortion. Although few participants in the overall Turnaway Study (2.5 percent) identified having an abusive partner as their specific reason for seeking an abortion, nearly one in ten reported experiencing intimate partner violence in the past year.[189] Moreover, nearly one in three women (31 percent) in the study reported partner-related reasons for seeking an abortion.[190] And among this group, eight percent said they sought an abortion because they had an abusive partner.[191]

Some studies have shown that domestic violence can escalate when a woman is pregnant.[192] At the same time, women can also experience intimate partner violence when they try to obtain an abortion.[193] Beyond the risk of violence during pregnancy, continuing or ending a pregnancy can be a factor in a woman's ability to escape a violent relationship. The Turnaway Study revealed that physical violence from the man involved in the pregnancy decreased over time for women who had abortions, but it did not decrease for the women who continued their pregnancies to term.[194] Furthermore, while violent relationships were likely to dissolve for both groups over time, the dissolution came later for those who were turned away from abortion care.

The findings suggest that the women denied an abortion were more likely to stay in contact with an abusive partner than those who got abortions.[195] This makes sense given that it is harder to cut off ties to a partner when there is a child involved. The researchers conclude that, "Policies that restrict abortion provision may result in more women being unable to terminate unwanted pregnancies, potentially keeping some women in physically violent relationships, and putting both women and their children at increased risk of violence and other negative health consequences."[196]

The Turnaway Study also examined drug, alcohol, and tobacco use and found that nearly five percent of the participants cited use of these substances by themselves or their partners as one of the reasons for seeking an abortion.[197] Among women who cited alcohol as a reason, all had used it before realizing they were pregnant and 84 percent reported binge drinking or a symptom of an alcohol problem.[198] Those using drugs reported frequent use: 74 percent used more than once a week and 30 percent used drugs daily.[199] Among women citing drugs as prompting the abortion decision, 61 percent had used drugs in the month before they learned they were pregnant.[200]

Limited drug treatment options exist for pregnant and parenting women due to a lack of: programs designed to meet their special needs, child care, transportation, or health insurance coverage, among other barriers.[201] While a handful of states prioritize substance abuse programs for pregnant women, many more states focus on the prosecution of women who use drugs while pregnant,[202] which causes further harm to both the woman and her offspring.[203]

That said, women in the Turnaway Study who abused drugs did not mention fear of punishment as a motivating factor in seeking an abortion.[204] Rather, the women worried about direct effects on fetal health as well as their parenting abilities, given where they were in their recovery process.[205] One woman who sought an abortion at 14 weeks explained, "I am trying to put my life back together. If I wasn't living in the treatment center, I would be homeless, I don't have a job."[206]

While pregnancy can sometimes motivate a woman struggling with addiction to seek treatment, the turnaways with substance abuse problems showed no such improvement. Indeed, the initial data suggested a slight uptick in drug use other than marijuana among women who were denied an abortion and ultimately gave birth, though the sample size is too small for definitive conclusions.[207] Likewise, the study revealed ongoing alcohol problems among heavy drinkers in the cohort that carried to term.[208]

# FALLING THROUGH THE CRACKS: THE IMPORTANCE OF SAFETY NET PROGRAMS

The Turnaway Study found that among the 231 women who were turned away from an abortion in the study, six months after recruitment into the study 64 (27.7 percent) had received an abortion elsewhere and 5 (2.2 percent) had a miscarriage or stillbirth.[209] Most, however, continued on with their pregnancy. After one year, the vast majority of those who gave birth were living with their child (86 percent), while 11 percent had placed the baby for adoption.[210] Still others had the child removed from their custody.[211]

Of those raising their child, many of the women's financial concerns were realized: "Consistent with women's reasons for wanting an abortion, primarily that they could not afford a child, many families increasingly rely on public assistance and remain in poverty after being denied an abortion." [212] For these women, social and economic supports that help them take care of their children, such as Medicaid or the WIC program, can provide a lifeline. As Turnaway Study principal investigator Foster noted, "Had the turnaways not had access to public assistance for women with newborns, ... they would have experienced greater hardship."[213]

The Turnaway Study makes it clear that it is impossible to cut off access to abortion care without inflicting further suffering on low-income families and, at the very least, lawmakers should be prepared to provide additional socioeconomic supports to families when they interfere with abortion care. As the study authors noted: "Denying [a woman] an abortion, which occurred among one quarter of the women interviewed in this study, may have a significant negative impact on her health, her existing children and other family members, and her future. Policies that restrict access to abortion must acknowledge that such women will need added support (e.g., financial, emotional, educational, health care, vocational support) to appropriately care for their children, other children, and themselves."[214]

Yet 16 states currently have what are known as "family caps"—limits on the amount of government assistance for new children to a family already receiving benefits.[215] These draconian measures seem to serve little purpose other than punishing poor families for being poor. As the Urban Institute found, family caps increase the deep poverty rate of single mothers by 12.5 percent and of children by 13.1 percent.[216]

Moreover, recent research conducted by Ibis Reproductive Health and the Center for Reproductive Rights shows that the more likely a state is to restrict access to abortion care, the fewer supports the state provides to pregnant and parenting women and the less well women and children in that state fare: "There is an inverse relationship between a state's number of abortion restrictions and a state's number of evidence-based policies that support women's and children's well-being."[217] Likewise, the report also "found a consistently negative relationship between a state's number of abortion restrictions and its performance on indicators of women's health, children's health, and social determinants of health."[218]

For instance, Oklahoma had the maximum number of abortion restrictions of any state (14) and tied for last place at 48th in its overall score on indicators of women's and children's well-being.[219] In similar fashion, as of May 2015, the Texas legislature had introduced 32 new bills related to abortion, the majority of which were designed to restrict abortion care.[220] Yet at the same time, Texas legislators have proposed a budget that would reduce access to life-saving breast and cervical cancer screenings for low-income women—in a state where the incidence of cervical cancer is roughly 19 percent higher than the national average.[221]

