**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF OREGON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; ATTORNEY GENERAL OF MICHIGAN; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF RHODE ISLAND; STATE OF VERMONT; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; COMMONWEALTH OF PENNSYLVANIA, | No. 23-35294<br><br>D.C. No. 1:23-cv-03026-TOR<br><br><br>OPINION |
| *Plaintiffs-Appellees,* | |
| v. | |
| U.S. FOOD & DRUG ADMINISTRATION; ROBERT M. CALIFF, in his official capacity as Commissioner of Food and Drugs; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in | |

2            STATE OF WASHINGTON V. FDA

his official capacity as Secretary of the
Department of Health and Human
Service,

            *Defendants-Appellees*,

    v.

STATE OF IDAHO; STATE OF
IOWA; STATE OF MONTANA;
STATE OF NEBRASKA; STATE OF
SOUTH CAROLINA; STATE OF
TEXAS; STATE OF UTAH, Proposed
State Plaintiff-Intervenors,

            *Movants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submission Deferred March 13, 2024
Submitted July 17, 2024
San Francisco, California

Filed July 24, 2024

Before:  Sidney R. Thomas, M. Margaret McKeown, and
Morgan Christen, Circuit Judges.

Opinion by Judge Sidney R. Thomas

STATE OF WASHINGTON v. FDA                3

## SUMMARY[*]

### Article III Standing / Intervention

The panel affirmed the district court's order denying Idaho's motion to intervene as of right, and dismissed for lack of jurisdiction the portion of the appeal concerning the district court's denial of permissive intervention, in the State of Washington's lawsuit challenging the Food and Drug Administration's imposition of safe-use restrictions on the abortion drug mifepristone.

The Food, Drug, and Cosmetic Act authorizes the FDA to restrict access to certain drugs by imposing a "risk evaluation and mitigation strategy" ("REMS") when it concludes that doing so is necessary to ensure that the benefits of the drug outweigh the risks. In a 2023 REMS, the FDA eliminated in-person dispensing requirements for mifepristone and allowed certain pharmacies to dispense mifepristone at retail locations or by mail. Washington and a collation of states sued the FDA under the Administrative Procedure Act, arguing that the agency should have gone further to eliminate hurdles to accessing mifepristone. Idaho and a different coalition of states moved to intervene seeking injunctive relief that would effectively reimpose the previous REMS, including the in-person dispensing requirement.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

4                    STATE OF WASHINGTON V. FDA

The panel held that because Idaho sought different relief from Washington, it must independently satisfy the requirements of Article III standing.

The panel concluded that Idaho's complaint-in-intervention did not establish a cognizable injury-in-fact that was fairly traceable to the FDA's revised safe-use restrictions. Idaho could not establish standing based on the alleged costs to the state's finances because the asserted casual chain was too attenuated. The panel rejected Idaho's allegation that elimination of the in-person dispensing requirement would harm its sovereign interest in law enforcement by making illegal mifepristone use harder to detect because nothing in the REMS impaired Idaho's sovereign authority to enact or enforce its own laws regulating chemical abortion. Finally, the panel rejected Idaho's allegation that elimination of the in-person dispensing requirement would harm its "quasi-sovereign interest" in maternal health and fetal life because the allegations concern the interests of individual citizens—not the separate interests of the state itself.

Guided by the Supreme Court's recent decision on standing in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the panel held that because Idaho did not have standing to bring the claims in its complaint, it affirmed the denial of its motion to intervene. The panel did not reach any other issue raised in the district court or urged by the parties on appeal, including whether Idaho would be otherwise entitled to intervene under Fed. R. Civ. P. 24.

STATE OF WASHINGTON V. FDA                    5

## COUNSEL

Emma Grunberg (argued) and Tera M. Heintz, Deputy Solicitors General; Noah G. Purcell, Solicitor General; Office of the Attorney General, Olympia, Washington; Andrew R.W. Hughes and Lauryn K. Fraas, Assistant Attorneys General; Kristin Beneski, First Assistant Attorney General; Colleen M. Melody, Civil Rights Division Chief; Robert W. Ferguson, Attorney General; Office of the Attorney General, Seattle, Washington;

Dustin Buehler, Deputy Attorney General; Ellen F. Rosenblum, Attorney General; Denise G. Fjordbeck, Assistant Attorney General; Sander Marcus Hull, Senior Assistant Attorney General; Youngwoo J. Osb, Assistant Attorney General; Oregon Department of Justice, Salem, Oregon; Carla Scott, Deputy Attorney General, Oregon Department of Justice; Portland, Oregon;

Luci D. Davis, Deputy Attorney General; Kris Mayes, Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; Daniel C. Barr, Perkins Coie LLP, Phoenix, Arizona;

