1  ROBERT W. FERGUSON
   Attorney General
2  NOAH GUZZO PURCELL, WSBA #43492
   Solicitor General
3  KRISTIN BENESKI, WSBA #45478
   First Assistant Attorney General
4  COLLEEN M. MELODY, WSBA #42275
   Civil Rights Division Chief
5  ANDREW R.W. HUGHES, WSBA #49515
   LAURYN K. FRAAS, WSBA #53238
6  Assistant Attorneys General
   TERA M. HEINTZ, WSBA #54921
7  Deputy Solicitor General
   800 Fifth Avenue, Suite 2000
8  Seattle, WA  98104-3188
   (206) 464-7744
9

10              **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF WASHINGTON**
11

12  STATE OF WASHINGTON, et al.,        NO. 1:23-cv-03026-TOR

13              Plaintiffs,             PLAINTIFF STATES' MOTION
                                        FOR SUMMARY JUDGMENT
14      v.
                                        With Oral Argument:
15  UNITED STATES FOOD AND              TBD (see ECF No. 153)
    DRUG ADMINISTRATION, et al.,
16
                Defendants.
17

18

19

20

21

22

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................ 1

II. RELEVANT FACTS ..................................................................................... 2

    A. Statutory and Regulatory Background ................................................ 2

    B. Mifepristone, Its Labeling, and Its Medication Guide ....................... 4

    C. FDA Long Ago Concluded That Mifepristone Is Safe and Effective ... 5

    D. The Mifepristone REMS Has Long Been Opposed by Medical Experts .................................................................................................. 6

    E. FDA's Decision to Continue the Burdensome Mifepristone REMS ..... 8

    F. The Mifepristone REMS Unduly Burdens Access to Healthcare ....... 11

III. ARGUMENT ............................................................................................... 12

    A. Legal Standard ................................................................................. 12

    B. The 2023 REMS with ETASU Violates the APA .............................. 13

        1. The 2023 REMS is contrary to law ............................................. 13

        2. The 2023 REMS is arbitrary and capricious ................................ 17

            a. FDA failed to consider how the 2023 REMS burden patient access, particularly in rural & medically underserved areas ....................................................................................... 18

            b. FDA arbitrarily failed to consider evidence on maternal mortality and mifepristone's safety without REMS .............. 22

            c. FDA's differential treatment of Korlym is arbitrary and capricious ................................................................................. 24

    C. The Court Should Remand This Matter to FDA ................................. 25

IV. CONCLUSION ........................................................................................... 25

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.   INTRODUCTION

Mifepristone is an exceptionally safe medication; in the words of Defendant Becerra, it "is one of the safest and most effective medicines that we have seen over the last 20 years to help women with their health care[.]" https://tinyurl.com/5epfasmh. It is even safer than such well-known drugs as Tylenol, Viagra, and insulin. Yet unlike these drugs, mifepristone is subject to severe dispensing restrictions imposed by FDA. FDA has acknowledged that a key reason it imposed these restrictions on mifepristone and not other similarly safe drugs is that mifepristone is "controversial," because it is used for early-stage abortion. *Infra* at 6. But the statutes allowing FDA to restrict high-risk drugs do not include "political controversy" as a basis for doing so. Rather, Congress authorized FDA to impose special restrictions only when needed to ensure safety.

After extensive preliminary injunction briefing, this Court already concluded that "FDA did not assess whether mifepristone qualifies for [special restrictions] based on the criteria set forth under 21 U.S.C. § 355-1(a)(1), (f)(1)." *Washington v. FDA*, 668 F. Supp. 3d 1125, 1141 (E.D. Wash. 2023). On summary judgment, the administrative record confirms that conclusion. The record also shows that FDA failed to consider its restrictions' impact on patient access, violating Congress's express directive. This Court should again hold that FDA violated the law in imposing special restrictions on mifepristone, and should remand this matter to FDA for proper consideration of the statutory requirements and record evidence.

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

1

## II.    RELEVANT FACTS

### A.    Statutory and Regulatory Background

Before a new drug may enter the U.S. market, it must undergo a rigorous approval process to determine its safety and efficacy. *See* 21 U.S.C. § 355. While all drugs have risks, for the vast majority of the 20,000 FDA-approved prescription medications, FDA manages those risks through "labeling." 21 C.F.R. § 201. Drug labeling includes "a summary of the essential scientific information needed for the safe and effective use of the drug," how it is administered, warnings, and potential adverse reactions. *Id.* §§ 201.56-57. FDA also often requires package inserts and medication guides to help patients avoid serious adverse events. *See id.* § 208.

After FDA approval, the provision of prescription drugs is subject to state regulations, malpractice laws, and professional and ethical rules—including requirements that prescriptions be issued only by licensed providers; providers only practice within their scope and the standard of care; and providers counsel patients on risks associated with the course of treatment. *See, e.g.*, AMA Principles of Medical Ethics, https://tinyurl.com/2dbl8oqd; Wash. Rev. Code § 18.71.002.

A tiny subset of FDA-approved drugs is subject to extra restrictions known as a Risk Evaluation and Mitigation Strategy (REMS). REMS may be imposed only when needed "to ensure that the benefits of the drug outweigh the risks . . . ." 21 U.S.C. § 355-1(a)(1). As FDA explains on its website: "While all medications have labeling that informs health care stakeholders about medication risks, only a few medications require a REMS." EAR324. This is because "REMS focus on

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    preventing, monitoring and/or managing *a specific serious risk* by informing,

2    educating and/or reinforcing actions to reduce the frequency and/or severity of the

3    event." *Id.* (emphasis added).

4         The most restrictive and burdensome type of REMS are "Elements to Assure

5    Safe Use" (ETASU), which FDA may impose only when a drug's "known serious

6    risks" or "inherent toxicity or potential harmfulness" requires it. 21 U.S.C. § 355-

7    1(f). ETASU apply only to drugs with serious side effects such as death, incapacity,

8    or birth defects, and where the risk is so severe that the drug's approval "would be

9    withdrawn" entirely without ETASU. *Id.* §§ 355-1(b)(5), (f)(1)(A). ETASU must

10   be "commensurate with" the drug's risks, cannot be "unduly burdensome on

11   patient access to the drug, considering in particular . . . patients who have difficulty

12   accessing health care (such as patients in rural or medically underserved areas),"

13   and must "minimize the burden on the health care delivery system" by conforming

14   with ETASU for drugs with similar risks and "established distribution,

15   procurement, and dispensing systems for drugs." *Id.* § 355-1(f)(2).

