1   NICHOLAS W. BROWN
    Attorney General
2   NOAH GUZZO PURCELL, WSBA #43492
    Solicitor General
3   COLLEEN M. MELODY, WSBA #42275
    Civil Rights Division Chief
4   LAURYN K. FRAAS, WSBA #53238
    ANDREW R.W. HUGHES, WSBA #49515
5   Assistant Attorneys General
    TERA M. HEINTZ, WSBA #54921
6   Deputy Solicitor General
    800 Fifth Avenue, Suite 2000
7   Seattle, WA  98104-3188
    (206) 464-7744

8

9                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF WASHINGTON**
10

11   STATE OF WASHINGTON, et al.,          NO. 1:23-cv-03026-TOR

12                    Plaintiffs,          PLAINTIFF STATES' REPLY IN
                                           SUPPORT OF MOTION FOR
13        v.                               SUMMARY JUDGMENT AND
                                           OPPOSITION TO DEFENDANTS'
14   UNITED STATES FOOD AND                CROSS-MOTION FOR
     DRUG ADMINISTRATION, et al.,          SUMMARY JUDGMENT
15
                     Defendants.           With Oral Argument:
16                                         TBD (see ECF No. 175)

17

18

19

20

21

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     ARGUMENT ..................................................................................... 2

    A.  The States Have Standing ............................................................ 2

        1.  The States have demonstrated direct economic and proprietary injuries.................................................................... 2

        2.  The Court should consider the States' standing as to the mifepristone REMS as a whole ................................................ 9

    B.  The Challenge Is Ripe for Judicial Review .................................... 9

    C.  The 2023 REMS Is Contrary to Law ........................................... 14

    D.  The 2023 REMS Is Arbitrary and Capricious............................... 18

        1.  FDA excluded and ignored extensive evidence in its review........................................................................................ 18

        2.  FDA refused to consider the safety outcomes from Canada ........................................................................................ 23

        3.  FDA's blinkered view of the evidence was irrational ........... 26

        4.  FDA's differential treatment of Korlym is unreasonable ................................................................................ 27

        5.  FDA failed to offer a reasoned explanation for the 2023 REMS........................................................................................ 29

    E.  Summary Judgment Is Not Warranted on the Constitutional Claim ............................................................................................ 33

    F.  The Court Should Remand with Guardrails to Protect the Status Quo .............................................................................................. 34

III.    CONCLUSION ................................................................................. 35

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.    INTRODUCTION

1   FDA's response brief, like its decision to continue imposing REMS on one of the safest drugs for women's health care, ignores the facts and the law. The Court should remand this matter for FDA to determine—using the science and *only* the science—if the burdens on patient access to mifepristone should be lessened.

In attempting to avoid remand, FDA first claims that the States lack standing. But as operators of medical institutions and health care systems that provide medication abortion, state instrumentalities are directly regulated by the REMS and suffer pocketbook injuries from burdens imposed by the REMS. Next, FDA argues the States failed to exhaust their administrative remedies. But the States, medical associations, and many others have repeatedly petitioned FDA to end the mifepristone REMS, and FDA has repeatedly refused. Third, FDA claims it reasonably applied the REMS modification factors under 21 U.S.C. § 355-1(g)(4). But the record is devoid of any indication that FDA also considered the factors in 21 U.S.C. §§ 355-1(a)(1) or 355(f)(1)-(2), which govern whether FDA can single out mifepristone for unique burdens it doesn't impose on 99% of drugs. Finally, FDA insists it considered all evidence and engaged in reasoned decision making for purposes of both the APA and the Fifth Amendment. But the record reflects—and FDA now confesses—that FDA intentionally excluded entire sections of the administrative record from its review, ignored evidence that the REMS burdens patient access, failed to address concerns of major medical organizations, and refused to grapple with contrary evidence.

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1     At bottom, while FDA congratulates itself for loosening the REMS (which

2  it only did as a result of litigation), FDA cannot explain why it continues to treat

3  mifepristone differently from the other 20,000 drugs that do not require a REMS.

4  The answer is obvious: abortion. But FDA can't say that because the FDCA does

5  not permit FDA to restrict drugs because some people disagree with how they are

6  used. *Cf. Tummino v. Hamburg*, 936 F. Supp. 2d 162, 169 (E.D.N.Y. 2013) ("The

7  standards are the same for aspirin and for contraceptives."). FDA's 2023 decision

8  to continue singling out mifepristone for increased burdens was both contrary to

9  law and arbitrary and capricious. The Court should grant the States' motion.

## II.     ARGUMENT

### A.     The States Have Standing

12     The States have met their burden to establish standing. At the summary

13  judgment phase, a plaintiff must "set forth by affidavit or other evidence specific

14  facts, . . . which for purposes of the summary judgment motion will be taken to be

15  true," demonstrating Article III's minimum requirements. *Lujan v. Defs. of

16  Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). The States have done

17  that, despite FDA's halfhearted arguments to the contrary.

### 1.     The States have demonstrated direct economic and proprietary injuries

20     As this Court recognized, Plaintiffs have shown injury in the form of costs

21  fairly traceable to the 2023 REMS program. *See Washington v. FDA* (*Washington

22  I*), 668 F. Supp. 3d 1125, 1137-38 (E.D. Wash. 2023). "Like any party, a state has

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

standing to challenge federal action that directly harms the state's economic interests or interferes with its operations as a service provider, market participant, or employer." *Washington v. FDA* (*Washington II*), 108 F.4th 1163, 1174 (9th Cir. 2024). Here, pocketbook injuries to the States include: (1) direct costs of complying with the 2023 REMS; and (2) costs to the States' Medicaid and other state-funded health care programs from increased surgical abortions and pregnancy care. *See id.* And because state instrumentalities are directly regulated by the REMS, they "incur these costs directly as the object[s] of regulation[.]" *Id.* at 1175. Further, as operators of medical systems, the REMS harms states' proprietary interests in providing the best possible healthcare to their patients.

***Costs to Comply with the REMS***. Washington and other states have demonstrated direct economic harm in the form of their costs implementing and complying with the 2023 REMS. State instrumentalities "incur these costs directly as the object of regulation[.]" *Id.* FDA concedes standing based on the costs of compliance imposed by the Pharmacy Certification ETASU, which they admit has caused "actual or imminent injury." ECF No. 170 at 16 (citing DasGupta Decl., ECF No. 4-1 at 44-47 ¶¶ 8-14, 19 (Decl. of UW Pharmacy Director)). For example, pharmacies must create costly new systems to ensure all prescribers are certified and comply with other unusual requirements. DasGupta Decl., ECF No. 4-1 at 44, 46-47 ¶¶ 8, 16, 19; *see also* Singh Decl., ECF No. 4-1 at 381-383 ¶¶ 12-14 (Decl. of UW Associate Chief Medical Information Officer). But FDA simply ignores the evidence of equivalent costly burdens imposed by the Provider Certification and

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Patient Agreement Form ETASUs. For instance, the Provider Certification

2   ETASU also necessitated setting up new secure databases and systems, including

3   system work to ensure that telehealth appointments related to medication abortion

4   are only scheduled with REMS-certified providers, maintaining an updated roster

5   of certified providers for telehealth appointments (an ongoing obligation as

6   providers come and go), teaching providers how to electronically submit their

7   Prescriber Certification form to pharmacies, as well as the ongoing burden on

8   prescribers of submitting their Prescriber Certification to each pharmacy they

9   prescribe to. Singh Decl., ECF No. 4-1 at 379-382 ¶¶ 8, 10, 13; Reed Decl.,

10  ECF No. 4-1 at 327-329 ¶¶ 8-11 (UW Medicine Administrator); Godfrey Decl.,

11  ECF No. 4-1 at 97 ¶ 26 (UW OB-GYN); Shih Decl., ECF No. 4-1 at 344-345 ¶ 18

12  (UW OB-GYN). The same is true for compliance with the Patient Agreement Form

13  ETASU in the telehealth context, which requires dual signatures and required

14  custom-built processes to address confidentiality concerns in a remote setting.