# THE PUBLIC GETS IT
# EVEN WHEN POLITICIANS DON'T

While the Turnaway Study is certainly illuminating, the American public does not need academic research to understand the connections between abortion and economic security. Voters recognize that any women's economic empowerment agenda is incomplete without policies that further access to comprehensive reproductive health care. Surveys conducted by the National Institute for Reproductive Health (NIRH) in New York, Pennsylvania, and Virginia found that "voters intuitively recognize links between control over one's reproductive decision-making—including access to abortion—and financial stability and equal opportunities." [222]

Some of the most important findings from the NIRH polling include:

- Strong majorities of voters agree that being able to control one's fertility is an important ingredient of women's equality and is related to women's financial stability;

- Around eight in ten voters support a women's legislative agenda that combines protections for economic and reproductive rights and more than two-thirds of voters support policies to protect access to abortion specifically;

- Elected officials who support a women's agenda that protects reproductive health care, including abortion, are viewed more favorably by approximately seven out of ten voters.[223]

Additional qualitative research by NIRH in Georgia and Michigan revealed that while voters may resist a direct, near-term link between abortion and a woman's economic stability, they naturally connect a woman's access to abortion care with her future opportunities and economic well-being. Voters also clearly understand that once a woman has decided to have an abortion, whether she has access to the services needed to end her pregnancy can significantly affect her long-term life trajectory.[224]

> Voters…naturally connect a woman's access to abortion care with her future opportunities and economic well-being.

# CONCLUSION

According to the *Shriver Report: A Woman's Nation Pushes Back from the Brink*, 42 million women—and the 28 million children who depend on them—are "living one single incident—a doctor's bill, a late paycheck, or a broken-down car—away from economic ruin."[225] The Turnaway Study demonstrates that a birth resulting from an unintended pregnancy is another such incident that can upend the financial security of a woman and her family.[226]

Put simply, the anti-poverty agenda—affordable housing, health insurance, education, supplemental nutrition, a living wage, paid sick and family leave, child care and reliable public transportation—is incomplete without affordable, comprehensive reproductive health care, including contraception to prevent unintended pregnancies and abortion care to end such pregnancies when that is what a woman has determined is the best course under her circumstances. After all, the woman struggling to pay for contraception or abortion services is also the woman trying to find a job, pay her bills, and feed her children.

The policy solutions are quite clear:

Ensure access to contraception, including:

‖ Protecting and enforcing the ACA's no-cost contraceptive coverage benefit, including by fighting religiously-based loopholes.

‖ Expanding Medicaid in states that have not yet done so.

‖ Fully investing in the Title X family planning network and continuing to fund essential providers like Planned Parenthood Federation of America.

‖ Removing immigration-based restrictions on public and private insurance plans.

Remove barriers to abortion care, including:

‖ Eliminating the Hyde Amendment and other restrictions on public and private insurance coverage of abortion.

‖ Repealing state bans on abortion at 20 weeks.

‖ Lifting unnecessary and burdensome restrictions on abortion providers.

Provide economic supports for women who choose to carry their pregnancies to term, including:

|| Repealing family welfare caps.

|| Increasing child care tax credits.

|| Ensuring high quality child care.

|| Requiring paid family and sick leave.

|| Improving workplace flexibility.

And yet, retributive laws that cut off women from both reproductive health care and economic supports are proliferating at both the federal and state levels. Such a trend is one more reminder that policies that truly value families are ones that support *all* women's pregnancy decisions and help families thrive, rather than those that seek to punish women for allegedly transgressing social mores.

Policies targeting poor women have led to a tattered and torn safety net. But progressives can work to repair it by advocating for economic and reproductive justice together, by standing up to the constant attacks on abortion and contraception, and by developing proactive measures that promote a vision of low-income women's self-determination alongside their self-sufficiency. The economic and reproductive rights of all women will never be secure until we do.

1   Rebecca Leber, "Nancy Pelosi And House Democrats Launch Campaign To Make Women's Economic Success A Hot Issue," *ThinkProgress.com*, July 19, 2013, http://thinkprogress.org/economy/2013/07/19/2321591/nancy-pelosi-and-house-democrats-launch-campaign-to-make-womens-economic-success-a-hot-issue/; "The Issues: Women's Economic Agenda," Nancy Pelosi website, http://www.democraticleader.gov/issue/women-succeed-america-succeeds/.

2   Regional Forums on Working Families and White House Summit on Working Families, U.S. Department of Labor Women's Bureau, http://www.dol.gov/wb/WorkingFamilies/; "Fact Sheet: The White House Summit on Working Families," The White House Office of the Press Secretary, June 23, 2014, https://www.whitehouse.gov/the-press-office/2014/06/23/fact-sheet-white-house-summit-working-families.

3   "Fact Sheet: The White House Summit on Working Families."

4   Forward Together (then Asian Communities for Reproductive Justice) has defined reproductive justice as "the complete physical, mental, spiritual, political, economic, and social well-being of women and girls, and will be achieved when women and girls have the economic, social and political power and resources to make healthy decisions about our bodies, sexuality and reproduction for ourselves, our families and our communities in all areas of our lives." Asian Communities for Reproductive Justice, "A New Vision for Advancing Our Movement," 2005, http://strongfamiliesmovement.org/assets/docs/ACRJ-A-New-Vision.pdf. Similarly, SisterSong Collective has explained that reproductive justice encompasses "the right to have children, not to have children, and to parent the children we have in safe and healthy environments." SisterSong, "What is RJ?" http://sistersong.net/index.php?option=com_content&view=article&id=141.

5   Editorial, "Sins of Omission," *New York Times*, February 1, 2009, http://www.nytimes.com/2009/02/02/opinion/02mon2.html; Nancy Folbre, "Sex and the Stimulus," *New York Times*, February 5, 2009, http://economix.blogs.nytimes.com/2009/02/05/sex-and-the-stimulus/; Amanda Terkel, "Is the Obama administration caving to the right wing on family planning provision in stimulus bill?" *ThinkProgress.com*, January 26, 2009, http://thinkprogress.org/politics/2009/01/30/35322/family-planning-back/.