Sabrena Clinton, Deputy Attorney General; Heidi P. Stern, Solicitor General; Aaron D. Ford, Attorney General; Office of the Nevada Attorney General, Las Vegas, Nevada;

Aletheia Allen, Solicitor General; Raul Torrey, Attorney General; Office of the New Mexico Attorney General, Albuquerque, New Mexico;

Peter F. Neronha, Attorney General; Julia C. Harvey, Special Assistant Attorney General; Office of the Rhode Island Attorney General, Providence, Rhode Island;

Douglas Keehn, Assistant Attorney General; Charity R. Clark, Attorney General; Eleanor L.P. Spottswood, Solicitor General; Office of the Vermont Attorney General, Montpelier, Vermont;

Brian L. Schwalb, Attorney General; Jennifer C. Jones, Deputy Attorney General Public Advocacy Division; William Stephens, Counsel to Deputy; Nicole S. Hill, Assistant Attorney General; Office of the District of Columbia Attorney General, Washington, D.C.;

Philip J. Weiser, Attorney General; Michael McMaster, Assistant Attorney General; Office of the Colorado Attorney General, Denver, Colorado; Eric Olson, Olson Grimsley Kawanabe Hinchcliff & Murray LLC, Denver, Colorado;

William Tong, Attorney General; Joshua Perry, Solicitor General; Office of the Connecticut Attorney General, Hartford, Connecticut;

Kathleen Jennings, Attorney General; Vanessa L. Kassab, Deputy Attorney General; Office of the Delaware Attorney General, Wilmington, Delaware;

Kwame Raoul, Attorney General; Lisa Roberson-Young, Public Interest Counsel; Office of the Illinois Attorney General, Chicago, Illinois;

Dana Nessel, Attorney General; Stephanie M. Service, Assistant Attorney Michigan Department of the Attorney General Health, Education and Family Services Division; Office of the Michigan Attorney General, Lansing Michigan;

Anne E. Lopez, Attorney General; Erin Lau, Deputy Attorney General, Office of the Hawaii Attorney General, Honolulu, Hawaii;

Aaron M. Frey, Attorney General; Halliday Moncure, Assistant Attorney General; Office of the Maine Attorney General, Augusta, Maine;

Joshua M. Segal, Assistant Attorney General; Anthony G. Brown, Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland;

Keith Ellison, Attorney General; Liz Kramer, Solicitor General; Jennifer Olson, Assistant Attorney General; Office of the Minnesota Attorney General, St. Paul, Minnesota;

Michael A. Henry, Attorney General; Jill M. Graziano, Chief Counsel to the Attorney General; Office of the Commonwealth of Pennsylvania Attorney General; Morrison, Pennsylvania; for Plaintiffs-Appellees.

Daniel L. Winik (argued), Dana Kaersvang and Michael S. Raab, Appellate Staff Attorneys; Vanessa R. Waldref, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Joshua N. Turner (argued), Acting Solicitor General, Chief of Constitutional Litigation and Policy; Sean M. Corkery, Assistant Solicitor General; Theodore J. Wold, Solicitor General; Michael A. Zarian, Deputy Solicitor General; Raul R. Labrador, Idaho Attorney General; Office of the Attorney General, Boise, Idaho; Peter M. Torstensen Jr., Assistant Solicitor General, Office of the Montana Attorney General, Helena, Montana; Thomas T. Hydrick, Deputy Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Stanford Purser, Deputy Solicitor, Office of the Utah Attorney General, Salt Lake

8                STATE OF WASHINGTON v. FDA

City, Utah; Lincoln D. Wilson, Alliance Defending
Freedom, Washington, D.C.; for Movants-Appellants.

<hr>

## OPINION

THOMAS, Circuit Judge:

In this appeal, we consider whether Idaho is entitled to
intervene in Washington's lawsuit challenging the Food and
Drug Administration's ("FDA") imposition of safe-use
restrictions on the abortion drug mifepristone. We conclude
that, because Idaho seeks different relief than Washington, it
must independently satisfy the requirements of Article III
standing. We further conclude that Idaho's complaint-in-
intervention does not establish a cognizable injury-in-fact
that is fairly traceable to FDA's revised safe-use restrictions.
We are guided in our decision by the Supreme Court's recent
decision on standing and the FDA's regulation of
mifepristone in *FDA v Alliance for Hippocratic Medicine*.
602 U.S. 367 (2024). Because Idaho does not have standing
to bring the claims in its complaint, we affirm the denial of
its motion to intervene.