16        REMS and ETASU are rare. Of the 20,000 approved prescription drugs,

17   EAR326, there are only 73 REMS programs, 69 with ETASU, EAR327-332. These

18   cover high-risk drugs such as fentanyl and other opioids, certain risky cancer drugs,

19   and sedatives used for patients with psychosis. *See* ECF No. 72 (high-risk drugs

20   with point-of-dispensing restrictions include those associated with sudden death,

21   organ failure, severe birth defects, addiction, and overdose); *see also* EAR324

22   (FDA, "REMS in Action: An Example").

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT                    3          ATTORNEY GENERAL OF WASHINGTON
                                                            Complex Litigation Division
                                                            800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                                  (206) 464-7744

1    Further, a REMS is not permanent. REMS may be modified or removed to
2    "ensure the benefits of the drug outweigh the risks" or "minimize the burden on
3    the health care delivery system . . . ." 21 U.S.C. § 355-1(g)(4)(B). FDA must also
4    "periodically evaluate" ETASU to assess if the elements are still needed to "assure
5    safe use of the drug," "are not unduly burdensome on patient access," and
6    "minimize the burden on the health care delivery system[.]" *Id.* § 355-1(f)(5)(B).

### B.    Mifepristone, Its Labeling, and Its Medication Guide

8    The FDA-approved regimen for first-trimester medication abortion involves
9    two drugs: mifepristone and misoprostol. Taken alone, misoprostol (labeled as an
10    ulcer drug) also acts as a safe and effective abortifacient, but it is less effective than
11    the two-drug regimen. EAR105. In the current regimen, the patient first swallows
12    one 200 mg mifepristone tablet. EAR319. Then, 24 to 48 hours later, she takes four
13    misoprostol tablets. *Id.* Most women expel the pregnancy within 2 to 24 hours. *Id.*

14    As with all prescription drugs, the FDA-approved labeling for mifepristone
15    warns of its potential risks. Specifically, the boxed warning on the Mifeprex label
16    explains: "Serious and sometimes fatal infections and bleeding occur very rarely
17    *following spontaneous, surgical, and medical abortions*, including following
18    MIFEPREX use. No causal relationship between the use of MIFEPREX and
19    misoprostol and these events has been established." EAR318, 321 (emphasis
20    added); *see also* EAR65. Thus, labeling identifies the two rare risks associated with
21    Mifeprex (infections and bleeding). But those are the same risks associated with
22    miscarriage, abortion, and childbirth and are *not* risks inherent to mifepristone.

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  *See* EAR318, 321; *see also* EAR47 ("the two serious risks described on the

2  Mifeprex label—atypical infection and prolonged heavy vaginal bleeding—also

3  may occur after many other common obstetrical and gynecological procedures,"

4  including vaginal birth); EAR32-33 (FDA acknowledgement that "the critical risk

5  factor" for certain rare infections following mifepristone was "pregnancy itself").

6  **C.      FDA Long Ago Concluded That Mifepristone Is Safe and Effective**

7       Since its FDA approval nearly a quarter-century ago, mifepristone has

8  proven extraordinarily safe. As FDA's 2016 medical review (based on 2.5 million

9  U.S. uses) concluded: "[Mifeprex] has been increasingly used as its efficacy and

10  safety have become well established by both research and experience, and serious

11  complications have proven to be extremely rare." EAR21; EAR22 (similar).

12  Mifepristone's "associated" fatality rate is a miniscule 0.0005% for the 20-plus

13  years it has been on the U.S. market, and not a single death from among the now

14  5.6 million uses can "be causally attributed to mifepristone." EAR271; EAR65.

15       Mifepristone's safety record has remained stable as FDA restrictions have

16  been lifted over time. *See* EAR164 (FDA acknowledging safety profile is "well-

17  characterized" and "has not changed over the period of surveillance"); EAR55.

18  There is no evidence of any increase in adverse events after FDA stopped enforcing

19  the in-person dispensing requirement during COVID-19 when it was distributed

20  without pharmacy certification. EAR68. And in Canada, lifting all REMS-like

21  restrictions resulted in no change to mifepristone's safety profile. EAR238, 239.

22       Mifepristone is also *far* safer than a pregnant person's alternative to

abortion: giving birth, where the risk of death is "14 times higher" than with abortion, and which is far riskier to health. *See, e.g.*, EAR92-94; 100-01 (charts describing "pregnancy-related deaths"). Mifepristone is also safer than common drugs like Tylenol, Viagra, and penicillin—none of which have a REMS—as well as highly-addictive drugs like OxyContin and other opioids, which have no mandatory ETASU. *See, e.g.*, EAR144 ("acetaminophen, aspirin" have "higher complication rates"); EAR84 (600+ Tylenol-related deaths annually); EAR84 (Viagra fatality rate six times higher; penicillin's three times higher); EAR333-36.

Indeed, FDA approved mifepristone *without a REMS* when the very same drug is prescribed, in higher doses, for a less "controversial use" than abortion. Specifically, in 2012, FDA approved Korlym—mifepristone used to treat Cushing's disease—without a REMS, even though it is taken chronically and in much higher doses than one-time mifepristone for pregnancy termination. *See* EAR20, EAR2, EAR11. FDA openly admitted that the application for Korlym's approval presented a "challenge" **"because of the more controversial use of this active ingredient for medical termination of pregnancy[.]"** EAR13. Korlym has remained without a REMS even though it has consistently had significantly higher rates of adverse events (hundreds compared with a handful of abortion-related events). *See, e.g.*, EAR149, 270; *see also* EAR20.

**D.    The Mifepristone REMS Has Long Been Opposed by Medical Experts**

The mifepristone REMS program has long been opposed by medical experts and out of line with FDA's treatment of similarly safe drugs. *See, e.g.*, EAR36-37,

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    34-35. Opposition has only grown as the medication's "effectiveness and safety

2    have been definitively established" through millions of uses. *See* EAR48

3    (explaining how the "REMS no longer makes clinical sense" given the "data and

4    experience" collected since 2000). As former FDA Commissioner Jane E. Henney,

5    M.D., concluded: "The accumulated knowledge about mifepristone strongly

6    suggests that the current restricted distribution system is not aligned with the

7    limited risks that are now known to be posed by the drug." EAR85.

8         Indeed, over time, studies have proven that the REMS does nothing to

9    promote patient safety, but does harm patients by artificially limiting access and

10   delaying time-sensitive care. *See, e.g.*, EAR122-27, 128-32, 135-36, 47-48.

11   Leading medical organizations, including the American College of Obstetricians

12   and Gynecologists (ACOG), American Academy of Family Physicians, and

13   American Medical Association (AMA), oppose the REMS as scientifically

14   unfounded, an outlier that is "inconsistent with [requirements] for other

15   medications with similar safety profiles," and harmful to patients because it

16   interferes with evidence-based care and causes treatment delays "without

17   supporting demonstrated improvements to patient safety or outcomes." EAR208;

18   *see, e.g.*, EAR210-37, 246-251, 143-44, 59-61, 208-09, 56-58, 75, 43-44, 111-16.