15  Singh Decl., ECF No. 4-1 at 380-31, 383-384 ¶¶ 10-11, 16-17; Reed Decl.,

16  ECF No. 4-1 at 329-330 ¶¶ 12-14; Shih Decl., ECF No. 4-1 at 343-344 ¶ 17.

17  Washington and other States employ healthcare providers and pharmacists who

18  prescribe and dispense mifepristone and operate instrumentalities that must spend

19  hundreds of hours complying with *all* of the REMS's complex and highly

20  uncommon certification requirements. *See* DasGupta Decl., ECF No. 4-1 at 43-48

21  ¶¶ 5-22; Singh Decl., ECF No. 4-1 at 377-385 ¶¶ 3-22; Godfrey Decl., ECF No. 4-1

22  at 101-102 ¶¶ 33-35; Prager Decl., ECF No. 4-1 at 275-279 ¶¶ 32-41 (UW OB-

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    GYN); Reed Decl., ECF No. 4-1 at 326-331 ¶¶ 3-17; Shih Decl., ECF No. 4-1 at

2    343-353 ¶¶ 15-34; *see also* Henry, et al. Decl., ECF No. 4-1 at 188-189 ¶¶ 3-8

3    (REMS impede WSU's ability to offer medication abortion in rural Washington);

4    ECF No. 60 at 9-10.

5          Other than its concession with respect to the Pharmacy Certification

6    requirement, FDA simply does not address the evidence regarding these expensive

7    burdens, which are clear, direct, and establish standing as to every challenged

8    REMS provision. *See Washington I*, 668 F. Supp. 3d at 1137-38 (holding States

9    have shown injury in the form of unrecoverable costs fairly traceable to the REMS

10   and have established standing).

11         ***Costs to State-Funded Health Care Programs***. The States also have

12   standing because the REMS restrictions cause more patients to seek higher-cost

13   surgical abortion over mifepristone—resulting in increased costs to Medicaid and

14   other state-funded healthcare programs. FDA's assertion that the States have

15   submitted "no evidence" on this point is demonstrably false. First, the States

16   submitted extensive evidence that the 2023 REMS restrict timely patient access to

17   medication abortion. *See* Colwill Decl., ECF No. 4-1 at 20-23 ¶¶ 18-25; Downing

18   Decl., ECF No. 4-1 at 65-69 ¶¶ 9-17; Godfrey Decl., ECF No. 4-1 at 87-93, 97-98

19   ¶¶ 17-20, 27; Gold Decl., ECF No. 4-1 at 134-139 ¶¶ 15-19, 21, 22, 24, 27; Henry,

20   et al. Decl., ECF No. 4-1 at 189 ¶¶ 6-8; Janiak Decl., ECF No. 4-1 at 197-204

21   ¶¶ 15-18, 20, 22-23, 26; Lazarus Decl., ECF No. 4-1 at 220-221 ¶¶ 16-17, 19;

22   Nichols Decl., ECF No. 4-1 at 234 ¶ 38; Prager Decl., ECF No. 4-1 at 275, 277

PL. STATES' REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP'N TO DEFS.' CROSS-MOT. FOR SUMM. J.

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  ¶¶ 34, 38; Shih Decl., ECF No. 4-1 at 345-351 ¶¶ 20-27, 29. Any such access

2  restrictions—whether due to a lack of certified provider (Godrey Decl., ECF No.

3  4-1 at 100 ¶¶ 30-31), lack of certified pharmacy (Shih Decl., ECF No. 4-1 at 349-

4  350 ¶ 27), inability to e-sign the Patient Agreement Form (*id.* at 343-344 ¶ 17),

5  reluctance or confusion regarding the Patient Agreement Form (Prager Decl.,

6  ECF No. 4-1 at 269 ¶ 18), lagging REMS paperwork (DasGupta Decl., ECF No.

7  4-1 at 44-45 ¶ 10), or some combination of these—will cause some patients to miss

8  or forgo medication abortion altogether. The States have submitted ample evidence

9  to this effect, *see, e.g.*, Shih Decl., ECF No. 4-1 at 343-344 ¶ 17, and its trigger of

10  higher-cost surgical abortions (*see, e.g.*, Birch Decl., ECF No. 4-1 at 4 ¶ 10;

11  Colwill Decl., ECF No. 4-1 at 22-23 ¶ 24; Fotinos Decl., ECF No. 4-1 at 74 ¶ 10)

12  and pregnancy-related care (*see, e.g.*, Birch Decl., ECF No. 4-1 at 5-6 ¶¶ 15, 17;

13  Fotinos Decl., ECF No. 4-1 at 75-76 ¶¶ 13-15).

14      Put simply, there is nothing at all speculative or hypothetical about the

15  States' evidence that "[a]ny limits on the availability of medication abortion in

16  Washington State is highly likely to cause an increase in the rate of surgical

17  abortion" and that any such increase in costs "would be borne by Washington

18  State." Birch Decl. ¶ 10 (emphasis added); Shih Decl. ¶ 17 ("[D]elaying the process

19  even by a few days may make [a patient] ineligible to select medication abortion.").

20  This is a textbook Article III injury. *See, e.g.*, *California v. Azar*, 911 F.3d 558,

21  571-73 (9th Cir. 2018) (states had standing based on showing that challenged

22  agency rules would lead to more women seeking care from state-funded programs).

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1        FDA's reliance on the Ninth Circuit's decision in *Washington II* to argue

2   otherwise is badly misplaced. ECF No. 170 at 14. *Washington II* concerned

3   *un*regulated parties' attempt to claim standing based on "indirect" costs. 108 F.4th

4   at 1175. As the Court knows, Idaho and six other states tried to force their way into

5   this suit by arguing that FDA's removal of mifepristone's in-person dispensing

6   requirement might result in some "marginal" rate of increased complications for

7   women taking the drug, which might, in turn, result in "follow-up care . . . 'borne

8   by Idaho through Medicaid expenditures.'" *Id.* at 1175-76. The Ninth Circuit

9   rejected this "highly attenuated" ground for standing. *Id.* In doing so, the court

10  explicitly distinguished the States' "direct[]" economic harm here from Idaho's

11  "indirect[]" injury there: "*Unlike* [*the States*], Idaho *does not* allege that it will

12  incur these costs directly as the object of regulation[.]" *Id.* at 1175 (emphasis

13  added). This distinction flows directly from the Supreme Court's holding that

14  "[g]overnment regulations that require or forbid some action by the plaintiff," such

15  as the REMS vis-à-vis States that directly provide abortion care, "almost invariably

16  satisfy both the injury in fact and causation requirements," whereas "unregulated

17  parties" that do not provide abortion care, "may have more difficulty establishing

18  causation—that is, linking their asserted injuries to the government's regulation

19  (or lack of regulation) of someone else." *FDA v. All. for Hippocratic Med.*, 602

20  U.S. 367, 382 (2024). *Washington II* supports, rather than refutes, standing here.

21      ***Proprietary Interests***. As owners and operators of medical facilities and

22  pharmacies, Washington and other states have proprietary interests in providing

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

the best possible healthcare to their patients—interests that are harmed by the REMS's unlawful practice restrictions. *See* ECF No. 3 at 17. FDA argues that this theory fails to identify a concrete injury because Plaintiffs do not allege, for example, "that the Patient Agreement Form actually prevents state healthcare providers from communicating what they believe is medically sound advice to patients." ECF No. 170 at 15-16. But the States' evidence says precisely what FDA claims it does not. *See, e.g.*, Godfrey Decl., ECF No. 4-1 at 82-84 ¶¶ 12-14 (Patient Agreement Form harms the patient experience and makes patient counseling more difficult because it suggests mifepristone is unsafe, when it is not); Prager Decl., ECF No. 4-1 at 269 ¶ 18. FDA next contends that Plaintiffs lack a concrete proprietary injury because they fail to "explain how state-employed prescribers who are already certified have a redressable injury stemming from the prescriber certification requirement." ECF No. 170 at 15-16. But this ignores that the REMS requires providers to send a prescriber agreement form to *every* certified pharmacy to which they send mifepristone prescriptions—plainly an ongoing burden to a provider's practice. Shih Decl., ECF No. 4-1 at 348-350 ¶¶ 23, 27; Godfrey Decl., ECF No. 4-1 at 87 ¶ 26; Colwill Decl., ECF No. 4-1 at 21 ¶¶ 19-20. Providers must also divert time to undertake other burdensome administrative tasks required by the REMS, including recording the National Drug Code and lot number for mifepristone; tracking which pharmacies are REMS certified; ensuring that telehealth appointments have digitally "dual signed" Patient Agreement forms; and coordinating with pharmacies in the event a prescription is delayed by more than

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

four days. *See, e.g.*, Shih Decl., ECF No. 4-1 at 341-342, 349 ¶¶ 10, 14, 27; DasGupta Decl., ECF No. 4-1 at 44-45 ¶¶ 10-11.

### 2. The Court should consider the States' standing as to the mifepristone REMS as a whole

Finally, FDA's request that the Court subdivide standing by individual REMS requirement is baseless. *Cf. Washington I*, 668 F. Supp. 3d at 1138 (holding that the States established standing to challenge the 2023 REMS program as a whole). To be clear, the Court need not address this argument because, as explained above, the REMS conditions operate together as a unified system that harms the States by imposing direct compliance costs, increasing State-funded healthcare costs, and interfering with the States' abilities to provide quality healthcare.