6   Sally Steenland and Jessica Arons, "Contraception is an Economic Issue: Family Planning and the Economy are Closely Connected," Center for American Progress, April 2, 2012, https://www.americanprogress.org/issues/women/news/2012/04/02/11387/contraception-is-an-economic-issue/.

7   PerryUndem Research/Communication, on behalf of National Institute for Reproductive Health, "Analysis of Voters' Opinions on Abortion in Women's Lives: Exploring Links to Equal Opportunity and Financial Stability," October 15, 2014, http://d35brb9zkkbdsd.cloudfront.net/wp-content/uploads/2014/10/Memo-NARAL-Oct152014-FINAL.pdf; National Institute for Reproductive Health, Memo to Interested Parties, "Research on the connection between abortion access and women's equality/economic security," July 14, 2015 (on file with authors).

8   We recognize that cisgender women are not the only people who have the capacity to become pregnant, need access to reproductive health care, or have faced gender-based discrimination, and we fully support comprehensive access to reproductive health care for all people regardless of gender identity. However, because the available literature typically uses the term "women" without further definition, we likewise use the term "women" throughout this report.

9   "Prevention of Infertility Source Document: The Impact of Age on Female Fertility," American Society for Reproductive Medicine, https://www.asrm.org/uploadedFiles/ASRM_Content/Resources/Patient_Resources/Protect_Your_Fertility/age_femaleinfertility.pdf.

10  Sarah Jane Glynn, "Breadwinning Mothers, Then and Now," Center for American Progress, June 2015, https://cdn.americanprogress.org/wp-content/uploads/2014/06/Glynn-Breadwinners-report-FINAL.pdf.

11  Guttmacher Institute, "Unintended Pregnancy in the United States," July 2015, http://www.guttmacher.org/pubs/FB-Unintended-Pregnancy-US.html.

12  Adam Sonfield et al., "The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children," Guttmacher Institute, March 2013, http://www.guttmacher.org/pubs/social-economic-benefits.pdf.

13  Claudia Goldin and Lawrence Katz, "The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions," *Journal of Political Economy* 110, no. 4 (2002): 730–770.

14  T.J. Mathews and Brady E. Hamilton, "Delayed Childbirth: More and More Women Are Having Their First Child Later In Life," Centers for Disease Control and Prevention, 2009, http://www.cdc.gov/nchs/data/databriefs/db21.htm.

15  Glynn, "Breadwinning Mothers, Then and Now."

16  Goldin and Katz, "The Power of the Pill"; see also Sonfield et al., "Social and Economic Benefits."

17  Goldin and Katz, "The Power of the Pill."

18  Sonfield et al., "Social and Economic Benefits."

19  Heather Boushey, Testimony Before the Senate Committee on Health, Education, Labor, and Pensions, "Strengthening the Middle Class: Ensuring Equal Pay for Women," Center for American Progress Action Fund, March 11, 2010, https://www.americanprogressaction.org/issues/labor/report/2010/03/11/7460/strengthening-the-middle-class-ensuring-equal-pay-for-women/.

20  Eileen Applebaum et al., "The Economic Importance of Women's Rising Hours of Work: Time to Update Employment Standards," Center for American Progress, April 15, 2014, https://www.americanprogress.org/issues/labor/report/2014/04/15/87638/the-economic-importance-of-womens-rising-hours-of-work/.

21  Glynn, "Breadwinning Mothers, Then and Now."

22  Ibid.

23  Joseph E. Stiglitz, "Rewriting the Rules of the American Economy: An Agenda for Growth and Shared Prosperity," Roosevelt Institute, 2015, http://www.rewritetherules.org/.

24  Ibid.

25  Ellen Chesler and Andrea Flynn, "Breaking the Cycle of Poverty: Expanding Access to Family Planning," Roosevelt Institute, March 31, 2014.

26  Nancy Duff Campbell, *Our Moment: An Economic Agenda for Women & Families*, National Women's Law Center, 2015, http://www.nwlc.org/sites/default/files/pdfs/final_nwlc_ourmomentreport2015.pdf.

27  Megan L. Kavanaugh and Ragnar M. Anderson, "Contraception and Beyond: The Health Benefits of Services Provided at Family Planning Centers," Guttmacher Institute, July 2013, https://www.guttmacher.org/pubs/health-benefits.pdf.

28    Ibid.

29    Guttmacher Institute, "Publicly Funded Family Planning Services in the United States," In Brief: Fact Sheet, October 2014, http://www.guttmacher.org/pubs/fb_contraceptive_serv.html; Jennifer J. Frost et al., "Return on investment: A fuller assessment of the benefits and cost savings of the US publicly funded family planning program," *The Milbank Quarterly* 92, no. 4 (2014): 667-720, doi: 10.1111/1468-0009.12080.

30    Jessica Arons, "Putting the Pill to Work," *Contraception* editorial, December 2010, http://www.arhp.org/Publications-and-Resources/Contraception-Journal/December-2010.

31    Sonfield et al., "Social and Economic Benefits."

32    Mary Prentice, Chelsey Storin, and Gail Robinson, "Make It Personal: How Pregnancy Planning and Prevention Helps Students Complete College," American Association of Community Colleges, 2012, http://www.aacc.nche.edu/Resources/aaccprograms/horizons/Documents/mipcc_dec2012.pdf.

33    Barbara Gault et al., "College Affordability for Low-Income Adults: Improving Returns on Investment for Families and Society," Institute for Women's Policy Research, April 2014, http://www.iwpr.org/publications/pubs/college-affordability-for-low-income-adults-improving-returns-on-investment-for-families-and-society/.

34    Ibid. The FPL is currently defined as an annual income of $24,250 for a family of four. 2015 Poverty Guidelines: U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs," United States Department of Health and Human Services, January 2015, http://aspe.hhs.gov/poverty/15poverty.cfm.

35    Gault et al., "College Affordability for Low-Income Adults: Improving Returns on Investment for Families and Society."

36    Ibid.

37    Ibid.

38    Ibid.

39    Ibid.

40    Heather Boushey, "The New Breadwinners," in *The Shriver Report: A Woman's Nation Changes Everything*, September 2009, http://shriverreport.org/the-new-breadwinners/.