I

A

The Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C.
§ 301 *et seq*., tasks FDA with ensuring the safety and
efficacy of all drugs that enter into interstate commerce. *See
Wyeth v. Levine*, 555 U.S. 555, 566–67 (2009). Before a new
drug is approved, the drug's sponsor must submit an
application that includes patent and manufacturing

information, the results of laboratory and clinical testing, and proposed labeling and instructions for use. 21 U.S.C. § 355(b). The statute instructs FDA to approve a new drug only when it determines that the drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling." *Id*. § 355(d).

The FDCA also authorizes FDA to restrict access to certain drugs by imposing a "risk evaluation and mitigation strategy" or "REMS" when it concludes that doing so is "necessary to ensure that the benefits of the drug outweigh the risks[.]" *Id*. § 355-1(a)(1).[1] A REMS may include restrictions on drug labeling and packaging, as well as more burdensome "safe use" restrictions, such as requirements that providers be specially certified or that patients be subjected to post-administration monitoring. *Id*. §§ 355-1(d)–355-1(f). Unlike package and labeling requirements, safe-use restrictions may only be imposed on drugs "with known serious risks" of a "serious adverse drug experience." *Id*. § 355-1(f); *id*. § 355-1(b)(4). The statute instructs FDA to design safe-use restrictions to ensure that they are "commensurate with the specific serious risk" and do not "unduly burden[]" patient access. *Id*. § 355-1(f)(2). Once safe-use restrictions have been imposed, FDA must periodically reevaluate them to ensure the restrictions are

---

[1] FDA's authority to adopt additional restrictions was previously governed by 21 C.F.R. §§ 314.500–560 ("Subpart H"). FDA adopted Subpart H in 1992 to accelerate its approval of new drugs with the potential to treat "serious or life-threatening illnesses" by authorizing the agency to impose post-approval safety restrictions. 57 Fed. Reg. 58942, 58958–59 (Dec. 11, 1992). This authority was codified and expanded by the Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823, which replaced Subpart H with the statutory "REMS" framework. *See id*. § 505-1, 121 Stat. at 926–39.

well calibrated to balance safety, access, and "the burden on the health care delivery system." *Id.* § 355-1(f)(5)(B).

### B

Mifepristone is a medication that, when used in combination with another drug called misoprostol, can safely end an early pregnancy. FDA first authorized the marketing of mifepristone under the commercial name "Mifeprex" in 2000. As a condition of its approval, FDA stipulated that Mifeprex could only be dispensed in person, under the supervision of a physician with certain qualifications, after the patient had been advised of the drugs risks and had reviewed and signed a "patient agreement form." *See All. for Hippocratic Med.*, 602 U.S. at 375–76 (describing original restrictions on Mifeprex approval).

In 2011, FDA reauthorized Mifeprex under the revised statutory framework that codified and expanded the agency's authority to impose a REMS. FDA retained the original conditions on distribution, formulated as three discrete safe-use restrictions requiring (1) in-person dispensing, (2) prescriber certification, and (3) documentation of patient counseling and consent.

Between 2011 and 2019, FDA reviewed the Mifeprex REMS several times, authorizing a handful of changes to prescribing guidelines and, in 2019, approving a generic version of mifepristone. At the conclusion of each review FDA concluded it was necessary to retain the three safe-use restrictions with only minor adjustments. *See All. for Hippocratic Medicine*, 602 U.S. at 375–76.

In 2020, FDA was forced to temporarily suspend the in-person dispensing requirement in response to a lawsuit filed by healthcare providers during the COVID-19 pandemic.

*Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 194–97 (D. Md. 2020). The suspension was in effect for six months, from July 2020 until January 2021, before the district court's injunction was stayed by the Supreme Court. *See FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (2021). During this time, FDA observed no impact on patient safety. Based in part on this revelation, FDA voluntarily stopped enforcing the in-person dispensing requirement in April 2021 and initiated a full review of the Mifepristone REMS Program.

In December 2021, FDA announced the completion of the review and its conclusions that the in-person dispensing requirement should be permanently eliminated, thus allowing certain pharmacies to dispense mifepristone at retail locations or by mail. In place of in-person dispensing, FDA added a new REMS requirement that pharmacies be specially certified before dispensing the drug to ensure compliance with the other safe-use restrictions—prescriber certification and patient documentation—which FDA elected to retain. The new REMS was finalized in January 2023.

C

In February 2023, a coalition of states led by Washington sued FDA under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), arguing that the agency should have gone further to eliminate hurdles to accessing mifepristone.[2]

---

[2] The eighteen plaintiff jurisdictions are Washington, Oregon, Arizona, Colorado, Connecticut, Delaware, Illinois, Michigan, Nevada, New Mexico, Rhode Island, Vermont, D.C., Hawaii, Maine, Maryland, Minnesota, and Pennsylvania. Because the plaintiff states are similarly situated for the purpose of this appeal, we refer to them collectively as "Washington."