19        Consistent with this medical consensus, in 2016 FDA's own scientific

20   review team concluded that an element of the mifepristone REMS program is

21   unnecessary. They found that ETASU D (the Patient Agreement Form) is

22   duplicative of standard informed consent requirements and labeling, "does not add

PLAINTIFF STATES' MOTION                    7            ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                          Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104-3188
                                                                    (206) 464-7744

1   to safe use conditions," is burdensome, and should be removed. EAR18; *see also,*
2   *e.g.*, EAR15-17, 26-27, 29-30. However, these scientific experts were overruled
3   by Commissioner Robert M. Califf, a political appointee, and ETASU D remains
4   in force today. EAR24.

5   **E.    FDA's Decision to Continue the Burdensome Mifepristone REMS**

6          The current mifepristone REMS, approved in January 2023 (hereinafter the
7   2023 REMS) is a product of FDA's repeated failure to meaningfully consider the
8   mountain of evidence of mifepristone's safety and efficacy. In 2020, fifteen
9   Plaintiff States petitioned FDA to remove the REMS as "onerous and medically
10  unnecessary." EAR69-74. And in 2022, ACOG and AMA petitioned FDA to
11  (among other things) remove the REMS entirely. EAR210-37. FDA denied
12  ACOG's petition, disregarding the scientific evidence cited therein, EAR240-243,
13  and later admitted in this litigation that it did not consider the evidence at all for its
14  2023 REMS decision, *see* ECF No. 139 at 8. Notwithstanding continued opposition
15  to the REMS from experts and FDA's own scientists, FDA nevertheless decided
16  to impose the 2023 REMS with three ETASU elements: Prescriber Certification,
17  Pharmacy Certification, and a Patient Agreement Form. *See* EAR150-98, 272-93.

18         *ETASU A (Prescriber Certification)*: ETASU A mandates that mifepristone
19  can only be prescribed by "certified" providers, who must attest to their
20  qualifications and send their certification to *every* pharmacy to which they send a
21  prescription. Regarding this element, FDA conceded that "[o]ur review of the
22  literature did not identify any studies comparing providers who met these

1  qualifications with providers who did not," but stated that "[i]n the absence of such

2  studies, there is no evidence to contradict our previous finding that prescribers'

3  ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide

4  surgical intervention or arrange for such care through others if needed, is necessary

5  to mitigate the serious risks associated with the use of mifepristone in a regimen

6  with misoprostol." *See* EAR162. FDA also stated that "the potential addition of

7  new prescribers" once the in-person dispensing requirement was lifted further

8  supported the requirement for prescriber certification. EAR163. In concluding that

9  ETASU A "continues to be necessary," FDA provided *no explanation* for why the

10  standard scope-of-practice and regulatory/ethical framework was insufficient to

11  ensure that prescribers are appropriately qualified, nor did it analyze the burden

12  imposed on providers by requiring them to send their certification form to every

13  pharmacy to which they sent a prescription. *See* EAR185-86, 281, 290-91

14  (conclusory determination of no burden). FDA also ignored the *absence* of any

15  evidence that "this restriction impacts the safety or quality of abortions." EAR64.

16      *ETASU B (Pharmacy Certification)*: ETASU B requires that pharmacies

17  must also be "certified," which entails designing and implementing a *sui generis*

18  system to confidentially track prescriber certifications and fill prescriptions. FDA

19  stated: "Adding pharmacy certification ensures that ETASU A is met prior to

20  dispensing the product to a patient; certified prescribers, in turn, have agreed to

21  meet all the conditions of the REMS, including ensuring that the *Patient Agreement*

22  *Form* (ETASU D) is completed." EAR189. In short, ETASU B merely reinforces

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   ETASUs A and D, while imposing enormous new burdens on pharmacies as a

2   condition of dispensing, thereby "likely limit[ing]" the number of pharmacies

3   willing to become certified dispensers. EAR285 (FDA concession). Further, in

4   concluding that this new ETASU B was necessary, FDA ignored that pharmacies

5   dispensed mifepristone with no pharmacy certification requirement for more than

6   a year during the COVID-19 pandemic with no increase in adverse events. *See*

7   EAR68; EAR107, 108 (zero adverse events "related to pharmacist dispensing").

8        *ETASU D (Patient Agreement Form)*: This element requires patients to sign

9   an agreement form that goes in their medical file, certifying that "I have decided

10  to take mifepristone and misoprostol to end my pregnancy." EAR323. FDA's

11  literature search "yielded no publications which directly addressed this element of

12  the REMS." EAR165. Based again on this absence of evidence, FDA determined

13  there was no evidence "that would support *removing* ETASU D." EAR166

14  (emphasis added). FDA stated that, given the potential increase in number of

15  prescribers upon removal of the in-person dispensing requirement, "[t]he Patient

16  Agreement Form is an important part of standardizing the medication information

17  on the use of mifepristone that prescribers communicate to their patients, and also

18  provides the information in a brief and understandable format for patients."

19  EAR167. But in "conclud[ing] that maintaining the Patient Agreement Form

20  remains necessary to assure safe use at this time," EAR186, FDA provided *no*

21  *explanation* for why the medication's current "box label" and Medication Guide,

22  which provide the same information, are insufficient. *Infra* at 8. Nor did it address

PLAINTIFF STATES' MOTION                                    10
FOR SUMMARY JUDGMENT

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    the burden associated with this ETASU, even though the sponsors apprised FDA

2    of this problem. *Infra* at 12; *see* EAR167 (conclusory determination of no burden).

3    Nor did FDA offer any justification for requiring every patient to attest that they

4    have "decided" to end their pregnancy, despite knowing that mifepristone is

5    commonly used off-label as the "gold standard" of care for miscarriage, which

6    more than half a million U.S. women experience each year. EAR52-53, 91, 341.