But even leaving that aside, FDA's argument still fails because the States challenge the legality of "FDA's promulgation of the mifepristone 2023 REMS" as a singular, "final agency action that is causing the States irreparable harm." *See* ECF No. 35 at 88-90. Accordingly, they ask the Court to declare unlawful and enjoin enforcement of "the mifepristone REMS" program as a whole, not as piecemeal requirements. *Id.* at 90; *Washington II*, 108 F.4th at 1172 ("[S]tanding is not dispensed in gross, . . . which means that *for all relief sought*, there must be a litigant with standing." (emphasis added) (cleaned up)). The 2023 REMS is a single regulation, and the States have standing to seek remand of all of it.

### B. The Challenge Is Ripe for Judicial Review

The States' claims are ripe because FDA has repeatedly rejected arguments

PL. STATES' REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP'N TO DEFS.' CROSS-MOT. FOR SUMM. J.

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    that the mifepristone REMS is unsound, unsupported, and burdensome. Thus, as

2    this Court previously found, further petitioning would be futile. *Washington I*, 668

3    F. Supp. 3d at 1139. Although FDA "disagrees[s] with" the Court's conclusion, it

4    raises nearly identical arguments to those already rejected. ECF No. 170 at 16.

5         The evidence demonstrating exhaustion is overwhelming. First, in 2021,

6    FDA, prompted by federal litigation, conducted a "full review" of the REMS.

7    EAR154. Evidence submitted to FDA by the plaintiffs in that federal litigation

8    raised all the same points States raise here: the REMS "confer no benefit in terms

9    of safety [or] efficacy, . . . are not 'commensurate with' the risks of mifepristone,

10   and create barriers to use that reduce patient access and negatively impact public

11   health . . . ." EAR141. The plaintiff doctors and medical organizations also

12   discussed the burdens associated with the Prescriber Certification and Patient

13   Agreement ETASUs. SEAR4-6. Further, they asked for "FDA's careful

14   consideration of the extensive evidence showing that the mifepristone REMS does

15   not advance patient safety; causes treatment delays that undermine patients' health;

16   subjects some patients who are unable to obtain mifepristone because of the REMS

17   to the serious medical risks of ongoing pregnancy and childbirth; and unduly

18   burdens both patients and the health care delivery system, with disproportionate

19   harm to people living in rural and medically underserved areas, people with fewer

20   financial resources, and people of color." SEAR6.

21        Next, in 2022, the American College of Obstetricians and Gynecologists

22   (ACOG) and other medical professional and healthcare access organizations

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    submitted a citizen petition to FDA. EAR210-237. That petition argued, just as

2    States do here, that the mifepristone REMS is medically unnecessary and

3    burdensome. *See* EAR220-226. Although ACOG's petition advocated for adding

4    miscarriage management as an indication for mifepristone, the petition also asked

5    FDA to eliminate the REMS for *all* uses of mifepristone—not just miscarriage

6    management. *See id.*; *contra* ECF No. 170 at 19.

7         These appeals are merely the latest in a longstanding chorus asking FDA to

8    lift the REMS. *See, e.g.*, EAR38-39 (2015 letter to FDA from researchers and

9    providers advocating for REMS removal, advising that Provider Certification

10   "inhibits access to mifepristone" and Patient Agreement Form is "inconsistent with

11   the requirements for other drugs with similar or greater risks"); EAR43-44

12   (2015 letter to FDA seeking same); EAR40-42 (2016 letter to FDA seeking same);

13   EAR75 (2019 letter to FDA from American Academy of Physicians seeking

14   same); EAR111-16 (2021 letter to FDA from Society of Family Planning arguing

15   REMS "confers no benefit in terms of safety, efficacy, or acceptability . . . and

16   instead creates barriers to use that negatively impact public health"); EAR76-80

17   (2020 letter to FDA explaining that "research and nearly 20 years of clinical

18   experience have demonstrated that these requirements are medically

19   unnecessary").

20        In addition to these repeated requests by the medical community, in

21   March 2020, many of the States sent a letter to FDA explaining how "these onerous

22   and medically unnecessary requirements limit healthcare providers' ability to

PL. STATES' REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP'N TO DEFS.' CROSS-MOT. FOR SUMM. J.

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    assist their female patients" and urged FDA "to act immediately and remove the

2    FDA REMS designation." EAR69-74; *see also, e.g.*, EAR87-89 (October 2020

3    letter from Maryland legislators asking FDA "to consider the position of [] major

4    medical organizations and repeal REMS both immediately and permanently").

5    FDA provided only a form response. ECF No. 51-11.

6        As the Court previously found, FDA's record of repeatedly rejecting the

7    arguments the States raise here demonstrates beyond any serious doubt "that

8    administrative exhaustion through a citizen petition on the January 2023 REMS

9    would be futile." *Washington I*, 668 F. Supp. 3d at 1139; *see also El Rescate Legal

10   Servs., Inc. v. EOIR*, 959 F.2d 742, 747 (9th Cir. 1991) ("[T]here is no requirement

11   of exhaustion where resort to the agency would be futile."). The evidence

12   demonstrates that FDA's position is "already set." *Id.* Thus, FDA "cannot credibly

13   argue" that another "formal application" from States would make a difference.

14   *Chinook Indian Nation v. Zinke*, 326 F. Supp. 3d 1128, 1144 (W.D. Wash. 2018).

15       FDA's contrary arguments lack merit. It claims this case involves "technical

16   and factual assertions" that it had no opportunity to consider. ECF No. 170 at 17.

17   This is wrong.

18       First, while admitting that States submitted a letter in 2020 regarding the

19   REMS, FDA contends it didn't need to consider it, as the letter was submitted to a

20   public docket relating to FDA's policies during COVID-19. *Id.*; EAR69-72. But

21   the States' letter was just one of many contemporaneous letters and lawsuits urging

22   FDA to abandon the REMS entirely. *See, e.g.*, EAR75; EAR111-16; EAR76-80;

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    EAR87-89. If FDA didn't consider the 2020 letter in connection with REMS

2    modification, that only demonstrates the futility of further letter-writing.

3        Second, FDA complains about "points that could not have been considered

4    in 2021," specifically, references to post-*Dobbs* events and a 2022 Canadian study.

5    ECF No. 170 at 18-19. But FDA did not make its final REMS decision until

6    *January 2023*, and its own record makes clear that it continued to consider

7    evidence and information that post-dated 2021. *See, e.g.*, EAR265-268; SEAR75-

8    78, 79-81; *see infra* 24-25. Again, if FDA failed to consider this evidence before

9    it, that merely highlights the futility of continuing to ask.

10        Finally, FDA argues that ACOG's 2022 Citizen Petition did not relate to

11    FDA's 2021 review of the REMS or its 2023 REMS modification. ECF No. 170

12    at 19. But FDA's 2021 review covered the same issues raised in ACOG's petition

13    and the same issues challenged here—the Prescriber Certification form, the Patient

14    Agreement form, and adoption of a Pharmacy Certification requirement. *See*

15    EAR221-226. And as explained above, ACOG's petition asked FDA to remove

16    the REMS as medically unnecessary and burdensome for *all* uses of the drug—not

17    just miscarriage management. *See id.*; *Washington I*, 668 F. Supp. 3d at 1139.

18        In light of the repeated requests for REMS removal already submitted to

19    FDA, "FDA cannot credibly argue that its decision on the Mifepristone REMS

20    Program would change upon another citizen petition." *Id.* This challenge is

21    therefore ripe for judicial review.

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

C.    **The 2023 REMS Is Contrary to Law**

As the States previously established, the 2023 REMS is unlawful because FDA failed to apply mandatory statutory factors. ECF No. 156 at 15-19. In response, FDA doubles down on its assertion that it needs only consider the 21 U.S.C. § 355-1(g)(4) factors, arguing that it can largely ignore the other statutory REMS and ETASU factors in making a REMS modification decision. ECF No. 170 at 27-28. But this Court already rejected that argument, *Washington I*, 668 F. Supp. 3d at 1140-41, and FDA's efforts to resurrect them are unavailing.