41    International Labor Organization, "Maternity and Paternity at Work: Law and Practice Across the World," 2014, http://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_242617.pdf.

42    U.S. Department of Labor, "Work Hours," http://www.dol.gov/dol/topic/workhours/sickleave.htm; Abt Associates, "Family and Medical Leave in 2012: Technical Report," prepared for U.S. Department of Labor (September 2012, revised April 2014), http://www.dol.gov/asp/evaluation/fmla/FMLA-2012-Technical-Report.pdf.

43    Stiglitz, "Rewriting the Rules of the American Economy."

44    Milia Fisher, "Women of Color and the Wage Gap," Center for American Progress, April 2015, https://www.americanprogress.org/issues/women/report/2015/04/14/110962/women-of-color-and-the-gender-wage-gap/.

45    "The Healthy Families Act," Fact Sheet, National Partnership for Women and Families, February 2015, http://www.nationalpartnership.org/research-library/work-family/psd/the-healthy-families-act-fact-sheet.pdf.

46    Sarah Jane Glynn and Joanna Venator, "Allowing Employees Some Leeway Is Good for Businesses and the Economy," Center for American Progress, August 16, 2012, https://www.americanprogress.org/issues/labor/news/2012/08/16/11981/fact-sheet-workplace-flexibility/.

47    The National Partnership for Women and Families, "Listening to Mothers: The Experiences of Expecting and New Mothers in the Workplace," January 2014, http://www.nationalpartnership.org/research-library/workplace-fairness/pregnancy-discrimination/listening-to-mothers-experiences-of-expecting-and-new-mothers.pdf.

48    U.S. Department of Labor, Wage and Hour Division, "Section 7(r) of the Fair Labor Standards Act – Break Time for Nursing Mothers Provision," http://www.dol.gov/whd/nursingmothers/Sec7rFLSA_btnm.htm.

49    Lynda Laughlin, "Who's Minding the Kids? Child Care Arrangements: Spring 2011," U.S. Census Bureau, April 2013, http://www.census.gov/content/dam/Census/library/publications/2013/demo/p70-135.pdf.

50    Boushey, "New Breadwinners"; Wendy Wang, Kim Parker, and Paul Taylor, "Breadwinner Moms," Pew Research Center, May 29, 2013, http://www.pewsocialtrends.org/2013/05/29/breadwinner-moms/; Dana Singiser, "Healthy Women, Healthy Economy," *The Hill*, February 10, 2015, http://thehill.com/blogs/congress-blog/healthcare/232218-healthy-women-healthy-economy.

51    Wang, Parker, and Taylor, "Breadwinner Moms." For a more nuanced breakdown of all categories of breadwinning mothers, see Glynn, "Breadwinning Mothers, Then and Now."

52    National Women's Law Center, "How the Wage Gap Hurts Women and Families," April 2015, http://www.nwlc.org/sites/default/files/5.11.15_how_the_wage_gap_hurts_women_and_families.pdf. According to the Pew report: "It is possible that some two-parent households are made up of same-sex couples, but because of the data limitations (small sample sizes), same-sex couples were not analyzed separately." Wang, Parker, and Taylor, "Breadwinner Moms."

53    Chesler and Flynn, "Breaking the Cycle of Poverty."

54    National Women's Law Center, "National Snapshot: Poverty Among Women & Families, 2013," September 2014, http://www.nwlc.org/sites/default/files/pdfs/povertysnapshot2013.pdf.

55    Duff Campbell, *Our Moment: An Economic Agenda for Women & Families*.

56    Chesler and Flynn, "Breaking the Cycle of Poverty."

57    National Women's Law Center, "Underpaid & Overloaded: Women in Low-Wage Jobs," Executive Summary, July 2014, http://www.nwlc.org/underpaid-overloaded-women-low-wage-jobs-executive-summary.

58    National Women's Law Center, "Fair Pay for Women Requires a Fair Minimum Wage," May 13, 2015, http://www.nwlc.org/resource/fair-pay-women-requires-fair-minimum-wage.

59    Duff Campbell, *Our Moment: An Economic Agenda for Women & Families*.

60    Dorothy Roberts and Jessica Arons, "Sick and Tired," in *The Shriver Report: A Woman's Nation Changes Everything*, September 2009, http://shriverreport.org/sick-and-tired/.

61    National Women's Law Center, "How the Wage Gap Hurts Women and Families"; see also Fisher, "Women of Color and the Wage Gap."

62    Sonfield et al., "Social and Economic Benefits."

63    Ibid.

64    National Women's Law Center, "How the Wage Gap Hurts Women and Families."

65    Ibid.

66    Ibid.

67    Stiglitz, "Rewriting the Rules of the American Economy."

68    Roberts and Arons, "Sick and Tired."

69    Sarah Maslin Nir, "The Price of Nice Nails," *New York Times*, May 7, 2015, http://www.nytimes.com/2015/05/10/nyregion/at-nail-salons-in-nyc-manicurists-are-underpaid-and-unprotected.html.

70    While transmen may have the ability to become pregnant and transwomen may not, these policies are usually designed for and applied to fertile cisgender women.

71    Andres Negro-Vilar, "Stress and other environmental factors affecting fertility in men and women: Overview," *Environmental Health Perspectives* 101, no. S2 (July 1993): 59-64, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1519933/.

72    National Women's Law Center, "Reproductive Health Is Part of the Economic Health of Women and Their Families," February 19, 2015, http://www.nwlc.org/resource/reproductive-health-part-economic-health-women-and-their-families.

73    The Affordable Care Act now requires insurers to cover prenatal care and childbirth, a dramatic contribution to family health and economic well-being.

74    National Women's Law Center, "Nowhere To Turn: How the Individual Health Insurance Market Fails Women," September 2008, http://www.nwlc.org/sites/default/files/pdfs/NWLCReport-NowhereToTurn-81309w.pdf; National Partnership for Women and Families, "Why the Affordable Care Act Matters for Women: Better Care for Pregnant Women and Mothers," August 2014, http://www.nationalpartnership.org/research-library/health-care/better-care-for-pregnant-women.pdf.