12                    STATE OF WASHINGTON V. FDA

Given the rarity of adverse events in the drug's twenty-some
year history, Washington argues that mifepristone should no
longer be subject to *any* of the original safe-use restrictions.
Washington alleges that it is harmed as a regulated provider
of maternal health care and pharmacy dispensing, and is
forced to incur significant costs and risk as a result of the
certification and documentation requirements.  Washington
supports these allegations with numerous sworn declarations
from providers and administrators who work for state
healthcare facilities.

Washington's operative complaint challenges the 2023
REMS as imposing "hurdles" to drug access "without any
corresponding medical benefit," in violation of the FDCA,
21 U.S.C. § 355-1(f)(2) and APA, 5 U.S.C. § 706(2).  In its
prayer for relief, Washington seeks a declaration that
mifepristone is "safe and effective" and an injunction
prohibiting FDA from enforcing the restrictions contained in
the 2023 REMS or otherwise "taking any action . . . to reduce
[mifepristone's] availability."   Washington also filed a
motion for preliminary injunction, requesting the district
court to enjoin the FDA from enforcing the 2023 REMS or
otherwise "caus[ing] the drug to become less available."

In March 2023, a different coalition of states led by
Idaho moved to intervene, arguing that Washington's
lawsuit jeopardizes their legally protected interests in
regulating the use of mifepristone within their borders.[3]
Idaho argues that Washington's lawsuit could impair its
interest by making mifepristone easier to obtain and harder

---

[3] The seven intervenor states are Idaho, Iowa, Montana, Nebraska, South
Carolina, Texas, and Utah.  Because the intervenor states are similarly
situated for the purpose of this appeal, we refer to them collectively as
"Idaho."

STATE OF WASHINGTON V. FDA                    13

to police, and by limiting Idaho's ability to challenge the REMS in a separate lawsuit.

Idaho filed a proposed complaint-in-intervention that, like Washington's, advances three causes of action under the APA and seeks broad declaratory relief concerning the legality of the 2023 REMS. Unlike Washington, however, Idaho seeks injunctive relief that would effectively reimpose the previous REMS, including the in-person dispensing requirement. Idaho predicts that elimination of the in-person dispensing requirement will lead to increased mifepristone use under conditions that are either dangerous or illegal. Idaho alleges this uptick will injure the state in three ways. First, Idaho alleges that more women will experience complications that require follow-up care, "some of which [will be] borne by Idaho through Medicaid expenditures." Second, Idaho alleges that elimination of the "controlled" in-person "delivery system" will "undermine Idaho's ability to enforce its laws." Third, Idaho alleges that increased mifepristone use will endanger women and prenatal life, in which Idaho has a "legitimate interest."

Washington and FDA both opposed intervention but advanced different arguments for why Idaho's motion should be denied. Washington argued that Idaho did not satisfy the requirements for intervention under Federal Rule of Civil Procedure 24 because its interest in reimposing the in-person dispensing requirement was not implicated in Washington's case, which concerns the legality of different safe-use restrictions. FDA argued the motion should be denied because Idaho did not satisfy a threshold requirement to demonstrate Article III standing to pursue relief that is different from the relief requested by the existing plaintiffs.

14          STATE OF WASHINGTON V. FDA

While the motion to intervene was pending, the district court ruled on Washington's motion for preliminary injunction, granting the motion in part and enjoining FDA from altering the status quo availability of mifepristone in the eighteen plaintiff jurisdictions. In evaluating the motion, the district court concluded that Washington had standing to challenge the 2023 REMS based on its allegations of direct harm to the state's health care system, practice restrictions on state employees, and "unrecoverable" compliance costs. The district court declined to enjoin the 2023 REMS in its entirety because doing so would have the perverse effect of reimposing the previous REMS, which would "run[] directly counter" to Washington's apparent aim.

On April 21, 2023, the district court denied Idaho's motion to intervene. The district court concluded that Idaho was not entitled to intervene as a matter of right because it did not have a "significantly protectable interest" that would be impaired by the litigation since its complaint concerned different features of the 2023 REMS. *See* Fed. R. Civ. P. 24(a). The district court also declined to permit Idaho to intervene permissively based on its conclusion that Idaho's APA claims did not share any questions of law or fact with Washington's claims. *See* Fed. R. Civ. P. 24(b). Idaho timely appealed the denial of its motion to intervene.

II

We have jurisdiction to review the denial of a motion to intervene as of right under 28 U.S.C. § 1291, and our review is *de novo*, except for the element of timeliness, which we review for abuse of discretion. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835 (9th Cir. 2022). "We have jurisdiction over a district court's denial of permissive intervention only if we conclude that the district court

abused its discretion." *Cooper v. Newsom*, 13 F.4th 857, 868 (9th Cir. 2021) (citation omitted).