7    **F.    The Mifepristone REMS Unduly Burdens Access to Healthcare**

8          As the administrative record shows, the REMS creates stigma, fear, and

9    reluctance to prescribe a safe and essential medication, artificially limits the

10   number of providers who can prescribe mifepristone and the number of pharmacies

11   that can dispense it, endangers providers' and patients' safety, and negatively

12   impacts access to and quality of care. These harms are more salient than ever amid

13   what Defendant Becerra described as a "crisis in health care" following *Dobbs v.*

14   *Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). EAR342. Despite

15   being well aware of the REMS' detrimental impacts on access and care quality,

16   FDA failed to consider or account for this when imposing the 2023 REMS.

17         In particular, in deciding to impose the 2023 REMS with ETASU, FDA

18   *intentionally excluded* reams of relevant information from its review, including

19   "survey studies or qualitative studies" on "satisfaction with medical abortion

20   procedures from patients, pharmacists, clinic staff, or providers," including studies

21   that *directly assessed REMS ETASUs*. EAR160-61. FDA likewise ignored "[d]ata

22   on the logistics of accessing abortion care in general, such as time to appointment

1   or the distance traveled to obtain care," which bears directly on patient burden and

2   access, as well as "policy/advocacy statements" by AMA and ACOG. *Id.*;

3   EAR193-97 (listing excluded data). Its rationale was that such information does

4   not contain "objective safety data," EAR160, but in excluding these materials, it

5   ignored information Congress *directed* it to consider, including the effect of the

6   REMS and its burden on patient access. 21 U.S.C. §§ 355-1(f)(2), (f)(5), (g)(4).

7        Also before FDA was stakeholder feedback from experts and providers in a

8   broad spectrum of health settings who "[u]niformly . . . advocated that any changes

9   to the REMS must lessen—and not increase—the current burdens on [health care

10   providers (HCPs)] and patients to ultimately increase patient access to

11   mifepristone," that "most stakeholders—particularly HCPs—continue to request

12   the removal of both the Prescriber Agreement and Patient Agreement to reduce the

13   burden on them and their patients," and that "most advocates were highly

14   supportive of expansion to all types of pharmacies without any restrictions."

15   EAR266-68, 264. FDA failed to address any of this in imposing the 2023 REMS.

16                   **III.   ARGUMENT**

17   **A.   Legal Standard**

18        At summary judgment in an APA case, "the Court does not ask whether

19   there is a genuine dispute as to any material fact." *Washington v. Azar*, 426 F. Supp.

20   3d 704, 708 (E.D. Wash. 2019). "Rather, 'the function of the district court is to

21   determine whether or not as a matter of law the evidence in the administrative

22   record permitted the agency to make the decision it did.'" *Id.* (citation omitted).

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Review is based on "the whole record," 5 U.S.C. § 706, which "consists of all

2   documents and materials directly or *indirectly* considered by the agency decision-

3   makers and includes evidence contrary to the agency's position." *Thompson v. U.S.*

4   *Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (quotation omitted).

5   **B.    The 2023 REMS with ETASU Violates the APA**

6          The APA authorizes courts to hold unlawful a "final agency action" where

7   it is, *inter alia*, "in excess of statutory jurisdiction, authority, or limitations," or

8   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

9   law[.]" 5 U.S.C. §§ 706(2)(A), (C). The 2023 REMS is unlawful because FDA

10  ignored the REMS statute's unambiguous criteria, and is arbitrary and capricious

11  because it entirely failed to consider important aspects of the problem. The 2023

12  REMS violates the APA, and the matter should be remanded to FDA.

13         **1.    The 2023 REMS is contrary to law**

14         To be valid, agency actions "must be consistent with the statute under which

15  they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873 (1977). The

16  reviewing court "must exercise [its] independent judgment in deciding whether

17  [FDA] has acted within its statutory authority, as the APA requires." *Loper Bright*

18  *Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Here, FDA blatantly failed to

19  consider whether mifepristone still qualifies for a REMS at all based on the factors

20  Congress enumerated, much less the more demanding standards for ETASU. This

21  error is dispositive and, on its own, warrants remand.

22         Congress permits FDA to impose a REMS *only* when FDA determines that

PLAINTIFF STATES' MOTION                    13              ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                            Complex Litigation Division
                                                                800 Fifth Avenue, Suite 2000
                                                                  Seattle, WA  98104-3188
                                                                     (206) 464-7744

1    it is "necessary to ensure that the benefits of the drug outweigh [its] risks,"

2    21 U.S.C. § 355-1(a)(1), which must be based on consideration of six factors:

3    (1) the size of the population likely to use the drug; (2) the seriousness of the

4    condition treated with the drug; (3) the expected benefit of the drug with respect to

5    the condition; (4) the duration of the treatment with the drug; (5) the seriousness

6    of any known or potential adverse events that may be related to the drug and the

7    background incidence of such events in the population likely to use the drug; and

8    (6) whether the drug is a new molecular entity. *Id.* And ETASU may be imposed

9    only where a drug has such "inherent toxicity or potential harmfulness" that,

10    without ETASU, it would be banned outright. *Id.* § 355-1(f)(1).

11          Once imposed, REMS are to be modified or removed as needed to "ensure

12    the benefits of the drug outweigh the risks of the drug" or to "minimize the burden

13    on the health care delivery system of complying with the [REMS.]" *Id.* § 355-

14    1(g)(4)(B); *see also id.* § 355-1(f)(5)(B). "Implicit in this assessment is whether

15    the drug's risks require REMS and/or ETASU." *Washington*, 668 F. Supp. 3d at

16    1140-41 (citation omitted). "Thus," as this Court previously held, "it would be

17    contrary to the plain language of the statute that the agency need not consider

18    arguments that mifepristone's REMS and ETASU should be removed in whole or

19    part based on criteria under 21 U.S.C. § 355-1(a)(1), (f)(1)." *Id.* And the Court was

20    exactly right—the statute requires FDA to determine that REMS and ETASU are

21    necessary *each time it imposes them*; the agency cannot simply assume that once a

22    REMS has been imposed on a drug, it will be automatically justified going forward

PLAINTIFF STATES' MOTION        14        ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                        Complex Litigation Division
                                                800 Fifth Avenue, Suite 2000
                                                  Seattle, WA  98104-3188
                                                     (206) 464-7744

1  regardless of new data and evidence. By January 2023, mifepristone did not come

2  close to meeting the stringent standards for a REMS with ETASU—and FDA

3  never determined otherwise. It simply imposed the 2023 REMS anyway.

4      First, FDA failed to consider the relevant statutory criteria in determining

5  whether a REMS with ETASU remained necessary to "ensure that the benefits of

6  the drug outweigh the risks of the drug[.]" 21 U.S.C. §§ 355-1(a)(1), (g)(2)(C)(i).