***FDA Did Not Consider the § 355-1(a)(1) Factors***. Defendants concede they did not consider the § 355-1(a)(1) factors—they claim they just don't have to. But while Defendants are correct that the States "are not challenging FDA's 'initial approval' of the mifepristone REMS," ECF No. 170 at 28, this does not make the § 355-1(a)(1) factors irrelevant. In making a REMS modification decision, § 355-1(g)(4)(B) requires FDA to consider whether modification or removal of the REMS is necessary to "ensure the benefits of the drug outweigh the risks of the drug[.]" Section 355-1(a)(1) explains exactly what this means by detailing the factors FDA "shall consider" in making this determination. Even if Congress did not explicitly "cross-reference" the § 355-1(a)(1) factors in the three later sections of the REMS statute where Congress directed FDA to "ensure the benefits of the drug outweigh the risks of the drug," *see* 21 U.S.C. §§ 355-1(a)(2)(A), (g)(2)(C)(i), (g)(4)(B)(i), courts generally "presume that words used more than once in the same statute have the same meaning throughout." *In re Cybernetic Servs., Inc.*, 252 F.3d

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   1039, 1051 (9th Cir. 2001) (citing *Boise Cascade Corp. v. EPA*, 942 F.2d 1427,

2   1432 (9th Cir.1991)). Thus, when Congress directed FDA to determine whether

3   "the benefits of the drug outweigh the risks of the drug" throughout the REMS

4   statute, it intended the § 355-1(a)(1) factors to apply. *See* 21 U.S.C. §§ 355-1(a)(1),

5   (a)(2)(A), (g)(2)(C)(i), (g)(4)(B)(i).

6       FDA nonetheless suggests it "makes[s no] sense to apply" the § 355-1(a)(1)

7   factors to REMS modifications because many of the factors speak in predictive

8   terms. ECF No. 170 at 28-29. But far from justifying FDA's behavior here, the

9   predictive, uncertain nature of an initial REMS approval is *precisely why* those

10  factors remain essential in later assessing whether a REMS should be modified or

11  removed. It is only when making a REMS modification or removal assessment

12  under § 355-1(g)(4)(B) that FDA has real-world data allowing it to assess whether

13  a REMS remains necessary to ensure that "the benefits of the drug outweigh the

14  risks . . . ." 21 U.S.C. §§ 355-1(a)(1), (g)(4)(B). Further, notwithstanding the

15  predictive language of the factors, FDA's own guidance concedes that it "generally

16  considers these factors in determining whether (based on new safety information)

17  a REMS is necessary for a drug that is the subject of an approved application."

18  SEAR89 n.24. If FDA were free to disregard the § 355-1(a)(1) factors after making

19  its initial risk benefit/analysis, it would be able to retain a REMS forever even if

20  real-world prescribing data later demonstrated that the congressionally mandated

21  threshold criteria are no longer met. As this Court previously determined, that

22  cannot be the case. *Washington I*, 668 F. Supp. 3d at 1140. By failing to consider

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   the six required factors, FDA acted contrary to law.

2   ***FDA Failed to Consider the § 355-1(f) Factors***. FDA does not dispute it

3   was obligated to consider the § 355-1(f) factors in the context of a REMS

4   modification. *See* ECF No. 170 at 28 n.3. But FDA nonetheless ignores the unique

5   and detailed requirements imposed by Congress in § 355-1(f), conflating them with

6   those in § 355-1(g) and then arguing it "weighed precisely those factors."

7   *See* ECF No. 170 at 29. Not so.

8   First, notwithstanding FDA's attempt to equate subsections (f) and (g), a

9   quick review of the statutory language reveals that subsection (f) contains many

10   more factors that FDA must consider. FDA made no attempt to "weigh[] precisely"

11   these threshold factors. *Id.* Entirely absent from FDA's analysis is any

12   determination that the mifepristone ETASUs remain "necessary . . . to mitigate a

13   specific serious risk listed in the labeling of the drug" or are "commensurate with"

14   any such risk, nor any determination that the medication would be "withdrawn

15   unless" the ETASUs are in place. Indeed, the record reflects no analysis of how—

16   given mifepristone's extensive, two-decade-long safety record—the medication

17   continues to meet the sky-high ETASU criteria under subsection (f). That is error.

18   Second, while acknowledging that FDA must consider "burden[] on patient

19   access," ECF No. 170 at 30, particularly in "rural or medically underserved areas,"

20   and must "minimize the burden on the health care delivery system" when

21   modifying a REMS with ETASUs, FDA failed to do so. 21 U.S.C. §§ 355-

22   1(f)(2)(C)-(D). Indeed, far from considering the issue, FDA expressly excluded

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    and ignored evidence on it. *Infra* 18-23. FDA's response seems to be that it

2    acknowledged the existence of these factors, it just didn't give them any weight.

3    For example, FDA claims it "acknowledged confidentiality concerns" regarding

4    the prescriber certification form, but elected to soldier on regardless. ECF No. 170

5    at 26. And it contends it "acknowledged that the pharmacy certification

6    requirement would likely limit the types of pharmacies that would choose to

7    dispense mifepristone," but added it anyways. *Id.* at 27. Even crediting FDA's

8    version of events, the statute requires FDA do more than check a box. Rather, it

9    creates a substantive obligation on FDA to ensure ETASUs "shall . . . not be unduly

10   burdensome . . . ." 21 U.S.C. § 355-1(f)(2)(C). FDA's lip service does not suffice.

11                          *       *       *

12        Because FDA failed to consider mandatory statutory factors in its REMS

13   modification decision, it is the Court's "clear duty" to reject that decision and

14   remand for further consideration. *See S.E.C. v. Sloan*, 436 U.S. 103, 118-119

15   (1978) (where agency action is "inconsistent with the statutory mandate," it is a

16   court's "clear duty" to reject it). The Court should likewise give no weight to

17   FDA's self-serving assertion that its failure to consider the relevant statutory

18   factors was "harmless." ECF No. 170 at 31. FDA's failure to consider statutorily

19   required factors necessarily means its decision-making was defective under the

20   APA, making remand the appropriate remedy. *See Sloan*, 436 U.S. at 118-119.

21

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**D.    The 2023 REMS Is Arbitrary and Capricious**

From ignoring evidence, to ignoring burdens, to arbitrarily singling out mifepristone for unique obstacles, FDA's 2023 REMS review was arbitrary and capricious several times over. ECF No. 156 at 19-27. FDA's response does little to address the significant gaps in its analysis and instead insists the Court not look behind the curtain, because FDA is owed near-complete deference to its decisions. ECF No. 170 at 32-35. But reasoned decision making under the APA requires more.

**1.    FDA excluded and ignored extensive evidence in its review**

A quick review of the administrative record refutes FDA's contention that it "considered all relevant evidence before it." ECF No. 170 at 32. FDA claims that it satisfied its obligation to review all evidence in the administrative record by creating a lengthy chart listing all the materials that it intentionally *excluded* from its review. *See id.* at 32-33; EAR193-197. Indeed, FDA argues that "[t]he very existence of the chart belies Plaintiffs' contention that FDA did not 'consider' the references in the APA sense." ECF No. 170 at 33. But that is not how the APA works. To engage in reasoned decision making, an agency must "'reasonably reflect upon' and 'grapple with'" the evidence before it. *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 759 (9th Cir. 2020) (quoting *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017)). If that were not the case, then agencies could routinely circumvent the APA by making a list of troublesome evidence the agency decided to ignore.

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

As FDA acknowledges, among the evidence it chose to exclude was "[i]nformation from survey studies or qualitative studies that evaluated perspectives on and/or satisfaction with medical abortion procedures from patients, pharmacists, clinic staff, or providers, even if the study assessed REMS ETASUs" as well as "[d]ata on the logistics of accessing abortion care in general." EAR160-161. FDA's chart (EAR193-197) also explicitly excluded (i) a survey of "US clinicians' perspectives on how mifepristone regulations affect access to medication abortion and early pregnancy loss in primary care" (EAR122-27); (ii) a qualitative study on how the REMS "serves as the linchpin of a cycle of medication abortion stigmatization in primary care, encouraging institutional anxiety over abortion provision which leads to logistical barriers to mifepristone use" (EAR128-132); (iii) a survey of Canadian physicians finding that Canada's deregulation of mifepristone "greatly assisted primary care practitioners to implement abortion care, particularly in rural communities" (EAR133-134); (iv) a study on expanding access to medication abortion through pharmacy dispensing of mifepristone (EAR135-40); and (v) studies focused on the logistics of accessing abortion care, including a study documenting how women in underserved areas must travel increasingly far for abortion care (EAR145-47).

FDA's decision to exclude swaths of data from consideration simply because they did not provide "objective safety data," EAR160, was arbitrary and capricious because safety is not the only statutorily required consideration in a REMS review. In addition to assessing "safe use of the drug," 21 U.S.C. § 355-

PL. STATES' REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP'N TO DEFS.' CROSS-MOT. FOR SUMM. J.