75    Kaiser Family Foundation, "Key Facts on Health Coverage for Low-Income Immigrants Today and Under the Affordable Care Act," March 2013, https://kaiserfamilyfoundation.files.wordpress.com/2013/03/8279-02.pdf.

76    Elizabeth Warren, "Medical Bankruptcy: Middle Class Families at Risk," Testimony before the House Judiciary Committee, July 17, 2007, http://www.avaresearch.com/files/20090904073640.pdf.

77    Gretchen Livingston, "In a Down Economy, Fewer Births," Pew Research Center Social and Demographic Trends, October 2011, http://www.pewsocialtrends.org/2011/10/12/in-a-down-economy-fewer-births/.

78    Neil Shah, "U.S. Birthrate Hits Turning Point," *Wall Street Journal*, June 17, 2015, http://www.wsj.com/articles/u-s-birthrate-hits-turning-point-1434513662.

79    Ibid.

80    Ibid. For some indications of the Great Recession's influence on pregnancy intentions in the midst of the economic downturn, see Arons, "Putting the Pill to Work."

81    Martha J. Bailey, Brad Hershbein, and Amalia R. Miller, "The Opt-In Revolution? Contraception and the Gender Gap in Wages," National Bureau of Economic Research Working Paper Series, March 2012, No. 17922, http://www.nber.org/papers/w17922.

82    Martha J. Bailey, "Fifty Years of Family Planning: New Evidence on the Long-Run Effects of Increasing Access to Contraception," National Bureau of Economic Research Working Paper Series, October 2013, No. 19493, http://www.nber.org/papers/w19493; Sonfield et al., "Social and Economic Benefits."

83    Sonfield et al., "Social and Economic Benefits."

84    Tara Culp-Ressler, "U.S. Women Saved $483 Million On Their Birth Control Pills Last Year," *ThinkProgress.com*, May 7, 2014, http://thinkprogress.org/health/2014/05/07/3435156/women-save-money-birth-control/; IMS Institute for HealthCare Informatics, "Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013," April 2014.

85    Sonfield et al., "Social and Economic Benefits."

86    See, e.g., Eliana Dockterman, "5 Things Women Need to Know About the Hobby Lobby Ruling," *Time*, July 1, 2014, http://time.com/2941323/supreme-court-contraception-ruling-hobby-lobby/; Amanda Marcotte, "House Republicans Try to Zero Out Funding for Family Planning," *Slate*, June 16, 2015, http://www.slate.com/blogs/xx_factor/2015/06/16/house_republicans_and_title_x_they_want_to_zero_out_federal_funding_for.html; Andrea Flynn, "The Title X Factor: Why the Health of America's Women Depends on More Funding for Family Planning," Roosevelt Institute, Oct. 28, 2013, http://rooseveltinstitute.org/sites/all/files/2013_10_28_Flynn_Title_X.pdf.

87    National Women's Law Center, "Medicaid at 50: Celebrating Medicaid's Contribution's to Women's Economic Security," July 2015, http://www.nwlc.org/resource/medicaid-50-celebrating-medicaid%E2%80%99s-contributions-women%E2%80%99s-economic-security.

88    Kaiser Family Foundation, "Current Status of State Medicaid Expansion Decisions," July 20,2015, http://kff.org/health-reform/slide/current-status-of-the-medicaid-expansion-decision/.

89    Kaiser Family Foundation, "Key Facts on Health Coverage for Low-Income Immigrants."

90    Guttmacher Institute, "Induced Abortion in the United States," July 2014, http://www.guttmacher.org/pubs/fb_induced_abortion.html.

91    More information about the Turnaway Study and ANSIRH can be found at http://www.ansirh.org/research/turnaway.php.

92    A prospective longitudinal study is a study that is conducted over a period of time in order to explore the impact of certain variables on the occurrence of a specific outcome. The British Medical Journal, "Longitudinal Studies," http://www.bmj.com/about-bmj/resources-readers/publications/epidemiology-uninitiated/7-longitudinal-studies.

93    ANSIRH, "What is the Turnaway Study?," http://www.ansirh.org/research/turnaway.php.

94    The clinics in this study were more than 150 miles away from any other clinics that provided later abortion care, making it difficult if not impossible for the women to access care elsewhere.

95    Study eligibility included being pregnant, English or Spanish speaking, 15 years or older, and not having any known fetal anomalies or demise. Though data collection for the study continues through December 2015, a number of papers have been published examining findings from the first several years of the Turnaway Study. ANSIRH, "What is the Turnaway Study?"

96    Rachel Jones, Lawrence B. Finer, and Susheela Singh, "Characteristics of U.S. Abortion Patients, 2008," Guttmacher Institute, 2010; Sarah Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion in the United States," Women's Health Issues 24, no. 2 (March-April 2014): e211–e218.

97   Diana Greene Foster, Sarah Roberts, and Jane Mauldon, "Socioeconomic Consequences of Abortion Compared to Unwanted Birth" (abstract, American Public Health Association annual meeting, San Francisco, CA, October 30, 2012), https://apha.confex.com/apha/140am/webprogram/Paper263858.html.

98   Ibid.

99   Guttmacher Institute, "Unintended Pregnancy in the United States."

100  Rachel Jones and Megan Kavanaugh, "Changes in Abortion Rates Between 2000 and 2008 and Lifetime Incidence of Abortion," Obstetrics and Gynecology 117, no. 6 (June 2011): 1358-1366.

101  Lawrence B. Finer and Mia R. Zolna, "Shifts in Intended and Unintended Pregnancies in the United States, 2001–2008," American Journal of Public Health 104, no. S1 (2014): S44-S48, doi:10.2105/AJPH.2013.301416, available at http://www.guttmacher.org/pubs/journals/ajph.2013.301416.pdf.