When the party attempting to intervene—whether as of right or permissively—seeks different relief than the original plaintiff, we review whether the intervening party has Article III standing to pursue the claims advanced in its complaint. *Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1233–34 (9th Cir. 2017) (hereafter "*OPDMP*"). We review questions of standing *de novo*. *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023). Like any party invoking federal jurisdiction, the party seeking to intervene has the burden of demonstrating standing "with the manner and degree of evidence required" at the relevant stage of litigation. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

III

The threshold issue in this appeal is whether Idaho must separately establish standing to intervene. Because Idaho seeks relief that is fundamentally different from that sought by Washington, the answer is yes.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017) (quoting U.S. Const. art. III, § 2, cl. 1). The purpose of this "fundamental limitation" is to prevent courts from "intrud[ing] upon the powers given to the other branches" in our tripartite system. *Id.* (citation omitted). To establish Article III standing, a plaintiff must demonstrate that they have suffered a concrete "injury in fact" that is traceable to the defendant and is likely redressable by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). These requirements "screen[] out plaintiffs who might have

16                STATE OF WASHINGTON V. FDA

only a general legal, moral, ideological, or policy objection to a particular government action," and "prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *All. for Hippocratic Medicine*, 602 U.S. at 381–82 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)).

The Supreme Court has repeatedly confirmed that "[s]tanding is not dispensed in gross," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted), which means that "[f]or all relief sought, there must be a litigant with standing[.]" *Town of Chester*, 581 U.S. at 439. Thus, when a party moves to intervene in a case and "seek[s] to obtain different relief than the original plaintiff, the [i]ntervenor[] must establish independent Article III standing." *OPDMP*, 860 F.3d at 1233–34. By contrast, "intervenors that seek the same relief sought by at least one existing party . . . need not do so." *Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (explaining that the court below "erred by inquiring into [intervenors'] independent Article III standing" where they sought the same relief as the federal government, which "clearly had standing").

In this case, application of *Town of Chester*'s intervenor standing requirement turns on whether or not Idaho is seeking the "same relief" as Washington. Idaho argues that it is seeking the same relief because its complaint, like Washington's, asks the court to "hold unlawful and set aside" the 2023 REMS. FDA disagrees, emphasizing the states' antipodal objectives with respect to the in-person dispensing requirement: Washington seeks to loosen restrictions even further while Idaho seeks to strengthen

them.  FDA argues that superficial similarities in the form of the parties' pleadings are "immaterial" when the ultimate outcomes they seek are "fundamentally different."

To assess whether Idaho and Washington seek the same relief, we look to the parties' complaints, which is the "best evidence of the relief [they] seek[]."  *Town of Chester*, 581 U.S. at 440.  In so doing, we consider not just the legal form of the parties' claims, but also their ultimate objectives.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 894 F.3d 1030, 1044 (9th Cir. 2018); *OPDMP*, 860 F.3d at 1234.  As the Supreme Court explained in *Town of Chester*, for example, two parties bringing "substantively identical" claims should nonetheless be understood as "seek[ing] different relief" when they seek separate judgments.  581 U.S. at 437, 440.

Applying *Town of Chester*, we have repeatedly held that an intervenor whose claims arise under a different legal theory "seeks different relief."  In *OPDMP*, for example, we considered an attempt by the ACLU Foundation of Oregon to intervene in a lawsuit brought by the state of Oregon.  860 F.3d at 1231.  The state plaintiffs sought a declaratory judgment that, under state law, the U.S. Drug Enforcement Administration ("DEA") was required to obtain a court order before accessing state prescription drug records.  860 F.3d at 1233–34.  The ACLU, by contrast, sought declaratory and injunctive relief "founded on the Fourth Amendment" ordering the DEA to obtain a warrant before it could access the same records.  *Id*. at 1234.  We concluded that because the ACLU wanted "something very different" than the original plaintiffs, it "must establish independent Article III standing."  *Id*.  Likewise, in *In re Volkswagen "Clean Diesel" Marketing*, we concluded that an injunction requiring Volkswagen to rescind the sale of vehicles

18          STATE OF WASHINGTON V. FDA

programmed to cheat on emissions tests would be "completely different" relief than an injunction requiring Volkswagen to stop installing the software in the future, notwithstanding the fact that both claims were founded on alleged violations of the Clean Air Act. 894 F.3d at 1044.

This case is somewhat different in that both Washington's and Idaho's complaints advance claims under the APA, which provides a generic cause of action for persons aggrieved by agency action. *See* 5 U.S.C. §§ 701–706. Invoking the broad scope of relief authorized by the APA, *id.* § 706(2), both complaints ask the court to declare the 2023 REMS unlawful and enjoin FDA from "enforcing or applying" its requirements. Beyond these superficial features, however, the two complaints have little in common and are, in many respects, diametrically opposed.