7  Notably absent from FDA's analysis is *any* discussion of Congress's six statutory

8  benefit/risk factors, *see id.* § 355-1(a)(1), making it anyone's guess what the FDA's

9  benefit/risk analysis was based upon. *See* EAR150-98, 277-310. Importantly, if

10 FDA had considered these statutory factors, it would have had to account for the

11 record demonstrating: (1) that more than 5.6 million patients had safely used

12 mifepristone since its U.S. approval in 2000, *supra* at 5; (2) the adverse physical

13 and mental health impacts associated with a lack of abortion access, *infra* at 22-23;

14 (3) the continued efficacy of the two-drug regimen for medication abortion;

15 (4) that only one dose of mifepristone is prescribed for medication abortion (as

16 opposed to the daily, higher dose of REMS-free Korlym); (5) additional reporting

17 confirming FDA's previous determination that adverse events remain "extremely

18 rare" and much lower than for Korlym, *supra* at 5; and (6) the continuing rise in

19 U.S. maternal mortality rates, making the background risk of pregnancy-related

20 death dramatically higher than the mifepristone-related mortality rate, *infra* at 22-

21 23. FDA, however, considered none of this in conducting its 2023 REMS review.

22 Indeed, this review stands in stark contrast to the type of risk/benefit analysis FDA

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   conducted for Korlym, where FDA walked through the statutory factors and
2   considered how a REMS would "burden" patients and "impede access." EAR3-10.

3       Beyond requiring consideration of all six REMS factors, Congress also
4   unambiguously mandated that any ETASU be "necessary . . . to mitigate a specific
5   serious risk listed in the labeling of the drug," 21 U.S.C. § 355-1(f), and be
6   "commensurate with" any such risk, *id.* § 355-1(f)(2)(A). Here, FDA did not make
7   the statutorily required conclusion that mifepristone is so dangerous that FDA
8   would "withdraw[]" its approval absent ETASU. *Id.* § 355-1(f)(1)(A). Such a
9   conclusion would be impossible: the two risks listed on the labeling of mifepristone
10  are infection and heavy bleeding, but the labeling clearly states that "[n]o causal
11  relationship between the use of MIFEPREX and misoprostol and these events has
12  been established." *Supra* at 4. Moreover, FDA has concluded that serious adverse
13  events following mifepristone use are "extremely rare." *Id.* at 5. And the drug's
14  *associated* fatality rate (which, of course, is not causation) is 0.0005% for the entire
15  time it has been available. *Id.* FDA did not even attempt to justify the ETASU in
16  light of the mandatory statutory elements—because it cannot.

17      Additionally, any ETASU must "not be unduly burdensome on patient
18  access," particularly for patients in "rural or medically underserved areas," and
19  must "minimize the burden on the health care delivery system[.]" 21 U.S.C.
20  §§ 355-1(f)(2)(C), (D). Although FDA determined it was necessary to remove the
21  in-person dispensing element due to its impact on patient access, FDA otherwise
22  ignored this statutory mandate in imposing the 2023 REMS ETASU elements.

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT                    16                    ATTORNEY GENERAL OF WASHINGTON
                                                              Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                              (206) 464-7744

1    Most glaringly, FDA *expressly declined to consider* "[d]ata on the logistics of

2    accessing abortion care in general, such as time to appointment or the distance

3    traveled to obtain care," as well as information from ACOG, AMA, and others that

4    would have allowed it to analyze burdens on patients and the health care system as

5    required. *See supra* at 11-12. FDA's refusal to consider evidence on this issue

6    despite Congress's express direction is dispositive on its own.

7         In sum, the 2023 REMS is a product of FDA's stark failure to consider the

8    statutory elements Congress required. Where an agency action is "inconsistent with

9    the statutory mandate," it is the Court's "clear duty . . . to reject" it. *S.E.C. v. Sloan*,

10   436 U.S. 103, 118-19 (1978). Thus, the 2023 REMS should be remanded.

11        **2.    The 2023 REMS is arbitrary and capricious**

12        The 2023 REMS is also arbitrary and capricious. An agency acts arbitrarily

13   and capriciously if it "has relied on factors which Congress has not intended it to

14   consider, entirely failed to consider an important aspect of the problem, offered an

15   explanation for its decision that runs counter to the evidence before the agency, or

16   is so implausible that it could not be ascribed to a difference in view or the product

17   of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

18   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "pay[] attention to the

19   advantages *and* the disadvantages of [its] decisions." *Michigan v. E.P.A.*, 576 U.S.

20   743, 753 (2015). It must also demonstrate that it "examine[d] the relevant data and

21   articulate[d] a satisfactory explanation for its action including a rational connection

22   between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at

42-43 (cleaned up). In multiple respects, the 2023 REMS fails this test.

a.     **FDA failed to consider how the 2023 REMS burden patient access, particularly in rural & medically underserved areas**

First, FDA failed to consider substantial record evidence of how the REMS burdens patient access, an issue Congress directed FDA to consider. 21 U.S.C. §§ 355-1(f)(2)(C)-(D); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1206 (9th Cir. 2008) ("An agency may not ignore factors Congress explicitly required be taken into account.") (citation omitted).

For example, a study examining the REMS' impact on patient access found that institutional resistance to prescribing mifepristone is driven by fears and misconceptions about its REMS classification and requirements; that disallowing routine access in primary care disrupts continuity of care, delays or impedes access, and creates stigma; that more costly and invasive aspiration (surgical) abortion accordingly becomes some patients' only realistic option (and for many is out of reach entirely); and that other countries' experience has confirmed that REMS-like restrictions are medically unjustified. *See, e.g.*, EAR122-27 (study concluding that the REMS reflects and perpetuates stigma that creates systematic barriers to care); EAR112 ("the REMS creates barriers to incorporation of mifepristone into practice by creating administrative burdens that clinical champions cannot overcome"); EAR18-24 (FDA analysis describing "burden for patients" of the "duplicative" Patient Agreement Form, which "does not add to safe use conditions"); EAR42.

For instance, ETASU A (prescriber certification) results in mifepristone

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   being excluded from the primary care setting with no scientific justification. As

2   reflected in the record, abortion with mifepristone is "well within the scope of

3   primary care in the United States, as it involves patient assessment and health

4   education for which primary care providers are extensively trained." EAR128; *see,*

5   *e.g.*, EAR66 ("Prescribing medication abortion is no different from prescribing

6   other medications"); EAR105, 106 ("Any clinician with the skills to screen patients

7   for eligibility for medication abortion and to provide appropriate follow-up can

8   provide medication abortion."); EAR39 ("Fulfilling these [provider-certification]

9   criteria requires no specialized medical expertise."). Indeed, all that providers must

10  do to become certified under ETASU A is attest that they possess these "minimal"

11  primary care skills—an "empty formality." EAR147, 48. As ACOG explained to

12  FDA, the "redundant and unnecessary" provider-certification requirement "serves

13  no benefit to patient safety" because providers *must always* possess the skills

14  necessary to prescribe any given medication. EAR210-37; *see also* EAR39 (noting

15  provider certification is not required to prescribe other "drugs that require careful

16  patient screening to ensure safety," such as "powerful cardiovascular drugs,"

17  antibiotics, and antipsychotics). Still, because of the stigma, administrative

18  hurdles, and privacy concerns created by the REMS, **only 1%** of medication

19  abortions occur in the primary care setting. EAR128; *see also* EAR146, 147. When

20  mifepristone is unavailable in primary care, patients suffer the consequences:

21  "disrupted continuity of care, medically-unnecessary appointments, and undesired

22  aspiration procedures." EAR122; *see also* EAR255-56; EAR37.