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  1(f)(5)(B)(i), Congress directed FDA to ensure that ETASUs "are not unduly

2  burdensome on patient access to the drug" and the "health care delivery system[.]"

3  *Id.* §§ 355-1(f)(5)(B)(ii)-(iii). The above studies that were "excluded from the

4  REMS review" speak directly to the burdens imposed by the REMS. EAR193-197.

5  By myopically focusing on so-called "objective safety data" (a term FDA does not

6  define) and excluding evidence relevant to assessing patient burden, FDA acted

7  arbitrarily and capriciously. *See Ctr. for Biological Diversity v. Nat'l Highway*

8  *Traffic Safety Admin.*, 538 F.3d 1172, 1206 (9th Cir. 2008) ("An agency may not

9  ignore factors Congress explicitly required be taken into account.") (citation

10  omitted); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216

11  (D.C. Cir. 2004) (failure to discuss a statutorily-mandated factor leaves the Court

12  "with no alternative but to conclude that the agency failed to take account of this

13  statutory limit on its authority, making the agency's reasoning arbitrary and

14  capricious") (cleaned up).

15      Further, FDA improperly excluded from its review the positions of major

16  professional medical organizations, including ACOG, the American Medical

17  Association, and the American Academy of Family Physicians (AAFP), all of

18  which advocated for removal of the REMS as medically unnecessary. EAR193;

19  *see* EAR60 (ACOG statement recommending that mifepristone "be made available

20  in retail pharmacies like other prescription drugs and without unique provider

21  certification or patient consent requirements" and that removing those ETASU

22  would "improve access"); EAR143-44 (AAFP statement explaining that REMS

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    "cause significant barriers to accessing abortion care," "contributes to delays in

2    care," and are "inconsistent with requirements for other drugs with similar or

3    greater risks, especially in light of the significant benefit that mifepristone provides

4    to patients"). Just like it ignored data on patient burdens, FDA purportedly

5    excluded these "policy/advocacy statement[s]" because they did not contain

6    "objective safety data." EAR160. But, again, Congress directed FDA to consider

7    more than safety data. 21 U.S.C. §§ 355-1(f)(5)(B)(ii)-(iii). In its citizen petition,

8    ACOG detailed how the Provider Certification and Pharmacy Certifications

9    ETASUs "unduly burden[] access to the drug." EAR222-25. Yet ACOG's

10    concerns are nowhere considered or addressed in FDA's 2023 REMS review.

11    FDA's decision to ignore the positions of major medical organizations is

12    particularly troubling given that FDA's own guidance permits it to "take into

13    consideration information from a variety of sources" including from "professional

14    societies." *See* SEAR88-89. While FDA is not required to agree with the consensus

15    of the nation's leading medical organizations that the mifepristone REMS is

16    unnecessary and unduly burdens patient access, reasoned decision making at least

17    requires them to consider and "grapple with" those views. *City & Cnty. of S.F.*,

18    981 F.3d at 759; *see also, e.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 277

19    (4th Cir. 2020) (HHS failed to provide satisfactory reasoning where it failed to

20    "address head-on the arguments of" major medical organizations); *Env't Health*

21    *Tr. v. FCC*, 9 F.4th 893, 908-09 (D.C. Cir. 2021) (agency acted arbitrarily and

22    capriciously where it "failed to provide a reasoned explanation for brushing off

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    record evidence" from commenters including major medical organizations, and

2    "failed even to acknowledge, let alone respond to" other health concerns).

3        FDA similarly ignored "stakeholder" feedback that the drug sponsors

4    provided in August 2022. EAR266-68; *see* ECF No. 156 at 14, 22-23. As reflected

5    in the administrative record, both Danco and GenBioPro advised FDA that "most

6    stakeholders—particularly HCPs [health care professionals]—continue[d] to

7    request the removal of both the Prescriber Agreement and Patient Agreement to

8    reduce the burden on them and their patients" and that "[m]ost advocates were

9    highly supportive to expansion to all types of pharmacies without any restrictions."

10    EAR267. Notwithstanding that FDA specifically requested this feedback, *see*

11    EAR266, the record is devoid of any mention or consideration of it in the agency's

12    January 2023 decision to continue to require both the Prescriber Certification and

13    Patient Agreement form and to impose the new Pharmacy Certification ETASU.

14    By failing to "acknowledge, let alone respond to" this requested feedback, FDA

15    acted arbitrarily and capriciously. *Env't Health Tr.*, 9 F.4th at 908-09.

16        FDA's only other response to the gaping holes in its review is that the agency

17    did not "categorically refuse" to consider non-objective-safety-data because they

18    considered some "provider volume" information in the context of the Patient

19    Agreement Form ETASU. ECF No. 170 at 33. But this does not excuse FDA's

20    failure to consider the medical studies, surveys, and data related to patient access

21    and burdens on the health care delivery system created by the ETASUs as well as

22    the concerns raised by major medical professional organizations. *See supra* 18-22;

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    *see also* 21 U.S.C. § 355-1(f)(5)(B)(ii). By simply listing and then not considering

2    reams of record evidence on how the mifepristone REMS burdens patient access,

3    and by ignoring the concerns of major medical organizations and the sponsors'

4    stakeholder feedback, FDA failed to "pay[] attention to the advantages *and* the

5    disadvantages of [its] decisions," *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015),

6    ignored evidence on the statutory factors that "Congress explicitly required be

7    taken into account," *Center for Biological Diversity*, 538 F.3d at 1206 (citation

8    omitted), and failed to "examine the relevant data and articulate a satisfactory

9    explanation for its action . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

10   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This is arbitrary and capricious.

11   **2.    FDA refused to consider the safety outcomes from Canada**

12   Notwithstanding its self-proclaimed focus on "objective safety data," FDA

13   concedes that it did not consider *Abortion Safety and Use with Normally*

14   *Prescribed Mifepristone in Canada*, a study published in the New England Journal

15   of Medicine in January 2022, a full year before FDA modified the REMS.

16   ECF No. 170 at 33-34; *see* EAR238-239; SEAR64-74. That study examined data

17   before and after Canada deregulated mifepristone in November 2017 and

18   concluded that "[w]hen mifepristone became available as a normally prescribed

19   medication in Canada," "[t]he incidences of serious adverse events and

20   complications remained materially unchanged[.]" EAR239. The study's findings

21   on the continued safety of mifepristone absent REMS-like conditions is consistent

22   with the recommendations of major medical organizations that FDA excluded.

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    FDA claims it was justified in ignoring the study prior to making its final

2    REMS decision because the study was published after the agency's July 2021

3    literature review. ECF No. 170 at 34. FDA contends consideration of the Canadian

4    study could lead to a "never-ending process." *Id.* This explanation fails in three

5    ways.

6    First, FDA ignores that this study was brought to FDA's attention by ACOG

7    through its October 2022 citizen petition, and was therefore "before FDA at the

8    time it promulgated the 2023 REMS." Order, ECF No. 146 at 14; *see* EAR226.

9    FDA did not need to do a new literature search and independently find this study

10    before it issued its 2023 REMS decision. Instead, ACOG did that work,

11    specifically advising FDA that the January 2022 study demonstrated that removal

12    of the Mifepristone REMS would not harm patient safety. *Id.* Thus, FDA was on

13    notice that the January 2022 study was relevant to its ongoing review of the REMS.

14    Second, FDA's attempt to use the July 2021 literature review cut-off date as

15    a purported justification for ignoring the Canadian study also rings hollow because

16    FDA did, in fact, consider studies brought to its attention after its July 2021

17    literature review. For example, on December 30, 2022, FDA wrote a memo-to-file

18    explaining that a researcher at FDA's Center for Drug Evaluation and Research

19    (CDER) was notified that some publications "were attached to the Complaint

20    recently filed in a lawsuit," and that the researcher "has reviewed these five

21    publications for the limited purpose of determining whether they contain

22    information relevant to our review of the REMS modifications[.]" SEAR76. FDA

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    concluded that the five new articles did not "include safety data relevant to the

2    Applicants' proposed modifications to the REMS ETASUs[.]" SEAR76-77.

3    Similarly, on January 3, 2023—the same day the REMS was approved—another

4    CDER researcher wrote a memo to file explaining they had "received notification

5    through a weekly email ... that a large clinical study ... was published in the Annals

6    of Internal Medicine on January 3, 2023." SEAR79-80. FDA, once again,

7    "reviewed this publication for the limited purpose of determining whether it

8    contains information relevant to our review of the REMS modifications," and

9    concluded it did not. SEAR80. These memos undermine FDA's argument that

10   without a "cut-off date, it would never have completed its review." ECF No. 170

11   at 34.