102  Guttmacher Institute, "Unintended Pregnancy in the United States."

103  Richard V. Reeves and Joanna Venator, "Sex, Contraception, or Abortion? Explaining Class Gaps in Unintended Childbearing," The Brookings Institution, February 2015, http://www.brookings.edu/research/papers/2015/02/26-class-gaps-in-unintended-childbearing-reeves.

104  Planned Parenthood Action Fund, "Immigration Reform," http://www.plannedparenthoodaction.org/issues/immigration-reform/.

105  Guttmacher Institute, "The HEAL for Immigrant Women and Families Act Would Remove Harmful Barriers to Health Coverage," April 22, 2015, https://www.guttmacher.org/media/inthenews/2015/04/22/index.html.

106  Joan Entmacher et al., "Insecure & Unequal: Poverty and Income Among Women and Families, 2000-2012," National Women's Law Center, 2013, http://www.nwlc.org/sites/default/files/pdfs/final_2013_nwlc_povertyreport.pdf.

107  Structural racism has been defined as: "A system in which public policies, institutional practices, cultural representations, and other norms work in various, often reinforcing ways to perpetuate racial group inequity." The Aspen Institute, "Glossary for Understanding the Dismantling Structural Racism/Promoting Racial Equity Analysis," http://www.aspeninstitute.org/sites/default/files/content/docs/rcc/RCC-Structural-Racism-Glossary.pdf.

108  Jessica Arons and Madina Agénor, "Separate and Unequal: The Hyde Amendment and Women of Color," Center for American Progress, December 2010, https://www.americanprogress.org/issues/women/report/2010/12/06/8808/separate-and-unequal/.

109  Maria Guerra, "Fact Sheet: The State of African American Women in the United States," Center for American Progress, Nov. 7, 2013, https://www.americanprogress.org/issues/race/report/2013/11/07/79165/fact-sheet-the-state-of-african-american-women-in-the-united-states/.

110  Center for Reproductive Rights, "Addressing Disparities in Reproductive and Sexual Health Care in the U.S.," http://www.reproductiverights.org/node/861.

111  Center for Reproductive Rights et al., "Report on the United States' Compliance with Its Human Rights Obligations in the Area of Women's Reproductive and Sexual Health," Submission to the United Nations Universal Periodic Review, 2010, http://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/CRR%20UPR%20Report-US-2010.pdf.

112  Center for Reproductive Rights, "Addressing Disparities in Reproductive and Sexual Health Care."

113  Finer and Zolna, "Shifts in Intended and Unintended Pregnancies."

114  Christine Dehlendorf, Lisa H. Harris, and Tracy A. Weitz, "Disparities in Abortion Rates: A Public Health Approach," American Journal of Public Health 103, no. 10 (October 2013): 1772-1779, doi:10.2105/AJPH.2013.301339.

115  Arons and Agénor, "Separate and Unequal."

116  M. Antonia Biggs, Heather Gould, and Diana Greene Foster, "Understanding Why Women Seek Abortions in the U.S.," BMC Women's Health 13, no. 29 (July 2013), http://www.biomedcentral.com/1472-6874/13/29; see also Lawrence B. Finer et al., "Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives," Perspectives on Sexual and Reproductive Health 37, no. 3 (September 2005): 110-118, http://www.guttmacher.org/pubs/journals/3711005.html.

117  Biggs, Gould, and Foster, "Understanding Why Women Seek Abortions."

118  Ibid.; see also Finer et al., "Reasons U.S. Women Have Abortions."

119  Biggs, Gould, and Foster, "Understanding Why Women Seek Abortions."

120  Ibid.

121  Ibid.

122  Ibid.

123  Ibid.

124  Ibid.

125  Ibid.

126  Ibid.

127  Ibid.

128  Ibid.

129  Ibid.

130  Ibid.

131  Guttmacher Institute, "Induced Abortion in the United States."

132  Biggs, Gould, and Foster, "Understanding Why Women Seek Abortions."

133  Foster, Roberts, and Mauldon, "Socioeconomic Consequences" (abstract); Joshua Lang, "What Happens to Women Who Are Denied Abortions?" New York Times Magazine, June 16, 2013, http://www.nytimes.com/2013/06/16/magazine/study-women-denied-abortions.html.

134  Diana Greene Foster, Sarah Roberts, and Jane Mauldon, "Socioeconomic consequences of receiving an abortion compared to carrying an unwanted pregnancy to term" (presentation, American Public Health Association annual meeting, San Francisco, CA, October 30, 2012) (on file with authors). We note that this statistic is based on preliminary analysis conducted on data available two years into the study. A conclusive finding will be available after the five-year study has been completed in December 2015.

135  Foster, Roberts, and Mauldon, "Socioeconomic Consequences" (abstract).

136   Ibid.

137   Ibid.

138   Lang, "What Happens to Women Who Are Denied Abortions?"

139   See, e.g., Jenna Jerman and Rachel K. Jones, "Secondary Measures of Access to Abortion Services in the United States, 2011 and 2012: Gestational Age Limits, Cost, and Harassment," *Women's Health Issues* 24, no. 4 (2014): e419–e424, http://www.guttmacher.org/pubs/journals/j.whi.2014.05.002.pdf; Christine Dehlendorf and Tracy Weitz, "Access to Abortion Services: A Neglected Health Disparity," *Journal of Health Care for the Poor and Underserved* 22 (2011): 415–421.

140   Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion."

141   Rachel Benson Gold and Elizabeth Nash, "TRAP Laws Gain Political Traction While Abortion Clinics—and the Women They Serve—Pay the Price," *Guttmacher Policy Review* 16, no. 2 (Spring 2013), https://www.guttmacher.org/pubs/gpr/16/2/gpr160207.html.

142   Guttmacher Institute, "Induced Abortion in the United States."

143   Tara Culp-Ressler and Erica Hellerstein, "Pricing American Women Out of Abortion, One Restriction at a Time," *ThinkProgress.com*, February 25, 2015, http://thinkprogress.org/health/2015/02/25/3622531/cost-abortion-investigation/.

144   Ibid.

145   Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion."