Washington and Idaho allege that different features of the 2023 REMS are unlawful. Washington's complaint concerns the legality of FDA's retention of the provider certification and patient documentation requirements, as well as the agency's broader determination that mifepristone meets the "stringent standards" for the imposition of safe-use restrictions in the first place. Idaho's complaint, by contrast, focuses entirely on FDA's elimination of the in-person dispensing requirement, alleging that the change was inadequately explained, contrary to medical science, and violative of 21 U.S.C. § 355-1(a)(1).

Washington and Idaho also seek different remedies. Washington asks the court to enjoin the enforcement of *any* safe-use restrictions based on its view that they are not justified by any "known serious risk." *See* 21 U.S.C. § 355-1(f)(2). Idaho seeks "something very different," *OPDMP*, 860 F.3d at 1234, asking the court to declare the 2023

changes to the REMS unlawful, vacate the revision, and effectively reinstate the prior status quo, including the in-person dispensing requirement.  As the district court recognized, reinstating the status quo would "run[] directly counter to [Washington's] request" by reducing the availability of mifepristone.  Indeed, the text of Washington's complaint, which declares that "the 2023 REMS improved on" the previous regime clearly reveals the chasm between the parties' preferred outcomes.

Given the deep and obvious conflict between the parties' objectives, we cannot conclude that Idaho seeks the "same relief" as Washington.  Under *Town of Chester*, Idaho must independently establish Article III standing to intervene.

## IV

We next consider whether the allegations in Idaho's complaint establish standing to challenge FDA's elimination of the in-person dispensing requirement.  Idaho's complaint alleges three kinds of injury caused by the 2023 REMS: increased Medicaid costs, interference with state law enforcement, and harms to women and fetal life.  Where, as here, the propriety of intervention "must be determined before discovery," we generally accept "all well-pleaded, nonconclusory allegations" in the proposed complaint as true. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819–20 (9th Cir. 2001); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to establish standing.]").  We conclude that none of the allegations contained in Idaho's complaint constitute a cognizable injury-in-fact to the state's own interests.

In assessing Idaho's standing, we are mindful of both the general requirements for Article III standing set forth in

20          STATE OF WASHINGTON V. FDA

*Lujan*, 504 U.S. at 560–61, as well as prudential limits on states' ability to sue the federal government on behalf of their citizens. *See Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) ("Texas lacks standing to . . . assert equal protection claims on behalf of its citizens because a State does not have standing as *parens patriae* to bring an action against the Federal Government." (cleaned up)); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue . . . for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government." (internal citation omitted)).  We heed the Supreme Court's reminder to "remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

### A

Idaho first alleges that elimination of the in-person dispensing requirement will cause the state economic injury in the form of increased costs to the state's Medicaid system. At oral argument, Idaho stated that this is its "strongest basis" for standing.  Even taking Idaho's highly speculative allegations as true, the complaint does not demonstrate an injury-in-fact because it depends on an attenuated chain of healthcare decisions by independent actors that will have only indirect effects on state revenue.

Like any party, a state has standing to challenge federal action that directly harms the state's economic interests or interferes with its operations as a service provider, market participant, or employer. *See*, *e.g.*, *Dept. of Com. v. New York*, 588 U.S. 752, 766–68 (2019); *City & Cnty.. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d

742, 754 (9th Cir. 2020); *Washington v. Trump*, 847 F.3d 1151, 1159-61 (9th Cir. 2017) (per curiam). To establish standing based on an alleged "pocketbook injur[y]," the state must allege a concrete impact on state revenues that is caused by the defendant's allegedly unlawful conduct. *California v. Texas*, 593 U.S. 659, 674 (2021). While the injury need not be direct, there must be a strong "causal chain" that "links" the federal action to the alleged harm. *California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018). "[P]laintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *All. for Hippocratic Medicine*, 602 U.S. at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)).

In recent years, the Supreme Court has specifically cautioned us to be wary of theories of state standing that rely on the "indirect effects" of federal policy on state revenue or state spending. *United States v. Texas*, 599 U.S. at 680 n.3; *see also California v. Texas*, 593 U.S. at 675–78. As the Sixth Circuit has explained, a theory of state standing "in which all peripheral costs imposed on the States by actions of the [executive branch]" constitute cognizable injuries would "make a mockery" of Article III. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (citation omitted).