PLAINTIFF STATES' MOTION                    19               ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                               Complex Litigation Division
                                                                  800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104-3188
                                                                        (206) 464-7744

1    Further, despite its appropriately low threshold for providers to qualify for

2    certification, ETASU A "deters many qualified clinicians from becoming

3    mifepristone prescribers," in part due to stigma associated with a REMS as well

4    fear that registration could expose them to threats of violence by anti-abortion

5    extremists. EAR42; EAR88 (certification makes "some clinicians uneasy because

6    they fear they will be identified publicly" and creates a provider shortage that is

7    "particularly pronounced in rural communities"); EAR8 (in rejecting a REMS for

8    Korlym, FDA said "[p]rivacy may be better maintained if there are no systems in

9    place to track formally prescribers and patients"); EAR142 (noting that FDA itself

10   strictly shields the identities of its personnel involved in reviewing mifepristone);

11   *see also* EAR41, 39, 82, 200-01, 202-204, 205-207. These "extreme risks" are all

12   too real, as reflected by the "long history of harassment and violence" experienced

13   by abortion providers in the U.S. EAR245, 47, 312-13; *see also* EAR110. Keeping

14   mifepristone out of the primary care setting exposes patients to risks of violence as

15   well, because at specialized clinics, they may encounter harassment that can turn

16   violent. *See* EAR389-90, 314-16 (homicides and arson at abortion clinics);

17   EAR284 (discussing concerns about patients' exposure to "intimidation, threats,

18   or acts of violence"); EAR245 (acknowledging the "ever-present risk of anti-

19   abortion violence"). While the FDA appropriately acknowledged abortion violence

20   in structuring ETASU B (pharmacy certification), it continued to ignore evidence

21   as to how the other ETASU create stigma and fear, and in turn barriers to access.

22   FDA's refusal to consider highly relevant data went much further, with FDA

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT                          20                ATTORNEY GENERAL OF WASHINGTON
                                                                    Complex Litigation Division
                                                                    800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104-3188
                                                                        (206) 464-7744

1   ignoring stakeholder feedback "request[ing] the removal of both the Prescriber

2   Agreement and Patient Agreement to reduce the burden on them and their

3   patients." EAR267. Even worse, FDA intentionally decided to exclude *all* studies

4   about patient access and provider experience that "did not include objective safety

5   data related to outcomes of medical abortion." EAR160-61; *see supra* at 11-12.

6   But Congress did not limit FDA to objective drug-safety data in reviewing whether

7   ETASU are "unduly burdensome on patient access . . . ." *See* 21 U.S.C. § 355-1(f).

8   FDA's decision to ignore the effects of stigma, reduced drug availability, and

9   violence, which are directly relevant to an issue Congress directed it to consider,

10  was arbitrary and capricious. *See Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir.

11  2015) ("An agency's decision is arbitrary and capricious if it ignores important

12  considerations or relevant evidence on the record.") (citing cases); *see also Motor*

13  *Vehicle Mfrs.*, 463 U.S. at 43 (requiring the agency to "examine the relevant data

14  and articulate a satisfactory explanation for its action . . . ").

15          What's more, to justify retaining ETASU D (patient agreement form), FDA

16  relied on a survey of OBGYNs showing that eliminating in-person dispensing

17  would lead to new mifepristone prescribers, EAR166-67 (Grossman study)—yet

18  ignored that *same study's* finding that prescriber certification prevents *nearly 1 in*

19  *10* OBGYNS from prescribing mifepristone. EAR120-21. FDA's decision "to rely

20  on portions of studies in the record that support its position, while ignoring

21  [information] in those studies that do[es] not," was arbitrary and capricious.

22  *Genuine Parts Co. v. E.P.A.*, 890 F.3d 304, 313 (D.C. Cir. 2018).

PLAINTIFF STATES' MOTION                    21          ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                         Complex Litigation Division
                                                             800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                                  (206) 464-7744

1      Likewise, in adding ETASU B, FDA did not address how limiting the

2    number of pharmacies that can dispense mifepristone negatively impacts patients'

3    access, particularly those who "are not digitally literate." EAR225. Although FDA

4    admitted that imposing this ETASU would "likely limit" the number of pharmacies

5    that would choose to become certified, EAR285, it did not consider how that would

6    impact "patients in rural or medically underserved areas" with far fewer

7    pharmacies, 21 U.S.C. § 355-1(f), an issue specifically raised by ACOG. EAR225;

8    *see In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) (unless the agency

9    "answers objections that on their face seem legitimate, its decision can hardly be

10   classified as reasoned") (citation omitted). That, too, was arbitrary and capricious.

11      In sum, FDA failed to consider extensive evidence on the burdens of the

12   REMS, and its "generic statements" to the contrary are insufficient. *Los Padres*

13   *ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (cleaned up).

14         **b.**    **FDA arbitrarily failed to consider evidence on maternal mortality and mifepristone's safety without REMS**

15      Further, in making its conclusory determination that the 2023 REMS was

16   necessary, FDA failed to consider significant evidence on the "seriousness of the

17   disease or condition that is to be treated with the drug." 21 U.S.C. § 355-1(a)(1)(B).

18   Notably absent from FDA's REMS review is any acknowledgment of—much less

19   consideration of—the fact that pregnant women are not taking mifepristone in a

20   vacuum; instead, **they are pregnant** and experiencing a serious medical condition

21   with limited alternatives. As reflected in the record, the U.S. has the highest rates

22

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

22

1  of maternal mortality in the developed world. EAR248 (discussing EAR257-61);

2  *see also* EAR262 ("[s]lightly less than two pregnant or postpartum women die *each*

3  *day* in the U.S.") (emphasis added); EAR100-01 (discussing causes of pregnancy

4  related deaths). In 2020, the most recent year for which data is in the record, there

5  were 23.8 deaths per 100,000 live births, up from 20.1 in 2019. EAR248.