12       Third, FDA's memo-to-file process undercuts its argument that it was free

13   to ignore the January 2022 study simply because it was not specifically "asked to

14   consider the Canadian study in connection with the January 2023 REMS

15   modification." *Id.* at 34-35. As set forth above, FDA considered new information

16   brought to its attention through various means, including outside litigation and

17   weekly emails with research notifications. The fact that FDA was put on notice of

18   the January 2022 study through a citizen petition by ACOG does not provide it

19   with a basis to ignore this relevant evidence. Nor does FDA contend it was unaware

20   of the study at the time it issued its 2023 REMS decision. *See id.* at 33-35.

21       In sum, rather than consider the January 2022 study, FDA ignored it. FDA's

22   failure to consider highly relevant evidence on mifepristone's safety, published in

PL. STATES' REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP'N TO DEFS.' CROSS-MOT. FOR SUMM. J.

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    one of the country's most prominent medical journals and highlighted for it by a

2    major medical association, was arbitrary and capricious. *See, e.g.*, *Port of Seattle,*

3    *Wash. v. F.E.R.C.*, 499 F.3d 1016, 1035 (9th Cir. 2007) (agency's failure to

4    consider new evidence submitted to it was arbitrary and capricious; remanding to

5    agency for examination of the new evidence); *Catawba County, N.C. v. E.P.A.*,

6    571 F.3d 20, 45 (D.C. Cir. 2009) (agency "was not obliged to stop the entire

7    process because a new piece of evidence emerged," but "[a]n agency does,

8    however, have an obligation to deal with newly acquired evidence in some

9    reasonable fashion") (citation omitted).

10    **3.    FDA's blinkered view of the evidence was irrational**

11    FDA tries to justify its decision to reimpose ETASU by claiming it lacked

12    evidence that mifepristone would be safe if the ETASU were removed. *See* ECF

13    No. 170 at 22 (claiming FDA had no studies regarding what would happen if

14    prescriber certification were removed), 26 (same), 27 (same), 23 (same for Patient

15    Agreement Form). As a factual matter, this is wrong: the 2022 Canadian study

16    demonstrated exactly that. More than that, this argument is absurd. An

17    overwhelming body of evidence shows that mifepristone is extraordinarily safe

18    and, indeed, safer than many commonly used drugs such as Tylenol. ECF No. 156

19    at 7-8. FDA has not pointed to a single scrap of evidence suggesting this is *because*

20    *of* the ETASU. To state the obvious: mifepristone is safe with a REMS because it

21    is safe. The ETASU, which are redundant of basic informed-consent and scope-of-

22    practice norms—albeit with a lot more paperwork—are not magic guardrails

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    converting a drug that is too "inherent[ly] toxic[] or potential[ly] harmful" into a

2    widely-used medication for which "serious complications have proven to be

3    extremely rate." EAR21. Indeed, FDA effectively concedes as much by making

4    Korlym—a higher dose of the drug—available without ETASU. ECF No. 156 at 8;

5    *infra* 27-28.

6         FDA's argument proves too much. Were it true that ETASU are necessary

7    unless FDA can point to evidence showing how the drug is prescribed in their

8    absence, then *every* new drug would require ETASU, because at the time a drug is

9    approved, there is generally no evidence it can be safely administered outside of a

10    clinical trial. And of course, this would mean that all ETASUs are perpetual,

11    because once they are in place, there generally won't be evidence showing what

12    happens in their absence. But the ETASU statute requires more of FDA than a

13    makeweight argument about counterfactuals—it requires a showing that the drug

14    "is associated with a serious adverse drug experience" such that it "can be approved

15    only if, or would be withdrawn unless" additional steps are taken "to mitigate a

16    specific serious risk . . . ." 21 U.S.C. § 355-1(f)(1)(A). No such showing was made.

17        **4.    FDA's differential treatment of Korlym is unreasonable**

18         FDA tries to gloss over its differential treatment of a lower dose of

19    mifepristone when used for abortion as opposed to a higher dose when used for

20    Cushing's disease by contending that people "with Cushing's syndrome are

21    'unlikely to be pregnant' due to the underlying disease, and . . . the sponsor

22    voluntarily distributes Korlym exclusively through specialty pharmacies."

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    ECF No. 170 at 30-31 (citing DEAR22, 28). This misses the mark.

2        First, FDA appears to be arguing that mifepristone is less dangerous for

3    those with Cushing's disease because those individuals are unlikely to be pregnant.

4    *Id.* But abortion is not a serious side-effect or risk for women taking mifepristone

5    for abortion: it is the intended purpose of the drug. *See* DEAR22.

6        Further, to impose an ETASU, FDA must determine that a drug has

7    "*inherent* toxicity or potential harmfulness[.]" 21 U.S.C. § 355-1(f)(1) (emphasis

8    added). It cannot be that a drug is "inherently" toxic or harmful to a person taking

9    a 200-mg formulation for abortion, but not to a person taking a higher 300-mg

10   formulation for a non-abortion indication. *See Bracco Diagnostics, Inc. v. Shalala*,

11   963 F. Supp. 20, 28 (D.D.C. 1997) (FDA cannot treat similar products dissimilarly

12   and cannot permit "two sets of similar products to run down two separate

13   tracks[.]"). FDA has not shown any inherent harmfulness of mifepristone to

14   women taking the medication for abortion—to the contrary, adverse events are

15   "extremely rare" and even lower than for Korlym. ECF No. 156 at 5, 8; *see also*

16   EAR149, 270. There is no reasoned basis for FDA's decision to treat an extremely

17   safe drug differently when used for abortion versus other conditions. *See id.*

18   at 26.27; *see also* EAR60. Yet FDA does just that. *See* EAR13 (FDA statement

19   that Korlym approval application presented a "challenge" "because of the more

20   controversial use of this active ingredient for medical termination of

21   pregnancy[.]"). This differential treatment is arbitrary and capricious.

22

PL. STATES' REPLY IN SUPP. OF    28
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1      **5.    FDA failed to offer a reasoned explanation for the 2023 REMS**

2          In making its 2023 REMS decision, FDA did not apply all the statutorily

3      required factors and inappropriately excluded portions of the record from its

4      review. *Contra* ECF No. 170 at 20-22. For those reasons, FDA's 2023 REMS

5      review was unlawful. In addition to those dispositive errors, FDA's own rationales

6      for the ETASU further underscore the arbitrary and capricious nature of the

7      2023 REMS.

8          ***Prescriber Certification ETASU***. FDA first contends it was justified in

9      maintaining this ETASU because "the agency's literature review did not identify

10     any studies comparing providers who met the qualifications that must be certified

11     with providers who did not." ECF No. 170 at 22. But this asks the wrong question.

12     As FDA concedes, the States do not dispute that mifepristone prescribers should

13     have those qualifications; instead, the issue is whether this ETASU is necessary

14     for prescribers who "possess those qualifications without so certifying." *Id.* at 25-

15     26. Notably, FDA does not require prescriber certification for 99% of prescription

16     drugs, but instead allows prescribers to self-determine if they are qualified to treat

17     a particular condition or prescribe a specific medication based on their education

18     and training. *See* ECF No. 156 at 2, 5 (citing state regulations and medical ethics

19     rules that provide guardrails for prescribers; only 69 of 20,000 prescription drugs

20     with ETASUs). The fact that FDA found no studies to support allowing *unqualified*

21     providers to prescribe mifepristone has no bearing on whether this ETASU is

22     necessary for *qualified* prescribers to prescribe mifepristone. FDA's reliance on its

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    flawed literature review as a basis to maintain this ETASU was unreasonable.

2            Second, and relatedly, FDA's purported concern about the potential increase

3    in the number of prescribers as a basis for maintaining the prescriber certification

4    makes sense only if *unqualified* prescribers would begin prescribing mifepristone.

5    EAR163. But the record contains no evidence to support this assumption. To the

6    contrary, the study on which FDA relied for the potential doubling of the number

7    of prescribers was a survey of OB-GYNs who were characterized as "well situated

8    to provide timely abortion care." SEAR10-13; *see also* EAR120 (survey indicating

9    providers who do not feel qualified to prescribe mifepristone do not prescribe it).

10   Given this record evidence, FDA does not explain how an increase in the number

11   of *qualified* OB-GYN prescribers necessitates continuation of this ETASU.