146   Ibid.

147   Reeves and Venator, "Sex, Contraception, or Abortion?"; Rachel O'Connor, Jeff Hayes, and Barbara Gault, "Paid Sick Days Access Varies by Race/Ethnicity, Sexual Orientation, and Job Characteristics," Institute for Women's Policy Research, July 2014, http://www.iwpr.org/publications/pubs/paid-sick-days-access-varies-by-race-ethnicity-sexual-orientation-and-job-characteristics.

148   Katherine Richard, "The Wealth Gap for Women of Color," Center for Global Policy Solutions, October 2014, http://globalpolicysolutions.org/wp-content/uploads/2014/10/Wealth-Gap-for-Women-of-Color.pdf.

149   Tim Grant, "Study finds median wealth for single black women at $5," *Pittsburgh Post-Gazette*, March 9, 2010, http://www.post-gazette.com/business/businessnews/2010/03/09/Study-finds-median-wealth-for-single-black-women-at-5/stories/201003090163.

150   Heather Boonstra, "The Heart of the Matter: Public Funding of Abortion for Poor Women in the United States," *Guttmacher Policy Review* 10, no. 1 (Winter 2007), https://www.guttmacher.org/pubs/gpr/10/1/gpr100112.html.

151   Ibid.; Strong Families, *Reproductive Justice Media Reference Guide*, 2015, http://strongfamiliesmovement.org/assets/files/rj-media-guide.pdf.

152   Guttmacher Institute, "State Funding of Abortion Under Medicaid," State Policies in Brief, as of July 1, 2015, http://www.guttmacher.org/statecenter/spibs/spib_SFAM.pdf.

153   Boonstra, "Heart of the Matter."

154   Guttmacher Institute, "Restricting Insurance Coverage of Abortion," State Policies in Brief, as of July 1, 2015, http://www.guttmacher.org/statecenter/spibs/spib_RICA.pdf.

155   Ibid.

156   Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion."

157   Ibid.

158   Ibid.

159   Ibid.

160   Rachel K. Jones, Ushma D. Upadhyay, and Tracy A. Weitz, "At What Cost? Payment for Abortion Care by U.S. Women," *Women's Health Issues* 23, no. 3 (May 2013): e173-e178, https://www.guttmacher.org/pubs/journals/j.whi.2013.03.001.pdf.

161   Ibid.

162   Adrianne Nickerson, Ruth Manski, and Amanda Dennis, "A Qualitative Investigation of Low-Income Abortion Clients' Attitudes Toward Public Funding for Abortion," *Women & Health* 54, no. 7 (2014): 672-86, doi: 10.1080/03630242.2014.919984.

163   Bayla Ostrach and Melissa Cheyney, "Navigating Social and Institutional Obstacles: Low-Income Women Seeking Abortion," *Qualitative Health Research* 24, no. 7 (2014): 1006-1017.

164   Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion."

165   Lawrence B. Finer et al., "Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States," *Contraception* 74 (2006): 334 – 344, http://www.guttmacher.org/pubs/2006/10/17/Contraception74-4-334_Finer.pdf.

166   Roberts et al., "Out-of-Pocket Costs and Insurance Coverage for Abortion."

167   Ibid.

168   Ushma D. Upadhyay et al., "Denial of Abortion Because of Provider Gestational Age Limits in the United States," *American Journal of Public Health* 104, no. 9 (September 2014): 1687-1694.

169   Finer et al., "Timing of Steps and Reasons for Delays in Obtaining Abortions."

170   Diana Greene Foster and Katrina Kimport, "Who Seeks Abortion at or After 20 Weeks?" *Perspectives on Sexual and Reproductive Health 45, no. 4 (*December 2013): 210-218, doi: 10.1363/4521013.

171   Finer et al., "Timing of Steps and Reasons for Delays in Obtaining Abortions."

172   Greene Foster and Kimport, "Who Seeks Abortion at or After 20 Weeks?"

173   Ibid.

174   Ibid.

175   Upadhyay et al., "Denial of Abortion Because of Provider Gestational Age Limits"; Greene Foster and Kimport, "Who Seeks Abortion at or After 20 Weeks?"

176   Lang, "What Happens to Women Who Are Denied Abortions?"

177   Greene Foster and Kimport, "Who Seeks Abortion at or After 20 Weeks?"

178   Strong Families, "Immigrant Communities and Abortion," *Reproductive Justice Media Reference Guide*, 2015 http://strongfamiliesmovement.org/rj-immigrant-access.

179  National Latina Institute for Reproductive Health, "Immigrant Latinas & Abortion: The Fight for Access to Comprehensive Coverage and Care," March 2015, http://www.latinainstitute.org/sites/default/files/NLIRH_ImmWmnAbrtn_FactSheet_Eng_R6.pdf.

180  Stanley K. Henshaw et al., "Restrictions on Medicaid Funding for Abortions: A Literature Review," Guttmacher Institute, June 2009, http://www.guttmacher.org/pubs/MedicaidLitReview.pdf.

181  Dehlendorf and Weitz, "Access to Abortion Services: A Neglected Health Disparity."

182  Upadhyay et al., "Denial of Abortion Because of Provider Gestational Age Limits."

183  Ibid.

184  Bridgit Burns, Amanda Dennis, and Ella Douglas-Durham, *Evaluating Priorities: Measuring Women's and Children's Health and Well-being against Abortion Restrictions in the States*, Ibis Reproductive Health, September 2014, http://www.reproductiverights.org/sites/crr.civicactions.net/files/documents/Priorities_Project.pdf.

185  Guttmacher Institute, "State Policies on Later Abortions," State Polices in Brief, as of July 1, 2015, http://www.guttmacher.org/statecenter/spibs/spib_PLTA.pdf.

186  Upadhyay et al., "Denial of Abortion Because of Provider Gestational Age Limits."

187  Greene Foster and Kimport, "Who Seeks Abortion at or After 20 Weeks?"

188  "Reproductive and Sexual Coercion," Committee Opinion No. 554, American College of Obstetricians and Gynecologists, *Obstetrics & Gynecology* 121 (February 2013): 411-515.