In this case, Idaho alleges that it will sustain economic injury in the form of downstream medical costs that will borne by the state. Specifically, Idaho alleges that elimination of the in-person dispensing requirement will cause more providers to dispense mifepristone to women "with contraindications," which in turn will lead more women to experience complications that require follow-up care, which will harm the state because some portion of the aggregate cost of that follow-up care will be "borne by Idaho

22          STATE OF WASHINGTON V. FDA

through Medicaid expenditures." The complaint does not clearly explain what form these expenditures will take, but we infer from the complaint that Idaho means it will be forced to reimburse providers for care delivered to those women enrolled in state-sponsored health plans. In other words, Idaho's allegations of economic harm refer to the costs it will incur as an insurer of women who use mifepristone. Unlike Washington, Idaho does not allege that it will incur these costs directly as the object of regulation, but indirectly as the result of "the government's allegedly unlawful . . . lack of regulation of *someone else*." *Lujan*, 504 U.S. at 562 (cleaned up). Accordingly, "much more is needed" to establish causation and redressability. *Id.*

As the Supreme Court recently explained in *Alliance for Hippocratic Medicine*, the causal chain between FDA's regulation of mifepristone and downsteam medical outcomes is highly attenuated, "even assuming for the sake of argument" that the 2023 REMS will "cause more pregnant women to require emergency abortions." 602 U.S. at 387–93. The links in this chain depend on the independent actions of doctors and pregnant women whose medical decisionmaking is informed by a wide range of individualized considerations that are difficult to predict. The 2023 REMS does not require doctors to prescribe mifepristone to certain patients; it simply provides doctors and patients with increased flexibility to choose how to dispense the drug based on their assessment of risk in each individual case. Nor does the 2023 REMS prevent Idaho from prohibiting medical abortion within its borders under circumstances the state deems contrary to public policy. For example, under current law, women in Idaho will only be "exposed" to the alleged risks of mifepristone when one or more independent actors decides to break state law. *See*

STATE OF WASHINGTON V. FDA                    23

Idaho Code §§ 18-604, 18-608, 18-622.   Given these contingencies, any marginal increase in the rate at which pregnant women require additional medical care is too attenuated to establish the requisite causal connection.

Further, an alleged uptick in Medicaid costs is exactly the kind of "indirect effect[] on . . . state spending" that the Supreme Court has rejected as a basis for standing.  *United States v. Texas*, 599 U.S. at 680 n.3.  As the Supreme Court has explained, "virtually all drugs come with complications, risks, and side effects," which means that changes in prescription drug guidelines will frequently "yield more visits to doctors to treat complications or side effects." *All. for Hippocratic Medicine*, 602 U.S. at 392. Allowing Idaho to proceed based on predictions of increased emergency-room visits alone would give not just states, but every entity that provides health insurance or subsidized medical care, standing "to challenge any FDA decision approving a new drug." *Id.*  We decline to endorse this boundless conception of Article III's injury requirement.  Idaho cannot establish standing based on the alleged costs to the state's finances because the asserted causal chain is too attenuated.

B

Idaho next alleges that elimination of the in-person dispensing requirement will harm its sovereign interest in law enforcement by making illegal mifepristone use harder to detect.  This allegation is insufficient to convey standing because nothing in the 2023 REMS impairs Idaho's sovereign authority to enact or enforce its own laws regulating chemical abortion.

States have standing to vindicate their authority as sovereign entities with a governing prerogative that is separate from the federal government.  *Alfred L. Snapp &*

24                STATE OF WASHINGTON v. FDA

*Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600–02 (1982).  A state has a "sovereign interest" in the retention of its authority to "exercise . . . sovereign power over individuals and entities within [its] jurisdiction," including "the power to create and enforce a legal code."  *Id.* at 601; *see also Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986) (acknowledging a state's "judicially cognizable interest in the preservation of its own sovereignty").  This interest is sufficient to convey standing to defend a state statute against a legal challenge in federal court, *Diamond v. Charles*, 476 U.S. 54, 62 (1986); *Maine v. Taylor*, 477 U.S. 131, 136 (1986), or challenge a federal statute that preempts or nullifies state law, *see generally*, *e.g.*, *Colorado v. Toll*, 268 U.S. 228 (1925); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1087 (D. Or. 14 2002); *see also Kentucky v. Biden*, 23 F.4th 585, 598–99 (6th Cir. 2022) (collecting cases).  This cognizable interest in the preservation of sovereign authority, however, does not convey standing to challenge federal action that affects state law enforcement indirectly, by making violations of state law more difficult or costly to detect.

Here, Idaho alleges an injury to its sovereign interest in enforcing state abortion laws, which make mifepristone illegal to use under most circumstances.  *See* Idaho Code §§ 18-602, 18-604, 18-617, 18-622; *Moyle v. United States*, 144 S.Ct. 2015, 2016–17 (2024) (Kagan, J., concurring) (describing Idaho's abortion laws).  Idaho alleges that elimination of the in-person dispensing requirement will impede the state's ability to enforce those laws by making it easier for Idaho residents to obtain and use mifepristone illegally.  Idaho does not, however, allege that the 2023 REMS preempts or otherwise interferes with the state's

STATE OF WASHINGTON V. FDA                    25

*authority* to enact or enforce restrictions on medical abortion within its boundaries.