6  Alarmingly, the maternal mortality rate for Black women was 55.3 deaths per

7  100,000 live births. *Id.* At just 0.3 deaths per 100,000 abortions performed at or

8  before 8 weeks, the mortality rate associated with abortion is vastly lower than the

9  mortality rate associated with childbirth. *Id.*; *see supra* at 6. Moreover, the

10  landmark Turnaway Study shows that patients denied abortion are more likely to

11  suffer anxiety and loss of self-esteem in the short term after being denied abortion.

12  EAR263. But FDA ignored the serious and sometimes deadly risks associated with

13  pregnancy—risks that are exacerbated by restricting mifepristone. That is arbitrary

14  and capricious. *See Michigan*, 576 U.S. at 753 (agency must "pay[] attention to the

15  advantages *and* the disadvantages of [its] decisions").

16      FDA also ignored evidence that mifepristone is equally safe without the

17  REMS. This includes evidence that "[a]fter Canada removed all restrictions on

18  prescribing mifepristone for abortion, thereby allowing it to be prescribed and

19  dispensed like any other drug ('normal prescribing'), there was no increase in

20  complications from mifepristone use." EAR226, 237. Based on the 10-month

21  period in Canada when mifepristone was distributed under "REMS-like

22  restrictions" and the 28-month period when it was distributed without such

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    restrictions, the study found "no difference" in the rates of complications or serious

2    adverse events. *Id.* (citing Laura Schummers, et al., *Abortion Safety and Use with*

3    *Normally Prescribed Mifepristone in Canada*, 386 N. Engl. J. Med. 57-67 (2022));

4    EAR238; *see also* EAR117-18, 133, 134. Although this study was cited in ACOG's

5    2022 citizen petition, FDA ignored it. *See* ECF No. 139 at 13-14. It likewise

6    ignored the U.S.'s own experience demonstrating no increase in adverse safety

7    events when pharmacies distributed mifepristone without certification during the

8    pandemic. *See supra* at 10. FDA's failure to "examine the relevant data" is

9    arbitrary and capricious. *Motor Vehicle Mfrs.*, 463 U.S. at 42-43.

10          **c.    FDA's differential treatment of Korlym is arbitrary and
                    capricious**

11

12          Finally, that FDA does not impose a REMS for Korlym is determinative. It

13    is nonsensical that mifepristone's labeling and Medication Guide are insufficient

14    to mitigate the exceedingly low risks associated with mifepristone when used for

15    the "controversial" treatment of abortion, but are sufficient to convey the risks for

16    a chronic, higher dose when used daily for a non-controversial condition. *See supra*

17    at 6. "[T]he FDA is not free to . . . treat [similar products] dissimilarly and to permit

18    two sets of similar products to run down two separate tracks, one more treacherous

19    than the other, for no apparent reason." *Bracco Diagnostics, Inc. v. Shalala*, 963 F.

20    Supp. 20, 28 (D.D.C. 1997); 21 U.S.C. § 355-1(f)(2)(D)(i) (requiring ETASU to

21    "conform" to restrictions "for other drugs with similar, serious risks"). Social

22    "controversy" is not a factor Congress authorized FDA to consider. *Motor Vehicle*

PLAINTIFF STATES' MOTION                    24          ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                              Complex Litigation Division
                                                                 800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA  98104-3188
                                                                       (206) 464-7744

*Mfrs.*, 463 U.S. at 42-43 (agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider"). Indeed, "[t]he disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious." *Bracco Diagnostics*, 963 F. Supp. at 28.[1]

## C.    The Court Should Remand This Matter to FDA

The most appropriate remedy for FDA's failures is to remand to FDA without vacatur. Although vacatur is the standard remedy, "when equity demands, the regulation can be left in place while the agency follows the necessary procedures to correct its action." *Cal. Cmties. Against Toxics v. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (cleaned up). Here, remand is appropriate to allow FDA to address its errors without the potentially disruptive consequences of vacatur. *Id.* On remand, the Court should order FDA to consider *each* of the statutory requirements for REMS and ETASU, and *all* relevant portions of the record.

## IV.    CONCLUSION

The Court should grant summary judgment for the States and remand this matter to FDA for consideration consistent with this Court's Order.

---

[1] The irrationality of FDA's action also renders the restrictions on pregnant patients unconstitutional. ECF No. 35 at 89-90; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (constitutional guarantee of equal protection violated by "arbitrary or irrational" governmental classifications). Because the Court should remand under the APA, it need not resolve the constitutional claim.

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT
25
ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1       DATED this 10th day of October 2024.

2                              ROBERT W. FERGUSON
                              Attorney General

3

4                              *s/ Kristin Beneski*
                              NOAH GUZZO PURCELL, WSBA #43492

5                              Solicitor General
                              KRISTIN BENESKI, WSBA #45478

6                              First Assistant Attorney General
                              COLLEEN M. MELODY, WSBA #42275

7                              Civil Rights Division Chief
                              ANDREW R.W. HUGHES, WSBA #49515

8                              LAURYN K. FRAAS, WSBA #53238
                              Assistant Attorneys General

9                              TERA M. HEINTZ, WSBA #54921
                              Deputy Solicitor General

10                             800 Fifth Avenue, Suite 2000
                              Seattle, WA  98104-3188

11                             (206) 464-7744
                              Noah.Purcell@atg.wa.gov

12                             Kristin.Beneski@atg.wa.gov
                              Colleen.Melody@atg.wa.gov

13                             Andrew.Hughes@atg.wa.gov
                              Lauryn.Fraas@atg.wa.gov

14                             Tera.Heintz@atg.wa.gov
                              *Attorneys for Plaintiff State of Washington*

15                             ELLEN F. ROSENBLUM
                              Attorney General of Oregon

16

17                             *s/ Carla A. Scott*
                              SANDER MARCUS HULL, WSBA #35986

18                              CARLA A. SCOTT, WSBA #39947
                              Senior Assistant Attorneys General

19                              YOUNGWOO JOH, OSB #164105
                              Assistant Attorney General

20                              Trial Attorneys
                              Tel: (971) 673-1880

21                             Fax: (971) 673-5000
                              marcus.hull@doj.state.or.us

22                             carla.a.scott@doj.state.or.us
                             youngwoo.joh@doj.state.or.us

PLAINTIFF STATES' MOTION         26         ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                      Complex Litigation Division
                                                 800 Fifth Avenue, Suite 2000
                                                 Seattle, WA  98104-3188
                                                 (206) 464-7744

1          *Attorneys for State of Oregon*

2          KRIS MAYES
           Attorney General of Arizona

3
           *s/ Daniel C. Barr*
4          Daniel C. Barr (Arizona No. 010149)
           Chief Deputy Attorney General
5          Luci D. Davis (Arizona No. 35347)
           Office of the Attorney General of Arizona
6          2005 N. Central Ave.
           Phoenix, AZ 85004-1592
7          Phone: (602) 542-8080
           Email:    Daniel.Barr@azag.gov
8                     Luci.Davis@azag.gov
           *Attorneys for Plaintiff State of Arizona*
9
           PHILIP J. WEISER
10         Attorney General of Colorado