12           Third, FDA's determination that Prescriber Certification was needed to

13   ensure that manufacturers learn of patient deaths ignores that mifepristone's

14   "associated" fatality rate is a miniscule 0.0005% for the 20-plus-years it has been

15   on the U.S. market and that not a single death can "be causally attributed to

16   mifepristone." ECF No. 156 at 7 (citing EAR271; EAR65). Given this safety

17   record, FDA provides no reason for continuing to single out mifepristone for this

18   reporting that does not apply to drugs with higher death rates. *Contra* 21 U.S.C.

19   § 355-1(f)(2)(A) (ETASU must be "commensurate" with the specific risk);

20   *see* EAR47 ("phosphodiesterase type 5 inhibitors for the treatment of erectile

21   dysfunction are estimated to be associated with death in up to 0.004% of users").

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Fourth, FDA contends it acknowledged the burden imposed by this ETASU

2    on prescribers, but concluded that the burden was minimized by requiring

3    prescribers to "certify only one time for each [sponsor]." ECF No. 170 at 26. This

4    response completely ignores the Pharmacy Certification ETASU, which requires

5    providers to send their certification to *every* pharmacy they send a prescription to,

6    making the ETASU much more burdensome than FDA admits. EAR290-91.

7    Finally, while FDA relied on survey data from one study to support its

8    decision to eliminate the in-person dispensing requirement because it would lead

9    to new mifepristone prescribers, EAR166-67, in deciding to keep the prescriber

10   certification requirement in place, FDA ignored that *same study's* finding that

11   prescriber certification prevents nearly 10% of qualified OB-GYNs from

12   prescribing mifepristone. EAR120-21. This was arbitrary and capricious. *Genuine*

13   *Parts Co. v. E.P.A.*, 890 F.3d 304, 313 (D.C. Cir. 2018); ECF No. 156 at 23.

14   **Patient Agreement ETASU**. FDA contends that this ETASU remains

15   necessary because it "ensures that patients are informed of the risks of serious

16   complications associated with use of mifepristone" for medication abortion.

17   ECF No. 170 at 23. While FDA acknowledges the States' argument that the Patient

18   Agreement Form should be eliminated as redundant of the boxed warning in the

19   Medication Guide, it contends that FDA considered and "rejected this argument."

20   *Id.* at 26-27. The record, however, shows that FDA never even *considered* that the

21   Patient Agreement Form is entirely duplicative of the risks listed in that Guide. *See*

22   EAR163-167. Similarly, while FDA determined that the Patient Agreement Form

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    "does not impose an unreasonable burden on providers or patients," EAR163, FDA

2    nowhere addressed the sponsors' feedback that most stakeholders continued to

3    request the removal of the Patient Agreement Form to reduce burden. EAR267.

4        Further, as with the Prescriber Certification, FDA found that the potential

5    increase in the number of medication abortion providers weighed in favor of

6    retaining the ETASU. ECF No. 170 at 24. But this does not explain why this type

7    of redundant "patient education" (*id.*) is necessary to ensure safe use for

8    mifepristone but not for any number of other drugs with much higher risks. And,

9    again, it assumes that new mifepristone prescribers would be *unqualified* to explain

10   the drug's risk to their patients. But the record does not support this assumption.

11   *Supra* at 30. Because FDA "ignore[d] important considerations [and] relevant

12   evidence," its rationale for continuing to impose this ETASU was unreasonable.

13   *Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir. 2015).

14       ***Pharmacy Certification ETASU***. FDA acknowledges that its justification

15   for this ETASU is to ensure the other REMS requirements, including Prescriber

16   Certification, are met. ECF No. 170 at 24-25. But FDA's flawed decision to

17   reimpose one ETASU cannot justify its decision to adopt a new one. And in

18   adopting this ETASU, FDA completely ignored evidence that pharmacies had

19   safely dispensed mifepristone during the COVID-19 pandemic without a

20   Pharmacy Certification. EAR68; EAR107, 108 (zero adverse events "related to

21   pharmacist dispensing"). FDA also claims that its cursory agreement that this

22   ETASU would limit the types of pharmacies that would choose to dispense

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    mifepristone "refutes . . . that FDA ignored the burdens of this requirement."

2    ECF No. 170 at 27. But FDA did not grapple with the evidence on this issue. It did

3    not, for instance, consider the impact on "patients in rural or medically underserved

4    areas" with an already limited number of pharmacies, an issue that ACOG raised

5    (EAR225) and that Congress directed FDA to consider. 21 U.S.C. § 355-1(f).

6    These failures too were arbitrary and capricious. *See Motor Vehicle Mfrs.*, 463 U.S.

7    at 43.

8    **E.**    **Summary Judgment Is Not Warranted on the Constitutional Claim**

9    Because FDA violated the APA, the Court need not consider the States'

10    Fifth Amendment claim. ECF No. 156 at 27 n.1. But should the Court reach it,

11    FDA is not entitled to summary judgment.

12    The States may assert the Fifth Amendment rights of staff and students at

13    the University of Washington. *Washington v. Trump*, 847 F.3d 1151, 1159-60

14    (9th Cir. 2017) (successful Fifth Amendment claim). And under equal protection,

15    FDA may not "treat[] differently persons who are in all relevant respects alike."

16    *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). *See also Ariz. Dream Act Coal. v.*

17    *Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("The groups need not be similar in

18    all respects, but they must be similar in those respects relevant to the Defendant's

19    policy."). Regulatory schemes are constitutionally infirm when they "irrational[ly]

20    singl[e] out" certain conduct, or rest on a "rationale so weak" that it cannot be

21    credited. *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008).

22

1     While public health is unquestionably a legitimate interest, it is irrational for

2  FDA to regulate mifepristone for abortion with a rare and burdensome REMS,

3  while imposing no REMS when the same drug is used chronically, in higher doses,

4  for a non-abortion use. EAR2, 11, 20. And worse, FDA offers no explanation why

5  the mifepristone REMS furthers public health when far more dangerous drugs are

6  widely available without a REMS and even without a prescription. *See, e.g.*,

7  EAR84, 144 (higher complication and death rates for Tylenol, aspirin, penicillin,

8  and Viagra). FDA transparently singled out abortion providers and student patients

9  for worse treatment because it believes abortion is "controversial." EAR13. That

10 fails even rational basis review.

11 **F.      The Court Should Remand with Guardrails to Protect the Status Quo**

12     As this Court previously recognized, when an agency violates the APA,

13 "'[o]rdinarily . . . the regulation is invalid,'" and the remedy is to "reinstate the rule

14 previously in force." *Washington I*, 668 F. Supp. 3d at 1143 (citations omitted).

15 Here, the States sought remand and not vacatur because of the potentially

16 disruptive consequences of vacatur. *See id.*; ECF No. 156 at 27. While the States

17 continue to believe this is the appropriate remedy, it is critical that the status quo

18 be maintained on remand while FDA determines if the 2023 REMS can be

19 removed or made less burdensome. Otherwise, FDA would be free to immediately

20 kowtow to political pressure to make the mifepristone REMS even more

21 burdensome. Indeed, at his confirmation hearing, HHS Secretary Robert F.

22 Kennedy Jr. promised to implement "[w]hatever" position President Trump takes

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    on "how to regulate" mifepristone. https://tinyurl.com/3htfk62n (Fraas Decl.,

2    Ex. 4). And recent news reports indicate that those who advocated in support of

3    FDA's decisions to loosen certain restrictions on mifepristone are being forced out

4    on those very grounds. https://tinyurl.com/2p8264r7 (Fraas Decl., Ex. 5). Given

5    these indications of improper politicalization at FDA, guardrails are imperative.

6    *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008)

7    (explaining that "detailed remedial orders" are permissible in "extraordinary

8    circumstances"). Accordingly, this Court should issue a narrow injunction

9    requiring FDA to maintain the status quo while FDA completes its review of the

10   excluded and ignored evidence and consideration of all relevant statutory factors

11   on remand. *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 16 (D.D.C. 2004) (issuing

12   injunctive relief in conjunction with remand to FDA). Further, the Court should

13   keep this case open "to ensure that, if the need arises, further action could be taken

14   by the Court." *See Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479, 487

15   (D. Md. 2019).

16              **III.   CONCLUSION**

17        The Court should grant summary judgment for the States, deny FDA's

18   motion for summary judgment, and remand to FDA with an injunction maintaining

19   the status quo during the remand period.

20

21

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

35

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1    DATED this 31st day of March 2025.