189  Karuna S. Chibber et al., "The Role of Intimate Partners in Women's Reasons for Seeking Abortion," *Women's Health Issues* 24, no. 1 (2014): e131-138.

190  Ibid.

191  Ibid.

192  Sandra L. Martin, Jennet Arcara, and McLean D. Pollock, "Violence During Pregnancy and the Postpartum Period," National Resource Center on Domestic Violence, December 2012, http://www.vawnet.org/; Karen Rosene-Montella et al., eds., Medical Care of the Pregnant Patient: Second Edition, American College of Physicians (Philadelphia: ACP Press, 2008).

193  Ostrach and Cheyney, "Navigating Social and Institutional Obstacles: Low-Income Women Seeking Abortion."

194  Sarah C.M. Roberts et al., "Risk of Violence from the Man Involved in the Pregnancy After Receiving or Being Denied an Abortion," *BMC Medicine* 12 (2014): 144, doi:10.1186/s12916-014-0144-z.

195  Ibid.

196  Ibid.

197  Sarah C.M. Roberts et al., "Alcohol, Tobacco and Drug Use as Reasons for Abortion," *Alcohol and Alcoholism* 47, no. 6 (2012): 640–648.

198  Ibid.

199  Ibid.

200  Ibid.

201  American College of Obstetricians and Gynecologists, "Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician-Gynecologist," Committee Opinion No. 473, *Obstetrics & Gynecology* 117 (January 2011): 200-1; National Advocates for Pregnant Women, "Facts About Drug Treatment," http://www.advocatesforpregnantwomen.org/issues/crackfacts.htm; Jeanne Flavin and Lynn M. Paltrow, "Punishing Pregnant Drug-Using Women: Defying Law, Medicine, and Common Sense," *Journal of Addictive Diseases* 29, no. 2 (2010): 231-244; Jeanene Swanson, "Pregnancy and Addiction Treatment," *The Fix*, October 29, 2014, http://www.thefix.com/content/how-do-we-treat-pregnant-addicts.

202  Guttmacher Institute, "Substance Abuse During Pregnancy," State Policies in Brief, as of July 1, 2015, http://www.guttmacher.org/statecenter/spibs/spib_SADP.pdf.

203  American College of Obstetricians and Gynecologists, "Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician-Gynecologist"; Flavin and Paltrow, "Punishing Pregnant Drug-Using Women."

204  Roberts et al., "Alcohol, Tobacco and Drug Use as Reasons for Abortion."

205  Ibid.

206  Ibid.

207  Sarah C.M. Roberts, Corinne H. Rocca, and Diana Greene Foster, "Receiving Versus Being Denied an Abortion and Subsequent Drug Use," *Drug and Alcohol Dependence* 134 (January 2014): 63-70.

208  Sarah C. M. Roberts et al., "Receiving Versus Being Denied a Pregnancy Termination and Subsequent Alcohol Use: A Longitudinal Study," *Alcohol and Alcoholism* 50, no. 4 (2015): 477-484.

209  Upadhyay et al., "Denial of Abortion Because of Provider Gestational Age Limits."

210  Foster, Roberts, and Mauldon, "Socioeconomic Consequences" (abstract).

211  Diana Greene Foster, email message to authors, July 17, 2015.

212  Foster, Roberts, and Mauldon, "Socioeconomic Consequences" (abstract).

213  Lang, "What Happens to Women Who Are Denied Abortions?"

214  Biggs, Gould, and Foster, "Understanding Why Women Seek Abortions."

215  Jamelle Bouie, "The Most Discriminatory Law in the Land," *Slate*, June 17, 2014, http://www.slate.com/articles/news_and_politics/politics/2014/06/the_maximum_family_grant_and_family_caps_a_racist_law_that_punishes_the.html.

216  Signe-Mary McKernan and Caroline Ratcliffe, *The Effect of Specific Welfare Policies on Poverty*, Urban Institute, April 2006, http://www.urban.org/research/publication/effect-specific-welfare-policies-poverty/view/full_report.

217  Burns, Dennis, and Douglas-Durham, *Evaluating Priorities: Measuring Women's and Children's Health and Well-being*.

218  Ibid.

219  Ibid.

220  Andrea Grimes, "Losing My Lege: Lawmakers Pitched 32 New Abortion Bills in Texas This Year, and a Few Might Pass," *RH Reality Check*, May 1, 2015, http://rhrealitycheck.org/article/2015/05/01/losing-lege-lawmakers-pitched-32-new-abortion-bills-texas-year-might-pass/.

221  Tara Culp-Ressler, "Texas May Slash Cancer Screenings For Low-Income Women," January 29, 2015, *ThinkProgress.com*, http://thinkprogress.org/health/2015/01/29/3617158/texas-budget-cancer-planned-parenthood/; National Latina Institute for

Reproductive Health, "Latinas and Cervical Cancer in Texas: A Public Health Crisis," January 2013, http://latinainstitute.org/sites/default/files/Latinas-and-Cervical-Cancer-inTexas-NLIRH-Fact-Sheet-January-2013.pdf.

222 National Institute for Reproductive Health, Memo to Interested Parties, "Research on the connection between abortion access and women's equality/economic security," July 14, 2015 (on file with authors).

223 National Institute for Reproductive Health, Press Release, "New Polling Bolsters Evidence that Voters Link Control Over Reproductive Decisions — Including Abortion Access — to Women's Financial Stability, Equal Opportunity," July 7, 2015, http://nirhealth.org/sections/publications/va_polling_release.asp.

224 National Institute for Reproductive Health, "Research on the connection between abortion access and women's equality/economic security."

225 Maria Shriver and the Center for American Progress, "*The Shriver Report* Executive Summary," *The Shriver Report: A Woman's Nation Pushes Back from the Brink*, January 12, 2014, https://www.americanprogress.org/issues/economy/report/2014/01/12/81906/the-shriver-report-a-womans-nation-pushes-back-from-the-brink/.

226 Moreover, these findings are based on only the first few years of data. We look forward to providing an update on these measures of socioeconomic well-being for the women who obtain and are denied abortion care once the study is complete.