These allegations are insufficient to demonstrate standing for two reasons. First, Idaho's prediction that elimination of the in-person dispensing requirement will lead to illegal use of mifepristone depends heavily on speculation that doctors and pregnant women will break state law. As we have previously explained, speculation about the decisions of independent actors, without more, is not a proper basis for standing. *Clapper*, 568 U.S. at 414. Second, even if the availability of retail and mail-order dispensing does make mifepristone more difficult to police, we have never held that a logistical burden on law enforcement constitutes a cognizable Article III injury. Holding otherwise would greatly expand state standing to challenge any federal action that allegedly increases crime or disorder, or imposes indirect compliance costs for state law enforcement.

In *United States v. Texas*, the Supreme Court has declined to take the federal judiciary down this "uncharted path." 599 U.S. at 681. In that case, Texas sued the Department of Homeland Security, arguing that the agency's revised enforcement guidelines, which deprioritized the deportation of noncitizens convicted of nonviolent offenses, violated federal law. *Id*. at 673–75. Texas alleged that it was injured by the increased costs of "incarcerat[ing]" and "supply[ing] social services" to individuals who "should be (but are not being) arrested." *Id*. at 674. The Supreme Court forcefully rejected this "novel standing argument," noting that holding otherwise would lead to an increase in "complaints in future years about alleged Executive Branch under-enforcement" of other laws, including "drug laws, gun laws, obstruction of justice laws, or the like." *Id*. at 681.

26                   STATE OF WASHINGTON V. FDA

This slippery slope concern is just as salient for Idaho's theory of injury, which similarly lacks a limiting principle.

Because Idaho does not allege that the 2023 REMS encroaches on its authority to govern, it does not have standing based on "law enforcement injury."

C

Finally, Idaho alleges that elimination of the in-person dispensing requirement will harm its "quasi-sovereign interest" in maternal health and fetal life. Idaho cannot sue FDA on this basis because the allegations concern the interests of individual citizens—not the separate interests of the state itself.

In *Massachusetts v. EPA*, the Supreme Court explained that states have standing to sue the federal government based on their "quasi-sovereign interests," that "concern the state as a whole." 549 U.S. 497, 520 n.17 (2007) (citation omitted). These interests include the "health and welfare" of state residents generally, which may be endangered by harms to the land or environment within a state's sovereign territory. *See id.* at 519–23; *California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020); *Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1248 n.8 (9th Cir. 2008). However, states do not have standing to sue the federal government in a third-party *parens patrie* capacity based on alleged injuries "to an identifiable group of individual residents." *Snapp*, 458 U.S. at 607. This is because, with respect to the relationship between citizens and federal action, the federal government, not the states, is the sovereign entity that acts as the ultimate "parent of the country." *See id.* at 600 ("*Parens patriae* means literally 'parent of the country.'"); *Mellon*, 262 U.S. at 485–86.

Here, Idaho alleges that elimination of the in-person dispensing requirement will endanger specific pregnant women who take the drug and "unborn children" subjected to its effects. These allegations concern the well-being of individual citizens—not a distinct interest of the state as a whole. *See Snapp*, 458 U.S. at 607 ("the State must articulate an interest apart from the interests of particular private parties"). While Idaho has a legitimate interest in legislating to protect maternal health and fetal life, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 262 (2022), it does not have standing to bring a lawsuit "on behalf of its citizens" against a federal agency, *Brackeen*, 599 U.S. at 294–95. Idaho's characterization of the medical risks of mifepristone as harms to the state itself is a "thinly veiled attempt to circumvent the limits on *parens patriae* standing." *Murthy v. Missouri*, 144 S.Ct. 1972, 1996–97 (2024) (quoting *Brackeen*, 599 U.S. at 295 n.11).

## V

In sum, Idaho does not have standing in this case to challenge the 2023 REMS based on the allegations contained in its complaint. Having failed to establish independent standing, Idaho cannot intervene to pursue separate relief. Because this appeal is confined to that narrow issue, we need not—and do not—reach any other issue raised in the district court or urged by the parties on appeal, including whether Idaho would otherwise be entitled to intervene under Federal Rule of Civil Procedure 24. We affirm the district court's order denying Idaho's motion to intervene as of right. We dismiss for lack of jurisdiction that portion of the appeal concerning the district court's denial of permissive intervention.

**AFFIRMED in part and DISMISSED in part.**