11         *s/ Shannon Wells Stevenson*
           SHANNON WELLS STEVENSON, #35542
12         Solicitor General
           MICHAEL MCMASTER, CO #42368
13         Assistant Solicitor General
           Office of the Attorney General
14         Colorado Department of Law
           1300 Broadway, 10th Floor
15         Denver, CO 80203
           Phone: (720) 508-6000
16         *Attorneys for Plaintiff State of Colorado*

17         WILLIAM TONG
           Attorney General of Connecticut
18
           *s/ Joshua Perry*
19         Joshua Perry
           Solicitor General
20         Office of the Connecticut Attorney General
           165 Capitol Ave, Hartford, CT 06106
21         Joshua.perry@ct.gov
           (860) 808-5372
22         Fax: (860) 808-5387

PLAINTIFF STATES' MOTION                27          ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                                        Complex Litigation Division
                                                              800 Fifth Avenue, Suite 2000
                                                               Seattle, WA  98104-3188
                                                                   (206) 464-7744

*Attorney for Plaintiff State of Connecticut*

KATHLEEN JENNINGS
Attorney General of Delaware

*s/ Vanessa L. Kassab*
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
vanessa.kassab@delaware.gov
*Attorney for Plaintiff State of Delaware*

KWAME RAOUL
Attorney General of Illinois

*s/ Caitlyn G. McEllis*
Caitlyn G. McEllis (6306561)
Senior Policy Counsel
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Phone: (312) 793-2394
Caitlyn.McEllis@ilag.gov
*Attorney for Plaintiff State of Illinois*

DANA NESSEL
Attorney General of Michigan

*s/ Stephanie M. Service*
Stephanie M. Service (P73305)
Assistant Attorney General
Michigan Department of Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
ServiceS3@michigan.gov
*Attorney for Plaintiff Attorney General of
Michigan*

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

28

AARON D. FORD
Attorney General of Nevada

_s/ Heidi Parry Stern_
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov
_Attorney for Plaintiff State of Nevada_

RAÚL TORREZ
Attorney General of New Mexico

_s/ Aletheia Allen_
Aletheia Allen
Solicitor General
Executive Office
State of New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmag.gov
_Attorney for Plaintiff State of New Mexico_

PETER F. NERONHA
Attorney General of Rhode Island

_s/ Julia C. Harvey_
JULIA C. HARVEY #10529
Special Assistant Attorney General
150 S. Main Street
Providence, RI 02903
(401) 274-4400 x2103
_Attorney for Plaintiff State of Rhode Island_

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT

29

1      CHARITY R. CLARK
Attorney General of Vermont

2

_s/ Douglas Keehn_

3      DOUGLAS KEEHN
Assistant Attorney General

4      109 State Street
Montpelier, VT 05609-1001

5      (802) 793-3892
douglas.keehn@vermont.gov

6      _Attorney for Plaintiff State of Vermont_

7      BRIAN L. SCHWALB
Attorney General for the District of Columbia

8      JENNIFER C. JONES
Deputy Attorney General

9      Public Advocacy Division
WILLIAM STEPHENS

10     Assistant Deputy Attorney General
Public Advocacy Division

11

_s/ Nicole S. Hill_

12     NICOLE S. HILL
Assistant Attorney General

13     Office of the Attorney General for the
District of Columbia

14     400 Sixth Street, N.W.
Washington, D.C. 20001

15     (202) 727-4171
nicole.hill@dc.gov

16     _Attorneys for Plaintiff District of Columbia_

17     ANNE E. LOPEZ
Attorney General

18

_s/ Erin N. Lau_

19     Erin N. Lau 009887
465 South King St., Room 200

20     Honolulu, Hawaii 96813
Erin.N.Lau@hawaii.gov

21     _Counsel for the State of Hawaii_

22

PLAINTIFF STATES' MOTION        30        ATTORNEY GENERAL OF WASHINGTON
FOR SUMMARY JUDGMENT                     Complex Litigation Division
                                     800 Fifth Avenue, Suite 2000
                                     Seattle, WA  98104-3188
                                     (206) 464-7744

1     AARON M. FREY
      Attorney General
2
      *s/ Halliday Moncure*
3     Halliday Moncure, Bar No. 4559
      Assistant Attorney General
4     Office of the Maine Attorney General
      6 State House Station
5     Augusta, ME 04333-0006
      (207) 626-8800
6     halliday.moncure@maine.gov

7     ANTHONY G. BROWN
      Attorney General of Maryland
8
      *s/ Joshua M. Segal*
9     JOSHUA M. SEGAL
      Assistant Attorney General
10    Office of the Attorney General of Maryland
      200 Saint Paul Place, 20th Floor
11    Baltimore, Maryland 21202
      (410) 576-6446
12    jsegal@oag.state.md.us
      *Attorney for Plaintiff State of Maryland*
13
      KEITH ELLISON
14    Attorney General
      State of Minnesota
15
      *s/ Liz Kramer*
16    LIZ KRAMER (#0325089)
      Solicitor General
17    JENNIFER OLSON (#0391356)
      Assistant Attorney General
18    445 Minnesota Street, Suite 1400
      St. Paul, Minnesota 55101-2131
19    (651) 757-1010 (Voice)
      (651) 282-5832 (Fax)
20    liz.kramer@ag.state.mn.us
      jennifer.olson@ag.state.mn.us
21    *Attorneys for Plaintiff State of Minnesota*

22

PLAINTIFF STATES' MOTION                    31
FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

MICHELLE A. HENRY
Attorney General of Pennsylvania

*s/ Lisa E. Eisenberg*
LISA E. EISENBERG
(Pa. Bar No. 324701)
Deputy Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
leisenberg@attorneygeneral.gov
(215) 316-9807
*Attorney for the Commonwealth of
Pennsylvania*

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT                32              ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on October 10, 2024, I electronically filed the foregoing

3 with the Clerk of the Court using the CM/ECF System, which in turn automatically

4 generated a Notice of Electronic Filing (NEF) to all parties in the case who are

5 registered users of the CM/ECF system. The NEF for the foregoing specifically

6 identifies recipients of electronic notice.

7       I declare under penalty of perjury under the laws of the State of Washington

8 and the United States of America that the foregoing is true and correct.

9       DATED this 10th day of October 2024, at Seattle, Washington.

10                           *s/ Kristin Beneski*

11                           KRISTIN BENESKI, WSBA #45478
First Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22

PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT          33         ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744