2                                NICHOLAS W. BROWN
                                 Attorney General
3
                                 s/ Lauryn K. Fraas
4                                NOAH GUZZO PURCELL, WSBA #43492
                                 Solicitor General
5                                COLLEEN M. MELODY, WSBA #42275
                                 Civil Rights Division Chief
6                                LAURYN K. FRAAS, WSBA #53238
                                 ANDREW R.W. HUGHES, WSBA #49515
7                                Assistant Attorneys General
                                 TERA M. HEINTZ, WSBA #54921
8                                Deputy Solicitor General
                                 800 Fifth Avenue, Suite 2000
9                                Seattle, WA  98104-3188
                                 (206) 464-7744
10                               Noah.Purcell@atg.wa.gov
                                 Colleen.Melody@atg.wa.gov
11                               Lauryn.Fraas@atg.wa.gov
                                 Andrew.Hughes@atg.wa.gov
12                               Tera.Heintz@atg.wa.gov
                                 Attorneys for Plaintiff State of Washington
13
                                 DAN RAYFIELD
14                               Attorney General of Oregon

15                               s/ Carla A. Scott
                                 SANDER MARCUS HULL, WSBA #35986
16                               CARLA A. SCOTT, WSBA #39947
                                 Senior Assistant Attorneys General
17                               YOUNGWOO JOH, OSB #164105
                                 Assistant Attorney General
18                               Trial Attorneys
                                 Tel: (971) 673-1880
19                               Fax: (971) 673-5000
                                 marcus.hull@doj.state.or.us
20                               carla.a.scott@doj.state.or.us
                                 youngwoo.joh@doj.state.or.us
21                               Attorneys for State of Oregon

22

PL. STATES' REPLY IN SUPP. OF              36              ATTORNEY GENERAL OF WASHINGTON
MOT. FOR SUMM. J. AND OPP'N TO                                Complex Litigation Division
                                                             800 Fifth Avenue, Suite 2000
DEFS.' CROSS-MOT. FOR SUMM. J.                                  Seattle, WA  98104-3188
                                                                   (206) 464-7744

1 KRIS MAYES
 Attorney General of Arizona

2
 *s/ Daniel C. Barr*

3 Daniel C. Barr (Arizona No. 010149)
 Chief Deputy Attorney General

4 Luci D. Davis (Arizona No. 35347)
 Office of the Attorney General of Arizona

5 2005 N. Central Ave.
 Phoenix, AZ 85004-1592

6 Phone: (602) 542-8080
 Email: Daniel.Barr@azag.gov

7     Luci.Davis@azag.gov
 *Attorneys for Plaintiff State of Arizona*

8
 PHILIP J. WEISER

9 Attorney General of Colorado

10 *s/ Shannon Wells Stevenson*
 SHANNON WELLS STEVENSON, #35542

11 Solicitor General
 MICHAEL MCMASTER, CO #42368

12 Assistant Solicitor General
 Office of the Attorney General

13 Colorado Department of Law
 1300 Broadway, 10th Floor

14 Denver, CO 80203
 Phone: (720) 508-6000

15 *Attorneys for Plaintiff State of Colorado*

16 WILLIAM TONG
 Attorney General of Connecticut

17
 *s/ Alma Rose Nunley*

18 Alma Rose Nunley
 Assistant Attorney General

19 Office of the Connecticut Attorney General
 165 Capitol Avenue

20 Hartford, CT 06106
 alma.nunley@ct.gov

21 (860) 808-5050
 Fax: (860) 808-5347

22 *Attorney for Plaintiff State of Connecticut*

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

37

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
KATHLEEN JENNINGS
Attorney General of Delaware

2

*s/ Vanessa L. Kassab*

3
VANESSA L. KASSAB
Deputy Attorney General

4
Delaware Department of Justice
820 N. French Street

5
Wilmington, DE 19801
302-683-8899

6
vanessa.kassab@delaware.gov
*Attorney for Plaintiff State of Delaware*

7

KWAME RAOUL

8
Attorney General of Illinois

9
*s/ Caitlyn G. McEllis*
Caitlyn G. McEllis (6306561)

10
Senior Policy Counsel
Office of the Illinois Attorney General

11
115 South LaSalle Street
Chicago, IL 60603

12
Phone: (312) 793-2394
Caitlyn.McEllis@ilag.gov

13
*Attorney for Plaintiff State of Illinois*

14
DANA NESSEL
Attorney General of Michigan

15
*s/ Stephanie M. Service*

16
Stephanie M. Service (P73305)
Assistant Attorney General

17
Michigan Department of Attorney General
Health, Education & Family

18
Services Division
P.O. Box 30758

19
Lansing, MI 48909
(517) 335-7603

20
ServiceS3@michigan.gov
*Attorney for Plaintiff Attorney General of*

21
*Michigan*

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

AARON D. FORD
Attorney General

*s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorney for Plaintiff State of Nevada*

RAÚL TORREZ
Attorney General of New Mexico

*s/ Aletheia Allen*
Aletheia Allen
Solicitor General
Executive Office
State of New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmag.gov
*Attorney for Plaintiff State of New Mexico*

PETER F. NERONHA
Attorney General of Rhode Island

*s/ Julia C. Harvey*
JULIA C. HARVEY #10529
Special Assistant Attorney General
150 S. Main Street
Providence, RI 02903
(401) 274-4400 x2103
*Attorney for Plaintiff State of Rhode Island*

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

39

1    CHARITY R. CLARK
      Attorney General of Vermont

2
      *s/ Douglas Keehn*
3     DOUGLAS KEEHN
      Assistant Attorney General
4     109 State Street
      Montpelier, VT 05609-1001
5     (802) 793-3892
      douglas.keehn@vermont.gov
6     *Attorney for Plaintiff State of Vermont*

7     BRIAN L. SCHWALB
      Attorney General for the District of Columbia
8     COTY MONTAG
      Deputy Attorney General
9     Public Advocacy Division
      WILLIAM STEPHENS
10    Assistant Deputy Attorney General
      Public Advocacy Division
11
      */s/ Nicole S. Hill*
12    NICOLE S. HILL
      Assistant Attorney General
13    Office of the Attorney General for the
      District of Columbia
14    400 Sixth Street, N.W.
      Washington, D.C. 20001
15    (202) 727-4171
      nicole.hill@dc.gov
16    *Attorneys for Plaintiff District of Columbia*

17    ANNE E. LOPEZ
      Attorney General
18
      *s/ Erin N. Lau*
19    Erin N. Lau 009887
      465 South King St., Room 200
20    Honolulu, Hawaii 96813
      Erin.N.Lau@hawaii.gov
21    *Counsel for the State of Hawaii*

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

AARON M. FREY
Attorney General

2

*s/ Halliday Moncure*

3

Halliday Moncure, Bar No. 4559
Assistant Attorney General

4

Office of the Maine Attorney General
6 State House Station

5

Augusta, ME 04333-0006
(207) 626-8800

6

halliday.moncure@maine.gov

7

ANTHONY G. BROWN
Attorney General of Maryland

8

*s/ Joshua M. Segal*

9

JOSHUA M. SEGAL
Principal Deputy Solicitor General

10

Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor

11

Baltimore, Maryland 21202
(410) 576-6446

12

jsegal@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

13

14

KEITH ELLISON
Attorney General
State of Minnesota

15

*s/ Liz Kramer*

16

LIZ KRAMER (#0325089)
Solicitor General

17

ANNA VEIT-CARTER (#0392518)
Assistant Attorney General

18

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131

19

(651) 757-1010 (Voice)
(651) 282-5832 (Fax)

20

liz.kramer@ag.state.mn.us
anna.veit-carter @ag.state.mn.us

21

*Attorneys for Plaintiff State of Minnesota*

22

PL. STATES' REPLY IN SUPP. OF
MOT. FOR SUMM. J. AND OPP'N TO
DEFS.' CROSS-MOT. FOR SUMM. J.

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Pennsylvania Governor's Office of General Counsel

*s/ Michael J. Fischer*
MICHAEL J. FISCHER, Pa. Bar No. 322311
Executive Deputy General Counsel
AIMEE D. THOMSON, Pa. Bar No. 326328
Deputy General Counsel
Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
aimeethomson@pa.gov
*Attorneys for the Commonwealth of Pennsylvania*

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on March 31, 2025, I electronically filed the foregoing

3   with the Clerk of the Court using the CM/ECF System, which in turn automatically

4   generated a Notice of Electronic Filing (NEF) to all parties in the case who are

5   registered users of the CM/ECF system. The NEF for the foregoing specifically

6   identifies recipients of electronic notice.

7          I declare under penalty of perjury under the laws of the State of Washington

8   and the United States of America that the foregoing is true and correct.

9          DATED this 31st day of March 2025, at Seattle, Washington.

10                                             <u>*s/ Lauryn K. Fraas*</u>
                                               LAURYN K. FRAAS, WSBA #53238
11                                             Assistant Attorney General

12

13

14

15

16

17

18

19

20

21

22